1  John A. Vogt (State Bar No. 198677)
2  javogt@jonesday.com
   Edward S. Chang (State Bar No. 241682)
3  JONES DAY
4  3161 Michelson Drive
   Suite 800
5  Irvine, CA 92612.4408
6  Telephone:  +1.949.851.3939
   Facsimile:  +1.949.553.7539
7
8  Michael A. Carvin (*Pro Hac Vice To Be Filed*)
   macarvin@JonesDay.com
9  James M. Burnham (*Pro Hac Vice To Be Filed*)
10 JONES DAY
   51 Louisiana Avenue, N.W.
11 Washington, D.C. 20001.2113
12 Telephone:  +1.202.879.3939
   Facsimile:  +1.202.626.1700
13
14 Michael E. Rosman (*Pro Hac Vice To Be Filed*)
   rosman@cir-usa.org
15 Center for Individual Rights
16 1233 20th St. NW, Suite 300
   Washington, DC 20036
17 Telephone:  +1.202.833.8400
18
19 ATTORNEYS FOR PLAINTIFFS

20              UNITED STATES DISTRICT COURT

21           CENTRAL DISTRICT OF CALIFORNIA

22                 SOUTHERN DIVISION

23

24  REBECCA FRIEDRICHS; SCOTT          Case No. **SACV13-676 JST(CWx)**
25  WILFORD; JELENA FIGUEROA;
    GEORGE W. WHITE, JR.; KEVIN
26  ROUGHTON; PEGGY SEARCY;            **COMPLAINT**
27  JOSE MANSO; HARLAN ELRICH;
    KAREN CUEN; IRENE ZAVALA;
28  CHRISTIAN EDUCATORS

1  ASSOCIATION INTERNATIONAL,

2          Plaintiffs,

3       v.

4
   CALIFORNIA TEACHERS
5  ASSOCIATION; NATIONAL
   EDUCATION ASSOCIATION;
6  SAVANNA DISTRICT TEACHERS
7  ASSOCIATION, CTA/NEA;
   SADDLEBACK VALLEY
8  EDUCATORS ASSOCIATION;
   ORANGE UNIFIED EDUCATION
9  ASSOCIATION, INC.; KERN HIGH
10 SCHOOL TEACHERS
   ASSOCIATION; NATIONAL
11 EDUCATION ASSOCIATION-
12 JURUPA; SANTA ANA
   EDUCATORS ASSOCIATION, INC.;
13 TEACHERS ASSOCIATION OF
14 NORWALK-LA MIRADA AREA;
   SANGER UNIFIED TEACHERS
15 ASSOCIATION; ASSOCIATED
16 CHINO TEACHERS; SAN LUIS
   OBISPO COUNTY EDUCATION
17 ASSOCIATION; SUE JOHNSON;
18 CLINT HARWICK; MICHAEL L.
   CHRISTENSEN; DONALD E.
19 CARTER; ELLIOTT DUCHON;
20 THELMA MELENDEZ DE SANTA
   ANA; RUTH PEREZ; MARCUS P.
21 JOHNSON; WAYNE JOSEPH;
22 JULIAN D. CROCKER,
23
          Defendants.
24

25

26

27

28

Plaintiffs Rebecca Friedrichs, Scott Wilford, Jelena Figueroa, George W. White, Jr., Kevin Roughton, Peggy Searcy, Jose Manso, Harlan Elrich, Karen Cuen, Irene Zavala, and Christian Educators Association International ("CEAI"), by and through their undersigned counsel, allege as follows:

## INTRODUCTION

1.     The First Amendment to the United States Constitution protects the individual rights of free speech and free association, including the right to withhold support from political causes and activities that conflict with one's beliefs.  "When a State establishes an 'agency shop' that exacts compulsory union fees as a condition of public employment, the dissenting employee is forced to support financially an organization with whose principles and demands he may disagree.  Because a public-sector union takes many positions during collective bargaining that have powerful political and civic consequences, the compulsory fees constitute a form of compelled speech and association that imposes a significant impingement on First Amendment rights."  *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2289 (2012) (citations and alterations omitted).

2.     The State of California (the "State") and its public school districts, in cooperation with the California Teachers Association ("CTA") and the other named Defendants, maintain an "agency shop" arrangement that injures public school teachers, including Plaintiffs, by forcing them to make financial contributions to teachers' unions as a condition of public employment.  This agency-shop arrangement is established and maintained under color of State law, the California Educational Employment Relations Act ("EERA"), Cal. Gov't Code § 3540 *et seq*. Each year, the unions estimate a breakdown of expenditures that will be "chargeable" (*i.e.*, germane to collective bargaining) and "non-chargeable" (*i.e.*, political or ideological and not germane to collective bargaining).  Teachers are required to contribute to the union's "chargeable" expenditures.  Teachers who wish to avoid contributing to a union's "non-chargeable" expenditures are annually forced

1    to affirmatively express that they do not wish to contribute.  Each year they must
2    send the union a new notice indicating their objection.

3         3.      This "opt out" process is unnecessarily burdensome and time-
4    consuming and is susceptible to resistance and pressure from the unions and their
5    members.

6         4.      Even if a teacher successfully completes the "opt out" process, he or
7    she is still forced to pay the "chargeable" portion of fees to support the union's
8    collective-bargaining activities.  Any teacher who objects to the union's
9    classification of certain expenditures as "chargeable" must bear the additional
10   burden and expense of filing a legal challenge.

11        5.      California's "agency shop" arrangement violates Plaintiffs' First
12   Amendment rights in two distinct ways.  First, the agency-shop arrangement violates
13   their rights of free speech and association by forcing them to contribute to so-called
14   "chargeable" union expenditures germane to collective bargaining, even though
15   those contributions provide economic support to "non-chargeable" union activities
16   and even though many of the "chargeable" expenditures and collective-bargaining
17   activities are contrary to Plaintiffs' personal interests and political beliefs.  Second,
18   the agency-shop arrangement violates Plaintiffs' rights of free speech and
19   association by forcing them to undergo an "opt out" process each year to avoid
20   contributing to political and ideological expenditures that the unions concede are not
21   germane to collective bargaining.

22        6.      These severe infringements on Plaintiffs' rights to free speech and
23   association cannot withstand First Amendment scrutiny.  Laws mandating
24   compulsory speech and association must be narrowly tailored to serve a compelling
25   government interest.  California's "agency shop" arrangement cannot meet that
26   standard.  Requiring forced contributions of non-members for collective bargaining-
27   efforts in the public sector serves no compelling state interest and is not narrowly
28   tailored.  Requiring non-members to contribute to "non-chargeable" union

expenditures unless they go through an annual opt-out process also serves no compelling state interest and is not narrowly tailored.

7.      It is clear that the California's "agency shop" does not serve the interests of all public school teachers.  In the course of collective bargaining, unions frequently take politically controversial positions that contradict the deeply held beliefs of some teachers, who do not believe the policies advocated by unions to be in their best interest, or in the best interest of society at large.  For example, unions consistently "bargain" for provisions requiring increased State spending, and against important educational reforms which some teachers believe would benefit teachers, students, and taxpayers.  Even in purely material terms, "seniority" protections and other employment protections advocated by unions benefit some teachers at the expense of other teachers who would fare better under an alternative system.

8.      Recognizing that compulsory agency fees violate the First Amendment will not undermine the unions' authority or entitlement to engage in collective bargaining.  The unions will remain the exclusive collective-bargaining agents in each school district as long as they retain the support of a majority of teachers in those districts.  Public school teachers will, therefore, remain fully entitled to join together and collectively bargain through the unions for any and all desired labor protections.

9.      Given the severe and ongoing infringement of Plaintiffs' rights to free speech and free association, Plaintiffs respectfully request that this Court declare that California's practice of forcing non-union members to contribute funds to unions, including funds to support their collective-bargaining activities, violates the First Amendment, and enjoin Defendants from enforcing this unconstitutional arrangement.

10.      Plaintiffs additionally request that this Court declare that the Defendants' practice of requiring an annual affirmative "opt out" to avoid

1  contributing to "non-chargeable" union expenditures violates the First Amendment,
2  and enjoin Defendants from imposing this unconstitutional burden.

3                                          **PARTIES**

4          11.    Plaintiff Rebecca Friedrichs has been a public school teacher in the
5  Savanna School District for 25 years.  She resigned her union membership in 2012
6  and opted out of paying the non-chargeable portion of the agency fees.  But for
7  California's "agency shop" arrangement, Ms. Friedrichs would not pay fees to or
8  otherwise subsidize the teachers' union, and she objects to the State's forced
9  subsidization policy.  She objects to many of the unions' public policy positions,
10 including positions taken in collective bargaining.

11         12.    Plaintiff Scott Wilford has been a public school teacher in California
12 for 20 years.  He has been a teacher in the Saddleback Valley School District for 14
13 years.  He resigned his union membership in 2009.  Every year since, he has opted
14 out of paying the non-chargeable portion of the agency fees.  But for California's
15 "agency shop" arrangement, Mr. Wilford would not pay fees to or otherwise
16 subsidize the teachers' union, and he objects to the State's forced subsidization
17 policy.  He objects to many of the unions' public policy positions, including
18 positions taken in collective bargaining.

19         13.    Plaintiff Jelena Figueroa has been a public school teacher in the Orange
20 Unified School District for ten years.  She resigned her union membership in 2008.
21 Every year since, she has opted out of paying the non-chargeable portion of the
22 agency fees.  But for California's "agency shop" arrangement, Ms. Figueroa would
23 not pay fees to or otherwise subsidize the teachers' union, and she objects to the
24 State's forced subsidization policy.  She objects to many of the unions' public policy
25 positions, including positions taken in collective bargaining.

26         14.    Plaintiff George W. White, Jr., has been a public school teacher in the
27 Kern High School District for 28 years.  He resigned his union membership in 2000.
28 Every year since, he has opted out of paying the non-chargeable portion of the

agency fees.  But for California's "agency shop" arrangement, Mr. White would not pay fees to or otherwise subsidize the teachers' union, and he objects to the State's forced subsidization policy.  He objects to many of the unions' public policy positions, including positions taken in collective bargaining.

15.  Plaintiff Kevin Roughton has been a public school teacher in the Jurupa Unified School District for eleven years.  He resigned his union membership in 2008.  Every year since, he has opted out of paying the non-chargeable portion of the agency fees.  But for California's "agency shop" arrangement, Mr. Roughton would not pay fees to or otherwise subsidize the teachers' union, and he objects to the State's forced subsidization policy.  He objects to many of the unions' public policy positions, including positions taken in collective bargaining.

16.  Plaintiff Peggy Searcy has been a public school teacher in the Santa Ana Unified School District for 23 years.  She resigned her union membership in or about 2010.  Every year since, she has opted out of paying the non-chargeable portion of the agency fees.  But for California's "agency shop" arrangement, Ms. Searcy would not pay fees to or otherwise subsidize the teachers' union, and she objects to the State's forced subsidization policy.  She objects to many of the unions' public policy positions, including positions taken in collective bargaining.

17.  Plaintiff Jose Manso began teaching in 1979.  He left the profession for a 23-year period and returned to teaching fulltime in the Norwalk-La Mirada Unified School District in 2002.  He resigned his union membership in 2010.  Every year since, he has opted out of paying the non-chargeable portion of the agency fees.  But for California's "agency shop" arrangement, Mr. Manso would not pay fees to or otherwise subsidize the teachers' union, and he objects to the State's forced subsidization policy.  He objects to many of the unions' public policy positions, including positions taken in collective bargaining.

18.  Plaintiff Harlan Elrich has been a public school teacher for over 26 years and has been a public school teacher in California for over 20 years.  He has

- 5 -

been a teacher in the Sanger Unified School District for 8 years.  He resigned his

union membership in 2012 and opted out of paying the non-chargeable portion of

the agency fees.  But for California's "agency shop" arrangement, Mr. Elrich would

not pay fees to or otherwise subsidize the teachers' union, and he objects to the

State's forced subsidization policy.  He objects to many of the unions' public policy

positions, including positions taken in collective bargaining.

19.     Plaintiff Karen Cuen has been a public school teacher in California for

25 years.  She has been a teacher in the Chino Valley Unified School District for 20

years.  She resigned her union membership in 1997.  Every year since, she has opted

out of paying the non-chargeable portion of the agency fees.  But for California's

"agency shop" arrangement, Ms. Cuen would not pay fees to or otherwise subsidize

the teachers' union, and she objects to the State's forced subsidization policy.  She

objects to many of the unions' public policy positions, including positions taken in

collective bargaining.

20.     Plaintiff Irene Zavala has been a public school teacher in California for

13 years.  She began teaching in San Luis Obispo County in 2012.  She resigned her

union membership in 2001.  Because of her religious principles, Mrs. Zavala is a

religious objector under Cal. Gov't Code § 3546.3 (providing that "any employee

who is a member of a religious body whose traditional tenets or teachings include

objections to joining or financially supporting employee organizations shall not be

required to join, maintain membership in, or financially support any employee

organization as a condition of employment; except that such employee may be

required, in lieu of a service fee, to pay sums equal to such service fee either to a

nonreligious, nonlabor organization, charitable fund . . . chosen by such employee

from a list of at least three such funds, designated in the organizational security

arrangement").  To qualify as a religious objector under her union's collective-

bargaining agreement and California law, *id.*, Mrs. Zavala had to send a letter

confirming her religious objections to making contributions to the union.  She then

had to engage in protracted e-mail correspondence with union and district officials to ensure that her objections were processed.  In accordance with State law, once Mrs. Zavala's objection was properly processed, she was required to donate the full amount of the agency fee—not merely the chargeable portion—to one of three State-approved charities specified in the collective-bargaining agreement.  *See* San Luis Obispo County Collective Bargaining Agreement, Art. 12.4.2 (attached as Ex. A). But for California's "agency shop" arrangement, Mrs. Zavala would not pay fees to or otherwise subsidize the teachers' union, would decide for herself how much to donate in charitable contributions every year, and would not have her charitable contributions constrained by a collective-bargaining agreement.  She objects to the State's agency-shop law, and to many of the unions' public policy positions, including positions taken in collective bargaining.

21.   Plaintiff CEAI is a non-profit religious organization that is the only professional association specifically serving Christians working in public schools. Founded and incorporated in the state of California, CEAI's membership consists of teachers, administrators, and para-professionals, and many other public and private school employees.  In addition, CEAI offers associate membership to parents, pastors, school-board members, youth leaders, and others concerned or interested in the education of the nation's children.  CEAI has approximately 600 members in the State of California, most of whom are subject to the unconstitutional arrangements outlined herein.  Some of the individual Plaintiffs here—Kevin Roughton, Irene Zavala, Peggy Searcy, Jose Manso, Rebecca Friedrichs, and Harlan Elrich—are CEAI members.  CEAI and its members object on policy grounds to the positions taken by teachers' unions in the collective bargaining process and outside of that process.  The interests that CEAI seeks to protect in this lawsuit are germane to the organization's purpose, and neither the claims asserted nor the relief requested require the participation in this lawsuit of CEAI's individual members.  In addition, Defendants' conduct pursuant to the State's agency-shop laws has the effect of

creating a drain on CEAI's resources.  There is a direct conflict between CEAI's mission and the challenged agency-shop arrangements, and CEAI engages in counseling, referral, advocacy, and educational services relating to California's agency-shop arrangements, independently of this litigation.

22.     Defendant National Education Association ("NEA") is the largest teachers' union in the United States and one of the largest public-sector unions.  It receives a share of the agency fees that are extracted from Plaintiffs and other public-school teachers under California's agency-shop laws.  It has annual revenues of over $400 million per year.  NEA is a major participant in political activities at the national, state, and local levels.

23.     Defendant California Teachers Association ("CTA") is the state affiliate of NEA.  It is the largest teachers' union in California and one of the largest public-employee unions in the United States.  It receives a share of the agency fees that are extracted from Plaintiffs and other public-school teachers under California's agency-shop laws.  It has annual revenues of over $175 million per year.  CTA is a major participant in California politics and is heavily active at all levels of state and local government.

24.     Defendant Savanna District Teachers Association, CTA/NEA is the local union that is recognized as the exclusive bargaining representative in the Savanna School District.  Its state affiliate is CTA and its national affiliate is NEA.

25.     Defendant Saddleback Valley Educators Association is the local union that is recognized as the exclusive bargaining representative in the Saddleback Valley Unified School District.  Its state affiliate is CTA and its national affiliate is NEA.

26.     Defendant Orange Unified Education Association, Inc. is the local union that is recognized as the exclusive bargaining representative in the Orange Unified School District.  Its state affiliate is CTA and its national affiliate is NEA.

27.   Defendant Kern High School Teachers Association is the local union that is recognized as the exclusive bargaining representative in the Kern High School District.  Its state affiliate is CTA and its national affiliate is NEA.

28.   Defendant National Education Association-Jurupa is the local union that is recognized as the exclusive bargaining representative in the Jurupa Unified School District.  Its state affiliate is CTA and its national affiliate is NEA.

29.   Defendant Santa Ana Educators Association, Inc. is the local union that is recognized as the exclusive bargaining representative in the Santa Ana Unified School District.  Its state affiliate is CTA and its national affiliate is NEA.

30.   Defendant Teachers Association of Norwalk-La Mirada Area is the local union that is recognized as the exclusive bargaining representative in the Norwalk-La Mirada Unified School District.  Its state affiliate is CTA and its national affiliate is NEA.

31.   Defendant Sanger Unified Teachers Association is the local union that is recognized as the exclusive bargaining representative in the Sanger Unified School District.  Its state affiliate is CTA and its national affiliate is NEA.

32.   Defendant Associated Chino Teachers is the local union that is recognized as the exclusive bargaining representative in the Chino Valley Unified School District.  Its state affiliate is CTA and its national affiliate is NEA.

33.   The San Luis Obispo County Education Association is the local union that is recognized as the exclusive bargaining representative in the San Luis Obispo County Office of Education.  Its state affiliate is CTA and its national affiliate is NEA.

34.   Defendant school superintendents are the executive officers in charge of the school districts that employ Plaintiff teachers, pay Plaintiff teachers' wages, and process all deductions therefrom, including for union dues and "agency fees" pursuant to "agency shop" arrangements authorized by State law.  Cal. Gov't Code §

3540 *et seq.*, Cal. Educ. Code § 45061.  Defendant school superintendents are sued in their official capacity.

35.     Defendant Sue Johnson is the superintendent of Savanna School District, and is the executive officer who implements the deduction of agency fees from the paychecks of Plaintiff Rebecca Friedrichs.

36.     Defendant Clint Harwick is the superintendent of the Saddleback Valley Unified School District, and is the executive officer who implements the deduction of agency fees from the paychecks of Plaintiff Scott Wilford.

37.     Defendant Michael L. Christensen is the superintendent of the Orange Unified School District, and is the executive officer who implements the deduction of agency fees from the paychecks of Plaintiff Jelena Figueroa.

38.     Defendant Donald E. Carter is the superintendent of the Kern High School District, and is the executive officer who implements the deduction of agency fees from the paychecks of Plaintiff George W. White, Jr.

39.     Defendant Elliott Duchon is the superintendent of the Jurupa Unified School District, and is the executive officer who implements the deduction of agency fees from the paychecks of Plaintiff Kevin Roughton.

40.     Defendant Thelma Meléndez de Santa Ana is the superintendent of the Santa Ana Unified School District, and is the executive officer who implements the deduction of agency fees from the paychecks of Plaintiff Peggy Searcy.

41.     Defendant Ruth Pérez is the superintendent of the Norwalk-La Mirada Unified School District, and is the executive officer who implements the deduction of agency fees from the paychecks of Plaintiff Jose Manso.

42.     Defendant Marcus P. Johnson is the superintendent of the Sanger Unified School District, and is the executive officer who implements the deduction of agency fees from the paychecks of Plaintiff Harlan Elrich.

43.     Defendant Wayne Joseph is the superintendent of the Chino Valley Unified School District, and is the executive officer who implements the deduction of agency fees from the paychecks of Plaintiff Karen Cuen.

44.     Defendant Julian D. Crocker is the superintendent of the San Luis Obispo County Office of Education, and is the executive officer who implements the deduction of agency fees from the paychecks of Plaintiff Irene Zavala.

## JURISDICTION AND VENUE

45.     This is an action under the Federal Civil Rights Act of 1871, 42 U.S.C. § 1983, to redress the deprivation, under color of state law, of rights, privileges and immunities secured to Plaintiffs by the Constitution of the United States, particularly the First and Fourteenth Amendments

46.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).  Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

47.     Venue is proper in this district under 28 U.S.C. § 1391(b).

48.     An actual controversy currently exists between the parties concerning the constitutionality of California's "agency shop" arrangement.  That controversy is justiciable in character, and relief is necessary to preserve Plaintiffs' rights and prevent future harm to Plaintiffs.

49.     California's "agency shop" arrangement imposes a cognizable injury on Plaintiffs by forcing them or their members to contribute money in support of union activities, and by forcing them to bear a substantial burden in order to "opt out" of supporting union activities that the unions themselves classify as political and unrelated to collective bargaining.

## FACTUAL ALLEGATIONS

**I.     California's "Agency Shop" Law for Public-School Teachers**

50.     Under California law, a union may become the exclusive bargaining representative for "public school employees" in a bargaining unit (usually a public

school district) by submitting adequate proof that a majority of such employees in the unit wish to be represented exclusively by the union.  Cal. Gov't Code §§ 3544, 3544.1.  "Public school employee" for these purposes is statutorily defined as "a person employed by a public school employer except persons elected by popular vote, persons appointed by the Governor of this state, management employees, and confidential employees [who facilitate employee relations on behalf of management]."  *Id.* § 3540.1(j).  When a union is designated as the exclusive representative, all the "public school employees" in that district are represented exclusively by the union for purposes of bargaining with the district.  *Id.* § 3543.1(a).

51.    California law defines the "terms and conditions of employment," concerning which the unions may collectively bargain, to include a wide range of issues at the heart of education policy.  *Id.* § 3543.2(a).  These topics of collective bargaining include wages, hours of employment, and other terms and conditions of employment, such as "health and welfare benefits," "leave," "transfer and reassignment policies," "safety conditions of employment," "class size," and "procedures to be used for the evaluation of employees."  *Id.*

52.    Under State law, a union that has been recognized as the exclusive bargaining representative for a school district can enter into an agency-shop arrangement (also known as an "organizational security agreement") with that district.  While teachers in the district are not required to become members of the union, they are required to pay fees to the union as a condition of their employment.  *Id.* § 3546(a).  State law authorizes the union to collect these "agency fees" from all teachers in the district to fund the union's operations and expenditures.  *Id.*  Under California law, the category of expenses covered by agency fees "may include, but shall not necessarily be limited to, the cost of lobbying activities designed to foster collective bargaining negotiations and contract administration, or to secure for the represented employees advantages in wages, hours, and other conditions of

employment in addition to those secured through meeting and negotiating with the employer." *Id.* § 3546(b).  Under the statute, the full amount of the "agency fee" charged to non-members is determined by the union and "shall not exceed the dues that are payable by members" of the union.  *Id.* § 3546(a).  In practice, the amount of agency fees is typically equivalent to the amount of union dues.

53.    If a teacher chooses to be a member of the union that is the exclusive representative in his or her district, the school district collects the full amount of union dues from that teacher and forwards them to the union.  *Id.* § 3543.1(d).  *See also* Cal. Educ. Code §§ 45060, 45061, 45061.5, 45168.  Non-union teachers are required to pay the above-described "agency fees" to the union.  Each year, the union must send out a "*Hudson*" notice indicating the percentage of the agency fees that will be "non-chargeable," *i.e.*, "not devoted to the cost of negotiations, contract administration, and other activities of the employee organization that are germane to its function as the exclusive bargaining representative."  Cal. Gov't Code § 3546(a).  If a teacher who is not a member of the union affirmatively responds to the notice by indicating he or she would like to "opt out" of paying the "non-chargeable" portion of the fee, he or she is entitled to a rebate or fee reduction for that year.  *Id.*; *see also* Regs. of Cal. Pub. Emp't Relations Bd. § 32992.  Absent such an affirmative "opt out," the non-member pays the full amount of the fee.

54.    Under State law, each school district may deduct agency fees from teachers' paychecks and pay the fees to the union recognized for that district.  Cal. Gov't Code § 3546(a).  Alternatively, "any employee may pay service fees directly to the [union] in lieu of having such service fees deducted from the salary or wage order."  Cal. Educ. Code § 45061.  The amount of the total agency fee is determined by the union based on an estimate of its expenditures in the coming year.  The "chargeable" and "non-chargeable" portions of the fee are calculated by the union based on an audited financial report for a recent year of the union's expenditures.  The union is required to include the audited financial report along with the

1    breakdown of "chargeable" and "non-chargeable" expenditures in the annual

2    "*Hudson*" notice sent out to teachers.  *See* Regs. of Cal. Pub. Emp't Relations Bd.

3    § 32992(b)(1).

4        55.    An agency fee payer who disagrees with the union's determination of

5    the chargeable portion of the agency fee may file a challenge with the union after

6    receiving the "*Hudson*" notice.  Upon receipt of an agency fee challenge, the union

7    must request a prompt hearing regarding the agency-fee breakdown before an

8    impartial decisionmaker selected by either the American Arbitration Association or

9    the California State Mediation Service.  *Id.* § 32994.

10   **II.    The "Agency Shop" Arrangements in California's Public School**

11   **        Districts**

12       56.    Under color of state law, Cal. Gov't Code § 3540 *et seq*., Defendant

13   local unions have been designated the exclusive bargaining agents for the school

14   districts in which Plaintiffs are employed as teachers.

15       57.    Under color of State law, *id.*, Defendant local unions have entered into

16   agency-shop agreements with the school districts where Plaintiffs are employed as

17   teachers.  These agreements include provisions requiring that all teachers in these

18   districts either join the unions, or else pay agency fees to the unions.  The

19   agreements also provide that teachers must contribute to "non-chargeable" union

20   expenditures unless they go through an opt-out process.

21       58.    For each school district in which Plaintiffs are employed, the total

22   agency-fee amount is determined by the local union that is recognized as the

23   exclusive bargaining representative for that district, often in collaboration with CTA.

24   After the local union or CTA informs the school district of the annual agency-fee

25   amount, the school district automatically deducts that amount in pro rata shares from

26   the teacher's regular paychecks (or, in some cases, the "chargeable" portions of the

27   fee for teachers who "opted out" of "non-chargeable" fees) unless the teacher

28   informs the district that he or she will pay the union directly.  The school district

- 14 -

1  sends the deducted amounts directly to the local union, which then distributes part of

2  the fees to CTA and NEA.

3        59.    For each school district in which Plaintiffs are employed, the local

4  union's agency fee includes "affiliate fees" for both CTA and NEA, which are the

5  state and national affiliates of the local union.  The amount of the affiliate fees are

6  uniform in every school district because they are determined on a statewide and

7  nationwide basis by CTA and NEA, respectively.

8        60.    For each school district in which Plaintiffs are employed, CTA and

9  NEA "affiliate fees" are treated as partially "chargeable."  The "chargeable" portion

10  of the "affiliate fees" is based on the "chargeable" portion of all statewide and

11  nationwide expenditures by CTA and NEA.  Thus, the portions of CTA and NEA

12  "affiliate fees" deemed "chargeable" to teachers in local school districts are not

13  designed to correspond to actual collective-bargaining expenditures made by CTA

14  and NEA within those districts.  Rather, they are based on the overall breakdown of

15  CTA and NEA "chargeable" expenditures in California and the United States,

16  respectively.

17        61.    For each school district in which plaintiffs are employed, the

18  "chargeable" and "non-chargeable" portions of the agency fees are calculated based

19  on an audit of the union expenditures in a recent year.  The auditors confirm that the

20  union expenditures were made as indicated, but do not confirm that the union has

21  properly classified the expenditures as "chargeable" or "non-chargeable."

22        62.    Teachers who are not union members receive an annual *Hudson*"

23  notice each fall, giving them a breakdown of the "chargeable" and "non-chargeable"

24  portion of the agency fee.  Upon receiving this notice, teachers who are not union

25  members have the option of undergoing the "opt out" process, which requires them

26  to object to the "non-chargeable" portion of the agency fee within approximately six

27  weeks.  If a teacher succeeds in making a timely objection, the union either refrains

28  from collecting the non-chargeable portion of the agency fee or sends a "rebate"

check to the teacher equal to the non-chargeable portion of the annual agency fee. Teachers who receive the "*Hudson*" notice also have the option to file a legal challenge to the union's calculation of the "chargeable" and "non-chargeable" portions of the agency fee.

63.    Annual dues (or agency fees for non-members) typically consume roughly two percent of a new teacher's salary, and sometimes increase regardless of whether there is an increase in teacher pay.  The total amount of annual dues generally exceeds $1,000 per teacher, while the amount of the refund received by nonmembers who successfully opt out of the non-chargeable portion of their agency fees is generally around $350 to $400.

64.    In order to participate in this "opt out" process, the teacher cannot be a member of the union.  This means that teachers who "opt out" must forgo the ability to obtain direct benefits through the union, some of which benefits are typically (and would likely otherwise be) obtainable through one's employer.  For example, teachers who "opt out" are unable to obtain disability insurance as part of their employment package.  *See, e.g.*, CTA, *Member Benefits*, http://archive.cta.org/MemberBenefits/Disability.html ("Most school districts do not provide disability insurance coverage for their employees."); *id.* ("The CTA Voluntary Disability Plan provides benefits to members when they become totally disabled for any reason.").  Such insurance is necessary to, among other things, provide teachers on maternity leave with monies approximating their regular salary. Most school districts provide only differential pay during maternity leave (that is, "the amount remaining of your salary after the district pays a substitute to fill your position," CTA, *Pregnancy and Parental Leave Rights*, http://ctainvest.org/home/insurance-estate-planning/disability-long-term/pregnancy-and-parental-leave-rights.aspx), leaving disability insurance to make up the difference).  *See* CTA, *Member Benefits*; CTA, *How is CTA saving you money?*,

http://www.cta.org/Professional-Development/Publications/2012/12/December-2012-Educator-Magazine/How-CTA-is-saving-you-money.aspx.

65.     The defendant unions invoke teachers' inability to obtain disability insurance through their school district employers when encouraging non-members to join the union. *See, e.g.*, Kern High Teachers Association Letter (undated) ("If you join CTA, you are eligible for income protection [in the event of a disability] through the insurance provider The Standard.") (attached as Ex. B).

66.     Plaintiffs or their members are subject to these "agency shop" arrangements in the school districts where they teach.

67.     In recent years, NEA has deemed approximately 40 percent of its expenditures to be "chargeable." CTA has deemed approximately 65 percent of its expenditures to be "chargeable." Local unions often use the same chargeability percentage as CTA. This practice is apparently based on a "local union presumption," which presumes that local unions tend to spend as much or more of their budgets on collective bargaining as do their state affiliates.

68.     Dues and agency fees yield significant revenues for the unions. For example, CTA's revenue in 2009 was $186 million, primarily from membership dues and fees. In 2011, it was over $191 million, over $178 million of which came from membership dues and fees.

69.     CTA spent over $211 million in political expenditures from 2000 through 2009. CTA's largest single expenditure, of over $26 million, was made to successfully oppose Proposition 38 on the 2000 ballot, which would have enacted a school-voucher system in California and thereby increased the potential employment pool for teachers. CTA also spent over $50 million to oppose three ballot initiatives in 2005, including Proposition 74, which sought to make changes in the probationary period for California school teachers; Proposition 75, which sought to prohibit the use of public employee agency fees for political contributions without

1   individual employees' prior consent; and Proposition 76, concerning state spending

2   and minimum school-funding requirements.  *See* California Fair Political Practices

3   Commission, *Big Money Talks*, at 11-12 (Mar. 2010),

4   http://www.fppc.ca.gov/reports/Report38104.pdf.  CTA also takes public positions

5   on a wide range of issues both related and unrelated to the educational system.  For

6   example, CTA opposes school vouchers (CTA, *Issues & Action:  Vouchers,*

7   http://www.cta.org/Issues-and-Action/Education-Reform/Vouchers.aspx) and

8   supports immigration reform that provides "timely legalization without regard to

9   national origin" (CTA, *Issues in Action:  Immigration*, http://www.cta.org/en/Issues-

10  and-Action/Ongoing-Issues/Immigration.aspx).

11      70.    CTA is a major donor to the California Democratic Party.  From 2003

12  to 2012, CTA spent nearly $102 million on political contributions, with only 0.08

13  percent of that money going to Republicans.  *See*  Troy Senik, *The Worst Union in*

14  *America*, City Journal (Spring 2012). CTA also spends money on direct political

15  advocacy, much of which is on issues with no connection to education.  For

16  example, the California Teachers Association spent over $1 million in opposition to

17  Proposition 8 (the gay marriage initiative).  *See, e.g.*, Evelyn Larrubia, *$1 million*

18  *from teachers' union to oppose Prop. 8*, L.A. Times (Oct. 17, 2008),

19  http://articles.latimes.com/2008/oct/17/local/me-teachers17.

20      71.    CTA also encourages its members to engage in extensive political

21  activism in the public schools where they work.  For example, as part of a recent

22  campaign to lobby the State Legislature on school funding issues, *see* State of

23  Emergency, *About* (explaining the reasons for CTA's lobbying campaign),

24  http://castateofemergency.com/?page_id=158, CTA distributed a list of practices

25  that it suggested to its teacher-members as ways to further CTA's campaign in their

26  classrooms.  For example, CTA suggested that teachers:

27      •  "Take ½ photo of Assembly members and have kids draw the other half

28          with a message stating what they want for their teachers," State of

- 18 -

Emergency, *State Council Ideas for Potential Activities*, at 1,

http://www.eiaonline.com/CTAStateofEmergencyIdeas.pdf,

- Have their "students create a BIG poster on a school bus that is sent to Sacramento," *id.* at 5,

- Organize a "Student Video Contest" in which those teachers would conduct a "contest for youth to create a video about what education costs would mean to them," *id.* at 10.

72.    In coordination with their express political advocacy, California's teachers' unions routinely take positions in the collective-bargaining process that have profound political and budgeting consequences.

73.    NEA likewise engages in widespread political advocacy on a wide range of issues.  This includes support for firearm restrictions (NEA, *Sign the petition to keep students safe from gun violence*, http://educationvotes.nea.org/gun-violence-petition/) and support for the Affordable Care Act (NEA, *Affordable Health Care for America*, http://www.nea.org/home/16326.htm).

74.    CTA classifies expenditures as being "chargeable"—and thus germane to collective bargaining—even when those expenditures appear to have little to do with collective bargaining.  For example, in 2010-2011:

- CTA classified its expenditures on "Human Rights Programs," including a "Gay/Lesbian Program," as being 100% chargeable.  *See* CTA Combined Financial Statement, at 21 (Aug. 31, 2011) (attached as Ex. C),

- CTA classified a "GLBT Conference" as being 71.3% chargeable, *id.* at 23, and

- CTA also deems publication and dissemination of its internal magazine, *The California Educator*, to be 78.4% chargeable, *id.* at 20.

Further, while the documents that CTA gives to teachers do not provide much detail on the activities underlying the listed charges, those documents do further reflect that CTA deems "Regional Services" to be 93.1% chargeable, *id.* at 17, despite

"Regional Services" appearing to contain expenditures on numerous activities of a non-bargaining-related nature.  *See id.* at 28-29 (listing as several targets of "emphasis" in 2010-2011, "[e]xpanding the CTA membership base"; "[a]ssistance with chapter organization"; "identification and development of local issues"; "[o]rganizing and training for political action and community outreach").

75.     CTA maintains that "[c]hargeable expenses generally include those related to" policy strategizing or public polling.  *Id* at 34.  ("[s]trategic planning and polling on priorities for association activities").

76.     NEA likewise classifies expenditures as "chargeable" even when those expenditures appear to have little to do with collective bargaining.  For example, in 2010-2011, NEA deemed "[p]rovide technical and financial support to affiliates engaged in or preparing to engage in comprehensive salary campaigns" to be 76% chargeable.  *See* NEA Combined Financial Statements at 28 (Aug. 31, 2011) (attached as Ex. D).  NEA likewise deemed:

- "Provide resources to assist affiliates build capacity to support their initiatives designed to advance pro-public education policies for student learning and workforce quality," to 91.5% chargeable, *id.,*
- "Affiliate programs and services that increase membership," to be 73.38% chargeable, *id.,*
- "[B]uild[ing] affiliate capacity for membership growth through project funding and constituency group assistance," to be 81% chargeable, *id.* at 35,
- "Facilitate[] the development of NEA strategy and operations," "[i]mplement[] workplace culture initiative," and "[m]aintain[] NEA records archives," to be 80.9% chargeable, NEA Letter, *Chargable & Nonchargeble Audited Expenditures for the 2010-2011 Fiscal Year*, at 15 (Aug. 9, 2012) (attached as Ex. E), and

- Conferences for NEA staff to be 100% chargeable, *id.* at 16 ("Provided learning opportunities through the Leadership Institute that enhance NEA staff's professional skills and contribute to high performance.").

NEA also deems to be partially chargeable spending such as "[c]ommunicate the NEA beliefs, qualities, and services to engage members and improve target audiences' recognition of NEA through print and electronic media" (13.36% chargeable), NEA Combined Financial Statements, at 36 (Ex. D), "[i]ncrease efficient use of campaign tools, technology, and resources in all NEA targeted campaigns" (14.09% chargeable), *id.*, and "[p]artner with ethnic minority, civil rights, and other organizations to advance NEA's commitment to social justice" (36.76% chargeable), NEA Letter, *Chargable & Nonchargeble Audited Expenditures for the 2010-2011 Fiscal Year*, at 11 (Ex. E).

77. NEA has "determined that <u>chargeable</u> activities and expenditures were related to" expenditures that are devoted to setting employment terms in public schools that affect core education policy, NEA Combined Financial Statement, at 41 (Ex. D) ("specific terms and conditions of employment that may be negotiable, such as," for example, "promotions," "discharge," and "performance evaluation"), as well as NEA-sponsored award programs, *id.* at 42 ("NEA award programs").

## III.  California's "Agency Shop" Law Violates the First Amendment

78. California's agency-shop arrangement violates the First Amendment rights of Plaintiffs and other public-school teachers who are not voluntary union members. There is no justification—much less a compelling one—for mandating that Plaintiffs make contributions to support collective bargaining and the other activities of California's teachers' unions, which are among the most powerful and politically controversial organizations in the State. Particularly given the inherently political nature of collective bargaining and its profound economic consequences, the First Amendment forbids coercing any money from Plaintiffs to fund so-called

"chargeable" union expenditures.  Moreover, even if the First Amendment did somehow tolerate conditioning public employment on subsidizing the unions, there is still no justification for forcing Plaintiffs and other teachers to pay for political and ideological activities—expenditures that the unions themselves admit are "non-chargeable" under the First Amendment—unless they affirmatively "opt out" of making payments each year.

**A.    Conditioning Public Employment on the Payment of Mandatory Fees to Support Collective Bargaining is Unconstitutional.**

79.    As the Supreme Court has explained, "compulsory subsidies for private speech are subject to exacting First Amendment scrutiny and cannot be sustained unless two criteria are met.  First, there must be a comprehensive regulatory scheme involving a 'mandated association' among those who are required to pay the subsidy." *Knox*, 132 S. Ct. at 2289 (citing *United States v. United Foods, Inc.*, 533 U.S. 405, 414 (2001)).  "Such situations are exceedingly rare because . . . mandatory associations are permissible only when they serve a compelling state interest . . . that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* (citation omitted).  "Second, even in the rare case where a mandatory association can be justified, compulsory fees can be levied only insofar as they are a 'necessary incident' of the 'larger regulatory purpose which justified the required association.'" *Id.* (quoting *United Foods*, 533 U.S. at 414).

80.    Agency-shop arrangements impose a "significant impingement on First Amendment rights" because "[t]he dissenting employee is forced to support financially an organization with whose principles and demands he may disagree." *Ellis v. Bhd. of Ry., Airline & S.S. Clerks*, 466 U.S. 435, 455 (1984)).  This "impingement" is quite severe because "public-sector union[s] take[] many positions during collective bargaining that have powerful political and civic consequences." *Knox*, 132 S. Ct. at 2289.

81.    Moreover, "any procedure for exacting [union] fees from unwilling contributors must be carefully tailored to minimize the infringement of free speech rights." *Id.* at 2291 (citation omitted).  By contrast, "unions have no constitutional entitlement to the fees of nonmember-employees." *Id.* (citation omitted).  Rather, their "collection of fees from nonmembers is authorized by an act of legislative grace." *Id.* (citation omitted).

82.    California's agency-shop arrangement does not serve any compelling state interest, nor is it narrowly tailored to serve whatever interest the State may have.  There is no compelling or even persuasive evidence that compulsory agency fees are needed to achieve "labor peace" in California or its public schools, or that such a compulsory policy is the least restrictive means of securing equitable policies in public employment.

**B.    The "Opt Out" Requirement for Non-Chargeable Expenditures is Unconstitutional.**

83.    Under the State's agency-shop provisions, any public school teacher who wishes to withhold contributions to unions' non-chargeable expenditures must write a letter each year expressing that wish.  CTA must receive this letter by a hard deadline or the request to opt out will be denied and the teacher will be required to pay full dues for the subsequent year.  No matter how many years in a row a non-member has opted out of paying the political portion of agency fees, that non-member must still send a letter each year to CTA in order to successfully opt out.

84.    This requirement to pay for political and ideological activities absent annual, affirmative disapproval constitutes a serious burden on the First Amendment rights of public employees.  It also creates an environment susceptible to contrary pressure by union personnel.  Finally, given the strong likelihood that individuals who choose not to join the union prefer not to subsidize the union's explicitly political expenditures by paying full agency fees, nonmembers should be presumed to be non-contributors unless they affirmatively "opt in."  In short, the Constitution

requires unions seeking political donations to solicit those donations from non-members through the ordinary process of voluntary, affirmative consent.

85.     *Abood v. Detroit Board of Education,* 431 U.S. 209 (1977), upheld the constitutionality of compelling payment of agency fees by public employees and *Mitchell v. Los Angeles Unified School District*, 963 F.2d 258 (9th Cir. 1992), upheld requiring non-members to "opt out" of paying the "non-chargeable" share of dues.  Consequently, stare decisis may restrict the ability of lower federal courts to grant Plaintiffs the relief they seek.

## FIRST COUNT

### Exacting Compulsory Fees to Support Collective Bargaining Violates the First Amendment

86.     Plaintiffs incorporate and reallege each and every allegation contained in the foregoing paragraphs of this Complaint, as though fully set forth herein.

87.     The First Amendment to the United States Constitution provides: "Congress shall make no law . . . abridging the freedom of speech."

88.     The Fourteenth Amendment to the United States Constitution incorporates the protection of the First Amendment against the States, providing: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

89.     By requiring Plaintiffs to make any financial contributions in support of any union, California's agency-shop arrangement violates their rights to free speech and association under the First and Fourteenth Amendments to the United States Constitution.

90.     Plaintiffs have no adequate remedy at law.

## SECOND COUNT

### Requiring "Opt Out" for Non-Chargeable Expenses
### Violates the First Amendment

91.     Plaintiffs incorporate and reallege each and every allegation contained in the foregoing paragraphs of this Complaint, as though fully set forth herein.

92.     By requiring Plaintiffs to undergo "opt out" procedures to avoid making financial contributions in support of "non-chargeable" union expenditures, California's agency-shop arrangement violates their rights to free speech and association under the First and Fourteenth Amendments to the United States Constitution.

93.     Plaintiffs have no adequate remedy at law.

## COSTS AND ATTORNEYS' FEES

94.     Pursuant to 42 U.S.C. § 1988, Plaintiffs further seek an award of their costs, including reasonable attorneys' fees, incurred in the litigation of this case.

## PRAYER FOR RELIEF

An actual controversy has arisen between the parties entitling Plaintiffs to declaratory and injunctive relief.

WHEREFORE, Plaintiffs pray that this Court:

(A)    Enter a judgment declaring that California's agency-shop law, codified in Cal. Gov't Code § 3540 *et seq*., impermissibly abridges Plaintiffs' First Amendment free speech rights by requiring payment of any fees to any union as a condition of public employment;

(B)    Enter a judgment declaring that California's agency shop arrangement, codified in Cal. Gov't Code § 3540 *et seq*., impermissibly abridges Plaintiffs' First Amendment free speech rights by requiring payments in support of "non-chargeable" union expenditures unless they affirmatively opt out of such payments;

(C)    Enter an injunction barring Defendants from seeking to require non-union employees to pay any monies that support any union or, at a minimum,

barring Defendants from seeking to require payments for "non-chargeable" expenditures from any employee who has not affirmatively stated a willingness to financially support such expenditures;

(D) Grant Plaintiffs such additional or different relief as it deems just and proper, including an award of reasonable attorneys' fees and the costs of this action.

Dated:     April 30, 2013                    JONES DAY

By:
John A. Vogt

ATTORNEYS FOR PLAINTIFFS

Michael A. Carvin, Esq. (*Pro Hac Vice To Be Filed*)
James M. Burnham, Esq. (*Pro Hac Vice To Be Filed*)
JONES DAY
51 Louisiana Avenue
Washington, DC 20001-2113

Michael E. Rosman (*Pro Hac Vice To Be Filed*)
Center for Individual Rights
1233 20th St. NW, Suite 300
Washington DC 20036

ATTORNEYS FOR PLAINTIFFS

- 26 -

Exhibit A

**AGREEMENT**

**BETWEEN**

**SAN LUIS OBISPO COUNTY SUPERINTENDENT OF SCHOOLS**

**AND**

**SAN LUIS OBISPO COUNTY EDUCATION ASSOCIATION, CALIFORNIA TEACHERS ASSOCIATION/NATIONAL EDUCATION ASSOCIATION**

# 2012-2015

# TABLE OF CONTENTS

ARTICLE                                                                                          Page

I       INTRODUCTION ...................................................................................................1

II      RECOGNITION ....................................................................................................2

III     SALARY ................................................................................................................3
        Salary Schedules...........................................................................................3
        Salary Advancement – Step Increments.........................................................3
        Salary Advancement – Column Movement ....................................................3
        Compensation for Job Shares........................................................................4
        Additional Compensation...............................................................................4

IV      HEALTH AND WELFARE BENEFITS ...............................................................7

V       HOURS OF EMPLOYMENT................................................................................9
        Work Year for Alternative Education and Special Education...........................9
        Work Year for Child Development Programs...................................................9
        Extended School Year (Special Education only) .............................................9
        Summer School (Community School only) ......................................................9
        Alternative Work Schedules..........................................................................10
        Work day for Alternative Education and Special Education............................11
        Work day for Child Development Programs...................................................11
        Duty-free Lunch Period .................................................................................12
        Classroom Interruptions for all Teachers ......................................................12
        Professional Duties – All Teachers ...............................................................12

VI      CLASS SIZE .......................................................................................................15

VII     VACANT POSITIONS/INVOLUNTARY MOVES ...........................................16
        Vacant Positions............................................................................................16
        Emergency/Short-Term Transfer....................................................................17
        Involuntary Moves..........................................................................................18

VIII    LEAVES OF ABSENCE .....................................................................................20
        Sick Leave ....................................................................................................20
        Personal Necessity Leave ..............................................................................21
        Bereavement Leave ........................................................................................21
        General Leave..................................................................................................22
        Professional Organization Leave...................................................................22
        Health Leave...................................................................................................22
        Jury Duty  .......................................................................................................22
        Elective Public Office Leave...........................................................................22

Professional Growth Leave ........................................................................22
Industrial Accident and Illness Leave........................................................23
Immediate Family Defined .........................................................................23
Verification of Ability to Return to Work ..................................................24
Provisions for Fringe Benefits...................................................................24
Return from Leaves ...................................................................................24
Concerted Activity......................................................................................24
Catastrophic Leave ...................................................................................24
     Eligibility.............................................................................................24
     Requests for Sick Leave Donation .....................................................25
     Donations for Catastrophic Leave ......................................................25
     Hold Harmless.....................................................................................26

IX     CERTIFICATED EMPLOYEE EVALUATION PROCEDURES..................27

X     PEER ASSISTANCE AND REVIEW PROGRAM (PAR).........................31
     Purpose     .............................................................................................31
     Definitions.................................................................................................31
     PAR Committee .........................................................................................32
     Program Participation................................................................................34
     Consulting Teachers (CT) .........................................................................36
     Other Provisions........................................................................................38

XI     SAFETY CONDITIONS OF EMPLOYMENT ...........................................39

XII     EMPLOYEE/MANAGEMENT RIGHTS
     TO INFORMATION AND COMMUNICATIONS .......................................40

XIII     GRIEVANCE PROCEDURE .....................................................................43
     Definitions.................................................................................................43
     Formal Level One .....................................................................................44
     Formal Level Two .....................................................................................44
     Formal Level Three ...................................................................................45

XIV     CONCLUSION .........................................................................................46
     Completion of Negotiations ......................................................................46
     Past Practices...........................................................................................46
     Severability...............................................................................................46
     Continuation of Economic Benefits .........................................................46
     Duration of Agreement.............................................................................47

     RECOMMENDED FOR RATIFICATION .................................................48
     ACCEPTED AND RATIFIED....................................................................48

## APPENDICES

SALARY SCHEDULES
Teacher/Therapist ............................................................................................................................ A-1
Occupational Therapist ..................................................................................................................... A-2
First Five ......................................................................................................................................... A-3
State Preschool ................................................................................................................................ A-4

Stipends and Hourly Rates .................................................................................................................. B

CATASTROPHIC LEAVE FORMS
Catastrophic Leave Forms .................................................................................................................. C

CERTIFICATED EVALUATIONS
Certificated Staff: Timeline for Evaluating Permanent and Probationary .................................... D-1
Certificated Evaluation Definitions ................................................................................................ D-2
Certificated Staff: Self Evaluation Form ....................................................................................... D-3
Certificated Staff Evaluation Form ................................................................................................ D-4
Certificated: Summative Evaluation Report Form ......................................................................... D-5
Certificated Staff: Classroom Observation Form .......................................................................... D-6
Certificated Staff: Informal Observation/Communication Form .................................................. D-7
Certificated Staff: Performance Improvement Plan ...................................................................... D-8

## ARTICLE I

### INTRODUCTION

1.1    This Agreement and the provisions contained herein constitute a bilateral and binding agreement by and between the SAN LUIS OBISPO COUNTY SUPERINTENDENT OF SCHOOLS (hereinafter referred to as "Superintendent" or "Employer") and the SAN LUIS OBISPO COUNTY EDUCATION ASSOCIATION, CTA/NEA, an employee organization, (hereinafter referred to as "Exclusive Representative" or "Association") and pertain to unit members in the bargaining unit (hereinafter referred to as "employees").

1.2    This Agreement is entered into pursuant to Sections 3540-3549 of the California Government Code (hereinafter referred to as the "Act").

## ARTICLE II

## RECOGNITION

2.1    The Employer recognizes the Association as the Exclusive Representative of certificated employees, as specified below:

2.1.1 Included: All Occupational Therapists and non-management certificated employees serving in a position requiring a credential or certification from California Commission on Teacher Credentialing, unless otherwise excluded below.

2.1.2 Excluded: All employees designated by the Employer as management, supervisory, confidential, certificated non-management employees employed for summer school or Extended School Year (ESY) only, Camp Hapitok and substitute teachers.

## ARTICLE III

## SALARY

3.1 Effective July 1, 2007, a 4.53% increase was applied to all cells, including the provisional rate, on the certificated salary schedules. Teachers and therapists shall be compensated per the Teacher/Therapist Salary Schedule effective July 1, 2007(excluding Extended School Year (ESY) and summer school). Occupational Therapists shall be compensated per the Educational Occupational Therapist Salary Schedule effective July 1, 2007 (excluding ESY and summer school). State Preschool and First Five Preschool teachers shall be compensated per the attached State Preschool and First Five Preschool Salary Schedules effective July 1, 2007 (See Appendix A1-A4). ESY and summer school pay shall be based on the preceding school year salary schedule.

### Salary Schedules
3.2 The salary schedules shall be attached as Appendix A1-A4. Certificated employees advance on the salary schedule based on years of experience (step increments) and units of education (column movement).

3.3 All certificated employees hired onto the Occupational Therapist or Teacher/Therapist salary schedules will receive year for year credit in terms of experience and education.

### Salary Advancement – Step Increments
3.4 Step increments shall be granted to those bargaining unit members who qualify. Bargaining unit members in paid status for 60% or greater of a 1.0 Full Time Equivalent (FTE) will receive a step increment every year. Bargaining unit members in paid status for less than 60% of a 1.0 FTE will receive a step increment every other year regardless of the percentage. There will be no accumulation of percentages from year to year.

3.5 Time spent in unpaid leave status shall not count toward advancement on the salary schedule.

### Salary Advancement –Column Movement
3.6 Column movement shall be granted to those employees who qualify through the educational development process (progress toward advanced degree program and/or qualifying units/continuing education units.).

#### Educational Development Process
3.6.1 Notice of intent to qualify for column movement must be filed with the Employer by May 1st of each year. All work must be completed and verified by the following October 15th.

3.6.2 Each employee is responsible for:
- Obtaining prior approval from the appropriate principal or director.

- Submitting transcripts or documentation by the instructor to verify completion of all work.
- Filing a request for change in salary column on a timely basis each time one is due.

3.6.3   Employees who present transcripts or documentation of qualifying units of credit earned which qualify the employee for a higher column on the salary schedule shall move to the higher column retroactive to their first work day of the current school year. In the event the institution of higher education is unable to furnish transcripts by October 15th, upon appropriate written notice from the employee, the Employer shall extend the deadline. The employee shall be placed on the appropriate column of the salary schedule following written institutional verification of completion of the units.

### Educational Development Requirements

3.6.4   All courses submitted for the purpose of advancement on the salary schedule must be substantially supportive of the teacher's current assignment in the San Luis Obispo County Office of Education and must have received prior approval from the appropriate principal or director.

3.6.5   All units which an employee seeks to have applied toward salary schedule advancement shall be in the employee's academic major or minor or shall be related to the employee's assignment.

3.6.6   Except for pass-fail courses, courses shall not be eligible for salary credit unless earned with a grade of "C" or higher.

3.6.7   Nothing in this Article precludes the Employer granting salary credit units at its discretion for in-service activities sponsored or conducted by the Employer.

### Compensation for Job Shares

3.7   When employees "share" one regular contract, salaries will be based upon the ratio of each employee's hours of service to a full-time employee's hours e.g., three and one-half hours equals 50% of salary. (For more information on alternative work schedules, see Article V – Hours of Employment.)

### Additional Compensation

3.8   The following qualify for additional compensation at the daily rate of pay, prorated on the ratio of hours worked to the employee's regular school year workday:

- Professional meetings (as defined in 5.15) requested by administration which occur on a day that the employee is not scheduled to work

- Duties which are not professional duties as described in 5.15 and which occur outside of the normal scheduled onsite hours (examples include participation in SLOCOE sponsored committees and extra projects requested by administration).

- IEP meetings or meetings with other agencies that are scheduled to start at 4:00 P.M. or later, with prior approval by the supervisor, and mutual agreement of the employee and supervisor as to the start time. (Note: Meetings scheduled to start before 4:00 P.M., even if they extend beyond 4:00 P.M., will not be eligible for additional compensation.) (See also 5.15.2)

If employees are participating as a learner, for example, in CPR training, they will be paid at the curriculum hourly rate. Stipends and hourly rates are attached as Appendix B1.

### Mileage - Use of Automobiles

3.8.1 Teachers who are assigned to use their own automobiles in the performance of their duties (including Individual Education Plans (IEPs), staffings, staff meetings, and other mandated meetings) and teachers who are assigned to more than one school per day shall be reimbursed for all such travel at the rate authorized by the County Superintendent of Schools for all driving done between the first school or designated headquarters (whichever is closer to the teacher's residence) and other schools or assignments. Travel assignments shall not be made to discipline teachers.

### Extended School Year (Special Education only)

3.8.2 By March 1st of each school year, the Employer shall poll individual members of the staff to determine which employees desire to work during the Extended School Year (ESY). Employees may apply to work during ESY either in their current assignment or in another assignment within their credential limitations, if any. A $500 stipend shall be awarded to teachers who agree by March 1 to teach a full assignment for ESY. Where a job share occurs, those teachers shall share the stipend which will be prorated accordingly.

3.8.2.1 Each Designated Instructional Services/Related Services (DIS/RS) Itinerant certificated employee who agrees by March 1st to teach Extended School Year (ESY), and applies to work a period of time less than the full 19 or 20 days (depending upon district calendar), shall be awarded a pro-rated stipend based upon the days worked provided that the employer is able to hire additional qualified staff to meet the program needs.

If the employer is not able to hire qualified staff, the DIS/RS employee will be requested to work the entire assignment as needed per management. If the DIS/RS employee chooses not to do that, he/she will not be awarded the stipend.

3.8.3 All bargaining unit members who work ESY shall be paid their daily rate of pay for each day of ESY service. The daily rate of pay shall be prorated on the ratio of the employee's ESY workday to the employee's regular school year workday. (See also 5.7).

### *Summer School (Alternative Education)*

3.8.4 All bargaining unit members who work summer school shall be paid their daily rate of pay for each day of summer school service. The daily rate of pay shall be prorated on the ratio of the employee's summer school workday to the employee's regular school year workday.

### *Extra Periods for Special Education and Alternative Education*

3.8.5 1.0 FTE teachers will be paid their daily rate of pay for teaching extra periods beyond their normal seven-hour workday. The daily rate of pay shall be prorated on the ratio of hours worked to the employee's regular school year workday.

### *Early Notification Retirement Incentive*

3.8.6 An incentive of $500 will be given to all certificated staff who turn in a signed retirement letter on or before March 1st. The letter needs to state that the certificated employee is retiring effective the end of the school year. Once the employee is retired in June, SLOCOE will send the employee $500 (minus the applicable taxes, but not subject to retirement deductions).

## ARTICLE IV

### HEALTH AND WELFARE BENEFITS

4.1    The Employer agrees to make a monthly contribution for the insurances set forth in para-
       graphs 4.1, 4.1.1-4.1.3 of this Article. The Employer's total annual contribution shall be
       $6,000.00, plus one-half the total insurance premiums above $6,000.00, as modified by the
       Cost Containment Committee. The Cost Containment Committee is an advisory body and
       does not negotiate for the unit. The Employer's contribution is a dollar amount contribution
       for the health and welfare benefits specified as follows:

       4.1.1   Medical insurance for the employee and eligible dependent(s) pursuant to a self-
               funded plan administered by Blue Cross/Self-Insured Schools of California (SISC).

       4.1.2   Dental insurance for the employee and eligible dependent(s) pursuant to a self-funded
               plan administered by Delta Dental Service/SISC.

       4.1.3   Vision insurance for the employee and eligible dependent(s) pursuant to a self-funded
               plan administered by Vision Service Plan/SISC.

4.2    Should there be no agreement in regard to the Employer's contribution level for a successor
       agreement prior to September 15th of the current school year the Employer's contribution for
       the above-specified insurances shall be limited to the actual monthly amount contributed by
       the Employer as of September 1st of the prior year.

4.3    In return for the provision of health and welfare benefits and the payment of the premiums, the
       Employer shall be entitled to select the provider(s) of the above-specified benefits.

       4.3.1   There shall be no change in provider(s) without prior notice to the Exclusive
               Representative and an opportunity for consultation.

       4.3.2   No change shall constitute an increase of premium to be paid for by the employee
               during the school year.

       4.3.3   Any change of provider(s) shall provide benefits and administration equivalent to or
               better than benefits currently in effect.

4.4    An employee with an assignment of less than a .5 Full Time Equivalent (FTE) is not eligible
       for health and welfare benefits. For employees with an assignment of .50 or greater FTE, the
       Employer shall prorate its contribution for health and welfare benefits based upon the ratio of
       the employee's FTE. For a job share assignment, the SLOCOE health and welfare
       contribution shall be shared equally or in a percentage that matches the work year of each
       member of the job-sharing team. Any member contributions that are necessary to maintain
       coverage must be received by the office in a timely manner. It is recommended that the

employee consult with the State Teacher's Retirement System (STRS) representative to determine the impact of the assignment on his/her retirement. (For more information on alternative work schedules, see Article V – Hours of Employment.)

4.5 No in-lieu payments or contributions to programs other than those that the Employer provides above shall be made by the Employer for any employees who elect not to subscribe to the benefits provided by this Article.

4.6 Employees hired on or after July 1, 1983, shall not be eligible for the insurance contributions set forth in SLOCOE Policy #4351.

## ARTICLE V

## HOURS OF EMPLOYMENT

### WORK YEAR

#### Work Year for Alternative Education and Special Education

5.1    The annual contract period shall consist of 186 days. Days beyond the state mandated days set for pupil contact may be used for staff development and class preparation.

5.2    Effective July 1, 2000, there is an additional 1.65% on-schedule salary increase in recognition of the addition of three (3) staff development days to teacher/therapist duty year for a total of 186 duty days per year (excluding child development programs). (Note: If the state eliminates or reduces funding, the salary schedule and workdays will be adjusted accordingly.)

5.3    A first-year employee's work year shall be 187 days. New employees may be required to work Extended School Year (ESY) for the first year of employment and on a rotating basis once every three years after that.

5.4    The work year for Juvenile Court School teachers is 186/187 days. These days may be scheduled over the 248 or 249-day instruction year with mutual agreement between the program manager and teacher. These modifications may include a year-round schedule such as forty-five/fifteen or changing the traditional summer break to other seasons, and other modifications that are mutually developed. Any schedule consideration is meant to provide the teacher with flexibility and the program with consistency and high professional standards.

#### Work Year for Child Development Programs

5.5    The work year for State Preschool Program Teachers shall be 178 days.

5.6    The work year for First Five Program Supervisors and First Five Teachers shall be 181 days.

#### Extended School Year (Special Education only)

5.7    For ESY, teachers will be paid for a 5.5 hour work day. Acknowledging this commitment and service, teachers will have latitude and flexibility in the use of non-instructional time. (see also 3.8.2 and 3.8.3)

5.8    The number of employees' workdays and the employees' working hours for the mandatory ESY program shall be finalized by the Employer following the completion of Individual Education Plans (IEPs) for all students.

#### Summer School (Community School only)

5.9    Teachers will be paid for a 5.5 hour work day. Acknowledging this commitment and service, teachers will have latitude and flexibility in the use of non-instructional time.

9/48

**Alternative Work Schedules**

5.10 Alternative work schedules may include, but are not limited to, job shares, reduced work loads, and the reduced work schedule program per Education Code 22713.

5.10.1 When employees "share" one regular contract, salaries will be based upon the ratio of each employee's hours of service to a full-time employee's hours (e.g., three and one-half hours equals 50% of salary) (Article III – Salary, 3.7)

5.10.2 An employee with an assignment of less than a .5 Full Time Equivalent (FTE) is not eligible for health and welfare benefits. For employees with an assignment of .50 or greater FTE, the Employer shall prorate its contribution for health and welfare benefits based upon the ratio of the employee's FTE. For a job share assignment, the SLOCOE health and welfare contribution shall be shared equally or in a percentage that matches the work year of each member of the job-sharing team. Any member contributions that are necessary to maintain coverage must be received by the office in a timely manner. It is recommended that the employee consult with the State Teacher's Retirement System (STRS) representative to determine the impact of the assignment on his/her retirement. (Article IV - Health and Welfare, 4.4)

5.10.3 Permanent (tenured) unit members who have satisfactory evaluations may apply to the Superintendent no later than March 1 of the preceding school year for consideration of an alternative work assignment. Employees shall be eligible for an Employer provided pre-retirement reduced-workload option pursuant to Education Code Section 22713. Under extenuating circumstances, the office will consider alternative work schedule assignments, including job share requests after the March 1st deadline referred to in this Article. Employees requesting alternative work schedules will be notified of the acceptance or denial of their request by April 30th. The following conditions must be met:

*Job Shares:*
- Each member of the team submitting job-sharing assignment request must meet all the credential and job description requirements for the requested position.

- If an individual requests a job-sharing assignment, the SLOCOE must be able to employ a suitable replacement in the position being left vacant.

- The job-sharing assignment request must include a work schedule accompanied by the recommendation of the principal and director. The request must be approved annually.

## WORK DAY

### Work day for Alternative Education and Special Education

5.11    LENGTH OF THE WORK DAY: During the regular school year, the length of the workday for special education and alternative education, including preparation time, relief periods, and time required before and after school, shall be seven hours, or 35 hours per week. The employee's workday shall begin 30 minutes before the first scheduled class or activity and continue until the specified number of hours of work has elapsed.

#### *Release Time for Alternative Education and Special Education*

5.11.1 At the discretion of the supervisor, teachers may, after making prior arrangements, be granted release time for the following:

- Home or school observation of a child who is recommended for possible placement in that teacher's program.

- Attending staffing and IEP meetings for the children in their classes.

- Preparation of IEP's by employees. Teachers may schedule IEP meetings at flexible times during the day and/or after school, using non-instructional time, administrative/support staff assistance with flexible scheduling, and/or requesting substitute coverage, to ensure that IEP requirement are met without the necessity for routine work outside the school day. It is understood that all regulations regarding appropriate staff attendance and participation in IEP's will be met, as well as adequate supervision and classroom instruction of students in the classroom.

#### *Flexibility in Non-Instructional Time*

5.11.2 It is recognized that teachers perform many professional duties outside the identified seven-hour workday. Mandated duties such as IEP meetings, parent conferences, and staff meetings significantly extend the teaching day past seven hours. Acknowledging this commitment and service, teachers will have latitude and flexibility in the use of non-instructional time during the seven-hour duty day. A duty day, beginning time and ending time, will be established. By notifying the Program Administrator, the teacher may take non-instructional time for personal convenience. This flexibility is not intended to change the duty-day hours on a regular basis, or to be used when professional duties are scheduled during the non-instructional time.

### Work day for Child Development Programs

5.12    The Child Development Programs are based upon available funding from the state. For State Preschool Teachers and First Five Preschool Program Supervisors, the length of the workday, including preparation time, relief periods, and time required before and after school, shall be five hours per day. For First Five Preschool Teachers, the length of the workday, including

### 11/48

preparation time, relief periods, and time required before and after school, shall be four and a half hours per day.

## Duty-free Lunch Period

5.13 There shall be a duty free lunch of no less than 30 minutes, which is not included in the workday.

## Classroom Interruptions for all Teachers

5.14 To the extent repairs to classrooms are under the control of the Employer, they will be scheduled after classes have been dismissed for the day whenever possible. If repairs must be scheduled during class time, the teacher will be given a 24-hour notice of the scheduled activity whenever possible.

## Professional Duties - All Teachers

5.15 Each teacher is responsible for performing duties which are reasonably related to his/her regular assignment, depending upon the educational program and pupil needs.

5.15.1 Professional duties under the direction of the COE administration and required within the normal scheduled on-site hours (excluding lunch) include:
- Supervising pupils and activities related to the teacher's regular assignment.
- Participating in professional activities related to the teacher's regular assignment.
- Participating in staff development programs relating to the teacher's regular assignment.
- Other reasonable related duties as assigned.

5.15.2 Professional duties, which may routinely require work outside the described normal scheduled on-site hours, include:
- Planning and preparing lesson plans
- Selecting materials for instruction
- Reviewing and evaluating work of pupils
- Conferring with pupils and/or parents
- Keeping records
- IEP meetings
- Conferences with staff, teacher, parent and/or student
- Attendance at prescheduled staff meetings shall be limited to one per month except in unusual circumstances
- Participating and supervising Back-to-School, Open House, information nights, and graduation/recognition ceremonies
- Child development parent education meetings

IEP meetings or meetings with other agencies shall be scheduled to start before 4:00 P.M. If an IEP meeting or meeting with other agencies is scheduled to start at 4:00

P.M. or later, with prior approval by the supervisor, and mutual agreement of the employee and supervisor as to the start time, teachers will be compensated for all time from 4:00 P.M. until the end of the meeting at their daily rate of pay. Meetings scheduled to start before 4:00 P.M., even if they extend beyond 4:00 P.M., will not be eligible for additional compensation. (See also 3.8)

### *Child Development- Additional Responsibilities*

5.15.3 Required staff meetings for afternoon child development teachers, including travel time to the meeting site, shall be scheduled during the regular workday whenever possible. Child development teachers will be reimbursed for mileage at the rate authorized by the County Superintendent of Schools.

5.15.4 Student testing and assessments shall be conducted during regular child development class hours.

5.15.5 All arrangements for yearly support service screenings (vision, hearing, and dental) shall be made by the child development teacher. Ongoing support services (speech therapy, etc.) may be coordinated by the child development teacher.

### *Special Education – Non-Instructional Program- Related Duties*

5.15.6 It is recognized that teachers in some county-operated classes are required to supervise and/or arrange supervision of the students to a greater extent than regular education teachers. This student supervision time (contact time) has increased with the program directive that mandates that county-operated classes be aligned with district classes for the daily beginning and ending times.

To address the instructional, supervision, and teacher preparation requirements during the workday, it is acknowledged that there is teacher judgment on blending these components. Teachers, through collaboration with the program supervisors, shall identify regularly scheduled periods during the student day that will allow for non-instructional program-related work to be completed. It is also expected that there will be opportunities for the teacher to complete non-instructional program-related duties while students are on task and supervised by an Instructional Assistant or other approved supervisory staff.

Nothing in these statements is intended to distract or encroach on the instructional minutes as set by statute, or decrease the quality of instruction. It is acknowledged that non-instructional program-related duties are an essential part of the instructional program. Detailed planning, the completion of records, and IEPs are fundamental to the educational program.

*Alternative Education and Special Education – Staff Development/In-services*

5.15.7 The COE may require teachers to attend staff development/in-service only during the contract workday and work year. The COE may offer voluntary workshops which teachers may attend outside the contract workday and work year.

5.15.8 The In-service program shall be based upon an Annual Needs Assessment. For the purpose of this Article, "In-service" means programs paid for by the San Luis Obispo County Office of Education and presented during the professional workday of the employees.

5.15.9 There shall be an In-service Committee which consists of the Assistant Superintendent of Student Services or designee and five volunteer teachers. The In-service Committee shall recommend to the Employer, and assist the Employer in implementing, an in-service training program. The In-service Committee shall seek out appropriate programs that will assist in fulfilling the professional needs of the staff.

## ARTICLE VI

### CLASS SIZE

6.1     The Association and the County Superintendent recognize that providing quality instruction and positive classroom environment is influenced by the support provided by federal and state governments, and the County Office of Education. It is further recognized that the County Office of Education has defined resources established through legislation at the federal and state levels, and that influence on future legislation will be a priority of the Association and County Superintendent. The County Superintendent and the Association leadership will continue to advocate support for education to the appropriate decision makers. Local education advocates and the County Office of Education staff will be informed and solicited for the purpose of influencing representatives to the state and federal governments regarding education-related legislation. Under the Master Plan, the Employer shall attempt to maintain special day classes consistent with state requirements.

## ARTICLE VII

### VACANT POSITIONS/INVOLUNTARY MOVES

#### Vacant Positions

7.1 The Employer shall declare when a position is vacant. A vacant position is created by:

- Splitting a class.
- Combining classes.
- Creating a new class other than by splitting a class or combining classes.
- A non-returning teacher.

7.2 When a vacant position is to be filled, the Employer shall list criteria detailing unique needs of the students, required and desirable teaching skills relevant to the program, and other teacher duties that are required.

7.3 In planning for the upcoming school year, the Human Resources department will send an interest survey to all probationary and permanent certificated staff.

7.4 Upon the determination that a vacant position shall be filled, the Employer shall notify via e-mail (and U.S. mail if requested on the interest survey) all bargaining unit members of the vacancy. All notices of vacancies will be advertised for a minimum of six working days. Employees may apply for a transfer to a position with the same job title by submitting a Letter of Interest to the Human Resources Department. An employee may apply for a position with a different job title or a promotion by completing an application.

    7.4.1 All announcements shall include the job title; a brief description of the position and duties; required minimum qualifications; the job location (if known); the number of hours per day; the regular hours of work, days Per week, and months per year; the salary range; and the deadline for filing a letter of interest or application.

    7.4.2 No final selection shall be made until after the closing date.

7.5 All requests for transfer will expire two weeks before the start of school. Requests will be considered beyond the two weeks before school starts. However, it is difficult to change assignments after this time due to impacts on SLOCOE programs.

7.6 All requests for transfer shall be considered and the employee will be interviewed.

7.7 The needs of students/clients will serve as the prime criterion when considering all applications. The following general criteria shall be included in the consideration of each application:

- The appropriate credentials, certificates, and authorizations held by the applicant.

- The applicant's qualifications by training and/or experience, including previous experience working with the particular type of students or age group.

- Commitment to the criteria as stated in the announcement of vacancy.

- Assessments of the applicant's performance in current and/or past assigned duties utilizing the personnel file.

   If all criteria as listed above are met by two or more applicants, seniority (the employee's length of service to the SLOCOE) within the San Luis Obispo County Office of Education will be the deciding factor.

7.8   If a request is denied, the applicant may request a meeting to discuss the decision to deny the transfer. The applicant shall be given, upon written request, reasons for the denial in writing.

7.9   When a class is split as set forth in paragraph 7.1 of this Article, the existing teacher shall have first choice of either class that results from the split, as long as that teacher possesses the appropriate credentials, certificates, and authorizations for the assignment.

7.10   If a classroom is to be moved, the employee shall receive at least a 15-calendar day notice before the actual move occurs. The employee shall receive two days of release time or be paid two days at the substitute rate to organize and move materials and supplies. The employees will also have the equivalent of two days of classroom Instructional Assistant time.

7.11   The Employer shall fill Extended School Year (ESY) positions based upon employee requests to the extent that those requests fulfill the Employer's requirements for the educational program. Should the Employer be unable to fill any ESY positions with credentialed teachers through the polling process described above, new employees may be required to work ESY for the first year of employment and on a rotating basis every three years after that. Both parties agree to promote participation in ESY. Promotion may include, but is not limited to, flyers, posters, memos, e-mails, staff meeting discussions, etc. (see also Articles 3.8.2, 3.8.3 and 5.7)

## Emergency/Short-Term Transfer

7.12   In an immediate program emergency where the interests of the program and the safety and interests of the students has been compromised through circumstances which were unforeseen, unanticipated, through no fault of the administration, and for which adequate time was not allowed for a regular solution, an employee may be transferred or reassigned on an emergency short-term basis. The selection and reassignment of an employee under this

### 17/48

section will be done at the discretion of the Employer after an assessment has been made that determines that the selection will result in the least disruption of the existing program and the best possible solution for the students, but under no circumstances will this Emergency/Short-Term Transfer be implemented lightly or without due care and consideration of the employee's preference. If, at the end of six (6) weeks, a permanent solution has not been implemented, the Emergency/Short-Term assignment shall not be extended by the Employer except in the case of a voluntary request from the employee. The employee shall be returned to his/her regular assignment. No employee may be assigned under this provision more than one time in any school year.

7.12.1 Emergency/Short-Term shall be defined as a period of time no longer than six (6) weeks. Every effort shall be made to terminate the Emergency Assignment sooner than six weeks and return the employee to his/her regular assignment.

7.12.2 Unforeseen shall be defined, in part, as a last minute resignation or termination of an employee, a catastrophic injury or illness that is expected to incapacitate the unit member for an extended period of time, or other incidents which are determined to be immediate and serious in nature.

7.12.3 The employee who is assigned under the Emergency/Short-Term provision shall be entitled to mileage reimbursement calculated round trip from their regular location to the Emergency location for the duration of the Emergency assignment at the standard rate that is established by the Employer at the time of the assignment.

7.12.4 The employee shall receive one day per week of the Emergency/Short-Term assignment up to a maximum total of three days of release time or be paid one day per week up to a maximum total of three days at the substitute rate, to organize materials and lesson plans for the Emergency assignment.

7.12.5 The employee who is assigned under the Emergency/Short-term provision will receive regular and frequent reports of the progress toward a solution and updated estimates of the end date of the assignment.

## Involuntary Moves

7.13 An employee may be involuntarily transferred, reassigned, or transferred-reassigned by the Employer except as a reprisal for employee activity protected by the Act. "Transfer" is defined as the movement of an employee from one school site to another school site. "Reassignment" is defined as a change in teaching assignment from one subject discipline or age group to another subject discipline or age group at the same school site. "Transfer-reassignment" is defined as the movement of an employee at one school site to another school site, accompanied by a change in teaching assignment from one subject discipline or age group to another subject discipline or age group.

7.13.1 Except as set forth in paragraph 7.13 of this Article, no position shall be filled by

**18/48**

means of an involuntary transfer or reassignment if another qualified employee has requested to fill the position.

7.13.2 A written notice of an involuntary move shall be given to the employee as soon as possible and, except in cases of unusual circumstances, not later than May 1, for the following year.

7.13.3 An involuntary move shall be based upon area of credential and least seniority (as defined in this Article) as a certificated employee in the San Luis Obispo County Office of Education. The following general criteria shall also be included:

- The applicant's qualifications by training and/or experience, including previous experience working with the particular type of students or age group.

- Assessment of the applicant's performance in current and/or past assigned duties.

If all criteria listed above are met by two or more unit members, seniority date within the SLOCOE will be the deciding factor.

7.13.4 An involuntary move shall take place only after a meeting between the employee and the supervisor, if such a meeting is requested in writing by the employee. The employee shall have the right to representation by the Association at the meeting and to be notified of the reasons for the move.

7.13.5 The employee to be involuntarily moved may indicate a preference of positions from a list of available vacancies.

7.13.6 The Employer may determine that an involuntary move is an appropriate response to an evaluation which specifies unsatisfactory performance. If so, the move shall not be made until completion of the remediation process pursuant to the evaluation process included in this Agreement and a determination that the unsatisfactory performance was not modified to the satisfaction of the evaluator.

A list of transfers and changes in assignments for the current school year as compared with the past school year will be made available to the Association upon written request.

## ARTICLE VIII

### LEAVES OF ABSENCE

#### ACCUMULATED LEAVE

**Sick Leave**

8.1   Every full-time employee shall be entitled to 10 days of sick leave for each year of employment. Part-time employees shall earn sick leave on the basis of the ratio of the part-time employment to full-time employment. An employee who is assigned to work an Extended School Year shall receive one additional day of sick leave for that year.

  8.1.1   An employee may use accumulated sick leave at any time during the school year for accident, illness, or quarantine and for medical examinations or treatments for self or immediate family members.

  a. Unused sick leave shall accrue from school year to school year.

  b. The Employer shall provide each employee with a written statement of accumulated and credited sick leave for the current school year as soon after the beginning of the school year as possible, but no later than November 1.

  8.1.2   Employees must contact the Employer as soon as the need to be absent is known.

  8.1.3   When the employee informs the Employer that the absence will be greater than one day, the employee must notify the Employer of an intention to return by 4:00 p.m. on the workday prior to the day of return.

  8.1.4   An employee who has been on sick leave for three or more consecutive days, or who has had any surgical procedure, may be required to furnish a physician's verification of ability to return to work and render service to the Employer.

  8.1.5   Female employees shall be entitled to utilize sick leave for the period of time required to be absent due to pregnancy or childbirth. The period of leave, including the date upon which the leave shall begin, shall be determined by the employee and her doctor. A statement from the employee's doctor as to the beginning date of the leave shall be filed with the Superintendent. The date of the employee's return to service shall be based upon her doctor's analysis and written verification of the employee's physical ability to render service to the Employer without limitations or restrictions.

  8.1.6   If the employee has exhausted all available sick leave, the employee shall be entitled to an additional period of five school months extended sick leave/differential pay (See Ed. Code 44977). Upon written verification of a physician or practitioner, the amount of salary deduction in any month shall not exceed:

20/48

- The sum which was actually paid a substitute in the position; or

- If no substitute was employed, the amount which would have been paid to a substitute had one been employed for the remainder of the illness up to a total period of five school months.

## OTHER LEAVES

### Personal Necessity Leave
8.2     It is of mutual interest that the Personal Necessity Leave provides employees the opportunity to address circumstances which are serious in nature, cannot be expected to be disregarded, necessitate immediate attention, and cannot be dealt with outside the work day. It is further recognized that employees can, and will, be trusted to use personal integrity in determining the need for such leave. Finally, it is recognized that children learn best when their regular teacher is present in the classroom.

8.2.1   Up to ten days of sick leave may be used as Personal Necessity Leave per year. Personal Necessity Leave does not accumulate from year to year.

8.2.2   Whenever possible, employees must request this leave in advance to allow for adequate planning for coverage of duties.

8.2.3   The employer will not require employees to declare the specific reason of the use of this leave. The employee will complete a Request for Leave form indicating that the leave is a personal necessity.

8.2.4   Personal Necessity Leave shall be used for the purposes stated in 8.2 above and shall not be used for association business, personal gain, or recreational purposes.

### Bereavement Leave
8.3     Every employee shall be entitled to five days of paid noncumulative leave of absence because of the death of any member of the employee's immediate family (as defined in 8.11 of this Article).

8.3.1   The Employer shall require the use of bereavement leave before other leave days are used for purposes allowed in this paragraph.

8.3.2   Bereavement leave shall not be deducted from sick leave.

8.3.3   Employees may receive up to one day of Bereavement Leave to attend the funeral of a student or former student.

**General Leave**

8.4     An employee may apply for a leave of absence on an unpaid basis for up to one year. The application may include a request for consideration of a two-year program. Letters of application are due to the Employer by May 1. A scheduled conference with the Superintendent shall be held unless there are unforeseeable circumstances. The Employer may, at its discretion, grant an unpaid leave to an employee for one year and issue an intent to renew for a second year to allow for a two-year program. At the conclusion of the first year, the additional year would be granted. The length of the leave, including beginning and ending dates, shall be mutually agreed upon by the employee and the Employer. Upon request, the Employer may extend the leave beyond one year. No more than three employees will be granted leaves in a given school year.

**Professional Organization Leave**

8.5     An employee who is a state-level officer of an organization of professional employees in the employee's teaching field (e.g., speech pathology) shall be released for statewide meetings without loss of pay. The employee shall be responsible for one-half of the cost of a substitute, if one is used.

**Health Leave**

8.6     An employee may be granted a leave of absence without pay for reasons of poor health. Such leave is to be specified for a period not to exceed the employee's contract year. A written statement of need by a physician is required prior to the leave being granted. An extension of this leave can be granted at the discretion of the Superintendent.

**Jury Duty**

8.7     An employee shall receive leave without loss of pay for time the employee is required to be absent for jury duty. (San Luis Obispo Grand Jury duty is excluded from this provision.) An employee serving on jury duty shall receive regular salary for the period served. The fee received for jury duty, except for mileage and meal allowances, shall be signed over to the Employer.

**Elective Public Office Leave**

8.8     An employee who is elected to a federal, state, or county office shall be granted a leave of absence without pay for the duration of the term of office.

**Professional Growth Leave**

8.9     An employee may receive up to two days of release time with full pay, including registration fees, per diem, and travel allowance, to be used for the following activities: (1) conferences directly related to the employee's teaching field and (2) observation of model programs. Request for professional leave must be submitted to the program director through the appropriate supervisor two weeks in advance of the leave date. Additional release time for the above activities shall be at the discretion of the appropriate supervisor. An employee may

request to attend professional meetings or conferences without reimbursement of per diem and travel expenses.

## Industrial Accident and Illness Leave

8.10 An employee shall be entitled to industrial accident or illness leave for any job-related illness in an amount of up to a maximum of 60 workdays in any one fiscal year for the same accident. Should the leave overlap into the next fiscal year, only those days remaining at the end of the fiscal year shall be available for utilization by the employee.

8.10.1 Such benefits shall be in addition to other sick leave benefits provided by the Employer.

8.10.2 When entitlement to this leave has been exhausted, other sick leave shall be utilized.

8.10.3 Employees will report all job-related injuries and illnesses to the Employer within 24 hours of the occurrence, regardless of whether or not medical attention is required or whether or not time is lost from work. In the event that the employee's injury or illness prevents the filing of the report within the time limit, the report shall be filed as soon as possible.

8.10.4 The employee's report of an industrial accident or illness shall be kept on file in the Employer's office.

8.10.5 An employee's industrial accident leave shall be suspended automatically for any period the employee is not within the State of California unless prior approval of the Employer has been granted.

8.10.6 The employee shall endorse all wage loss checks received under the Workers' Compensation Law to the Employer. The Employer, after receipt of the endorsed check, shall issue the employee appropriate salary warrants for payments of the employee's full salary, and shall deduct normal retirement and other authorized deductions.

### MISCELLANEOUS PROVISIONS

## Immediate Family Defined

8.11 For the purposes of this Article, immediate family shall be defined as: mother, father, grandmother, grandfather, or grandchild of the employee or the spouse of the employee, and the spouse, son, son-in-law, daughter, daughter-in-law, brother, brother-in-law, step-son, step-daughter, sister, sister-in-law, step-brother, or step-sister of the employee or any relative of the employee living in the immediate household of the employee.

## Verification of Ability to Return to Work

8.12 An employee absent under the provisions of paragraphs relating to extended illness, industrial accident leave, or health leave for 15 or more consecutive days, may be required to provide a

23/48

physician's verification of ability to return to work and render service to the Employer without limitation or restriction prior to returning to work.

8.12.1 Notwithstanding the provisions of the above paragraph, an employee who is absent at any time for surgery shall be required to furnish a physician's verification of the employee's ability to return to work and render service to the Employer without limitation or restriction.

8.12.2 Employees on unpaid leaves of absence may, as long as the practice is allowed by the insurance company, continue their fringe benefit program eligibility by paying to the Employer the amount of money equal to the premiums for the various fringe benefit programs.

**Provisions for Fringe Benefits**
8.13    Employees on paid leaves of absence shall have all the Employer's contributions set forth in Article IV paid for them throughout the duration of the leave of absence.

**Return from Leaves**
8.14    An employee shall notify the Employer of his or her intent to return from a leave of absence no later than May 1 of the school year in which the leave is granted. Failure to notify the Employer by May 1 shall constitute the employee's resignation. Upon return from leave, the employee will return to the position held at the time leave was granted, or to as nearly identical a position as possible.

**Concerted Activity**
8.15    No employee may utilize or receive any leave provision when the employee or other employees engage in any concerted activity which interrupts the operation of the Employer.

**Catastrophic Leave**
8.16    Section 1 – Eligibility: A probationary or permanent (temporary employees are not eligible) employee who suffers from a catastrophic injury or illness that is expected to incapacitate the unit member for an extended period of time (more than ten days), or who is required to take time off from work to provide care for an immediate family member who suffers from a catastrophic injury or illness, shall be eligible to receive Catastrophic Leave donations from other unit members subject to the restrictions and conditions outlined below:

8.16.1 Before using donated sick leave, the employee must have exhausted all accrued sick leave.

8.16.2 The Catastrophic Leave Committee determines that the employee is unable to work due to the employee's or his/her family member's catastrophic illness or injury.

8.16.3 The maximum amount of donated leave shall not exceed five school months.

**24/48**

8.17   Section 2 - Requests for Sick Leave Donation: An employee who meets the eligibility requirements for Catastrophic Leave may request donation of sick leave from other unit members by submitting a "Catastrophic Leave Request for Donation Form" to the Human Resources Department. The request shall clearly specify the circumstances of the catastrophe and the amount of sick leave requested. Appropriate written verification of the catastrophic illness or injury must be included with the request. The unit member should be prepared to provide additional documentation on the nature and severity of the illness or injury, if requested. Catastrophic Leave will commence on the same day that the differential sick leave pay calendar begins. The employee will receive full pay, and the employee's differential pay rights will run concurrently with the Catastrophic Leave.

   8.17.1 A committee consisting of two Employer representatives and two representatives appointed by the Association shall be established each fiscal year. One member shall serve as recorder. Minutes shall be kept. The committee shall consider all requests for sick leave donations. The committee may grant, partially grant, or reject a request. All deliberations are confidential and the decisions to grant or deny requests shall require mutual agreement. The decision of the committee is final and not grievable. A written copy of the committee's decision shall be provided to the requesting employee, to the Association, and to the Human Resources Department so that the sick leave can be transferred from the unit member donors to the member's account, if necessary.

   8.17.2 Requesting employees should apply for donated sick leave prior to exhausting regular sick leave. At no time shall donated sick leave be applied to a pay period that has been closed and for which a pay warrant was issued.

   8.17.3 Donated sick leave shall be established in an individual account for the recipient and will be utilized in a sequence that will use one day from each donor before utilizing the second day from each donor. Unused sick leave will be returned to the donor(s).

   8.17.4 An employee who uses a donated sick leave day shall be paid at his/her regular daily rate. No distinction shall be made as to the differing pay rates of the donors or recipients.

   8.17.5 An employee may not receive the benefits of this leave while receiving monies or leave from Workers' Compensation.

8.18   Section 3 - Donations for Catastrophic Leave:

   8.18.1 Donated sick leave may not be used for industrial illness or injury accident.

   8.18.2 Donations to the unit member will be made in one-day increments.

25/48

8.18.3 Unit members may only donate five (5) days per school year.

8.18.4 A sick leave donor may not donate sick leave that would cause his/her personal accrued sick leave to fall below (10) days.

8.18.5 The donor list shall be confidential.

8.19 Section 4 - Hold Harmless: The Association agrees that it will not file, on its own behalf or on behalf of any unit member, any grievance, claim, or lawsuit of any kind related to any attempt by a unit member to retrieve donated sick leave used by another unit member pursuant to this provision. The Association also agrees that it will not file, on its own behalf or on behalf of any unit member, any grievance, claim, or lawsuit of any kind which attempts to challenge in any way the legality or enforcement of this provision.

The Association agrees to indemnify and hold harmless the Employer from any loss or damages arising from the implementation of this provision. In the event of any grievance, claim, or lawsuit challenging the legality or enforcement of this provision, the Employer may terminate this provision upon written notice to the Association.

## ARTICLE IX

### CERTIFICATED EMPLOYEE EVALUATION PROCEDURES

9.1     These provisions constitute the procedures to be utilized for the evaluation and assessment of the instructional performance of certificated employees as set forth in California Education Code Sections 44660, et seq., commonly referred to as the "Stull Bill," or its successor.

    9.1.1   The evaluations shall relate to:

- The progress of pupils toward the established standards of expected student achievement.

- The instructional techniques and strategies used by the employee.

- The employee's adherence to curricular objectives.

- The performance of non-instructional duties and responsibilities as set forth on adopted evaluation forms.

- The establishment and maintenance of a suitable learning environment within the scope of the employee's responsibility.

- Compliance with the Employer's rules, regulations, and policies and applicable state and federal laws and regulations.

    9.1.2   It is the responsibility of the Superintendent or designee to evaluate or provide for the evaluation of each certificated employee. Evaluation and assessment of certificated employee competence pursuant to this Article shall not include the use of publisher's norms established by standardized tests (Education Code Section 44661(d)).

    9.1.3   Effective the beginning of the 2007-2008 school year, both parties agree to implement the 2000 evaluation system (attached as Appendix D1-D8).

9.2     The basis for the evaluation includes the items in paragraph 9.1.1 of this Article and the forms listed for the Evaluation Systems. If the employee disputes the evaluator's decision on the basis of the employee's evaluation, the employee may appeal the evaluator's decision to the Superintendent or designee.

    9.2.1   2000 Evaluation System

        a.   The evaluation cycle consists of a formal evaluation which must occur at least every other year.   A permanent teacher who is not meeting SLOCOE's

expectations (unsatisfactory on any of the identified criteria) will be placed on a formal evaluation in the subsequent year(s), and referred to the Peer Assistance and Review Program. Probationary teachers will be on probationary-cycle evaluation for two years, or until permanent status is granted, or teacher is non-reelected. A complete copy of the 2000 Evaluation System is attached as Appendices C1-C8 and, by virtue of the attachment, becomes a permanent part of this section of the Agreement.

- Components of the 2000 Formal Evaluation

  - ➢ Individual Orientation Conference
  - ➢ Pre-Observation Contact
  - ➢ Formal Observations
  - ➢ Post-Observation (feedback) Conference
  - ➢ Other data/input may include:
  - ➢ Informal Classroom Observations
  - ➢ Work Samples
  - ➢ Other Job Specific Data
  - ➢ Self-Evaluation
  - ➢ Summative Evaluation Report/Conference

- 2000 Evaluation System Documents

  - ➢ Timeline for Evaluating Permanent and Probationary
  - ➢ Certificated Evaluation Definitions
  - ➢ Certificated Staff Self-Evaluation Form (SEF001)
  - ➢ Certificated Staff Evaluation Form (SERF001)
  - ➢ Pre-Observation Data Sheet/Post-Observation Report (FOF001)
  - ➢ Certificated Staff Information Observation/Communication Form (IOF001)

9.3    Probationary employee evaluations shall be made on a continuing basis at least once each school year per Form attached in Appendix D1, D4.

   9.3.1   During the process leading to the formal written evaluation, a probationary employee shall have at least two formal observations. In addition, informal observations may be made.

   9.3.2   Each formal observation by the evaluator shall last a minimum of 30 minutes and will be scheduled with the employee prior to the observation. If the evaluator is unable to observe the pre-scheduled lesson in its entirety, alternative arrangements may be made.

9.3.3    Each formal observation shall be followed by a conference within two workdays. At or before the conference, the employee shall receive a copy of the completed Classroom Observation Form (Appendix D6).

9.3.4    Each item marked as "needing improvement" or "unacceptable" shall be noted on the form, discussed with the employee, and a Certificated Performance Improvement Plan Form (Appendix D8) shall be written and implemented within 10 teaching days of the observation conference. A written list of specific recommendations for improvement shall be made.

9.4    Permanent employee evaluations shall be made on a continuing basis at least once every other school year and shall be concluded by the date set forth in the Stull Bill. Permanent employee evaluations that include "needs improvement" or "unacceptable" will be done yearly per form in Appendix D8.

   9.4.1    During the evaluation process leading to the formal written evaluation, a permanent employee shall have at least one formal observation.    In addition, informal observations may be made.

   9.4.2    Each formal observation by the evaluator shall last a minimum of 30 minutes and will be scheduled with the employee prior to the observation. If the evaluator is unable to observe the pre-scheduled lesson in its entirety, alternative arrangements may be made.

   9.4.3    Each formal observation shall be followed by a conference within two workdays. At or before the conference, the employee shall receive a copy of the completed Report of Classroom Observation Form.

   9.4.4    Each item marked as "needing improvement" or "unacceptable" shall be noted on the form, discussed with the employee, and a Performance Improvement Plan Form (Appendix DF) shall be written and implemented within 10 teaching days of the observation conference. A written list of specific recommendations for improvement shall be made.

9.5    Eligible certificated employees will be evaluated at least every five years for personnel with permanent status who have been employed at least ten years with the San Luis Obispo County Office of Education, are highly qualified as defined in 20 U.S.C. Sec.7801, and whose previous evaluation rated the employee as meeting or exceeding standards, if the evaluator and certificated employee being evaluated agree. The certificated employee or the evaluator may withdraw consent at any time (Education Code 44664).

9.6    In the written evaluation for both probationary and permanent employees, the evaluator shall cite specific qualities, abilities, or deficiencies.

9.6.1   Any statement concerning instructional competency by a third party shall be submitted in writing and shall be verified by the evaluator prior to inclusion in the written evaluation.

9.6.2   The evaluation conference shall be conducted during non-student contact time unless appropriate supervision is provided.

9.6.3   Following the evaluation conference, the employee shall sign the evaluation to indicate that it has been reviewed and that the employee has received a copy. The employee's signature does not necessarily signify agreement with the evaluation.

9.6.4   The employee may prepare and submit a written response to the written evaluation within 10 workdays of the review.

9.6.5   Following the 10-day response period, the evaluation and response, if any, shall be placed in the employee's personnel file.

9.6.6   If deficiencies are noted, the evaluator may provide, or the employee may request, further continued periodic observations and conferences. An "Instructional Assistance Team" comprised of peers and/or other administrative personnel may be requested as a part of the remediation process.

    • Participation in the Instructional Assistance Team is optional.

    • All members of the Instructional Assistance Team will be informed if they are included on the employee's improvement plan.

9.6.7   If subsequent remedial actions on the part of the employee sufficiently modify the employee's performance and identified deficiencies to the satisfaction of the evaluator, a notification to that effect shall be attached to the evaluation.

9.7   No grievance arising under this Article shall challenge the substantive objectives, standards, or criteria determined by the evaluator or Employer, nor shall it contest the judgment of the evaluator; any grievance shall be limited to a claim that the procedures of this Article have been violated.

9.8   Provided that the requirements of the law pertaining to dismissal have been met, a violation of the procedural steps of this Article shall not prevent the Employer from taking action on the dismissal of an employee. Any procedural violation may be raised by the employee in the dismissal hearing requested by the employee, if one is required by law to be held.

## ARTICLE X

## PEER ASSISTANCE AND REVIEW PROGRAM

### Purpose

10.1    The SLOCEA and SLOCOE strive to provide the highest possible quality of education.  We believe that all teachers should focus on continuous improvement in professional practice and that teachers having difficulties can benefit from the assistance and review of colleagues. Therefore, the parties have cooperated in the design and implementation of this Peer Assistance and Review Program (PAR or Program) to improve the quality of instruction through opportunities for professional development and peer assistance. Teachers referred to, or who volunteer for, this Program are viewed as valuable professionals.

   10.1.1 The program allows exemplary teachers to assist certain permanent and beginning teachers in the areas of teaching strategies, teaching methods, and subject matter knowledge.

   10.1.2 The extent of the Program's assistance and review depends on whether the participating teacher  (2) is a voluntary participating teacher or (3) is a participating teacher with an unsatisfactory evaluation in one or more of the areas of subject matter knowledge, instructional strategies, or classroom management.

   10.1.3 The Program's assistance shall be provided through Consulting Teachers.  The assistance shall not involve the participation in, nor the conducting of, the annual evaluation of unit members as set forth in Article IX of this Agreement and Education code Section 44660 et seq.

   10.1.4 Program resources shall be utilized in the following order:

   • Tenured Teachers with an "Unsatisfactory" designation in one or more of the following areas on their final evaluation: planning, instruction, and/or management

   • Voluntary Participating Teachers

   • Professional Development

10.2    **Definitions:**

   10.2.1"Teacher":  All certificated teachers, preschool teachers, nurses, speech/language pathologists, vision, orientation and mobility specialists, orthopedic impaired specialists, occupational therapists, and adapted physical education teachers.

10.2.2 "Participating Teacher": Any unit member who is a "teacher" and who either volunteers for, or is required by this Article to participate in, the Program.

10.2.3 "Consulting Teacher": An exemplary teacher meeting the requirements of Section E who is to provide Program assistance to a Participating Teacher.

10.2.4 "Mandatory Participating Teacher": A unit member with permanent status whose most recent performance evaluation contained an unsatisfactory designation in one or more of the following areas of their final evaluation: planning, instruction and management.

10.2.5 "Consensus": Five or more affirmative votes.

10.2.6 "Voluntary Participating Teacher": A permanent unit member who seeks to improve his/her teaching performance.

10.2.7 "Principal or Evaluating Administrator": The certificated administrator appointed by SLOCOE to evaluate a "Teacher."

## PAR Committee

10.3 The PAR Committee shall consist of seven (7) members. Four (4) shall be "Teachers" who are chosen to serve by SLOCEA. SLOCOE shall choose three (3) administrators to serve on the PAR Committee. The SLOCOE and SLOCEA shall individually determine the method for selection and the qualifications to serve.

10.3.1 To promote continuity, appointees shall serve staggered three-year terms.

10.3.2 The PAR Committee shall establish its own meeting schedule. To meet, at least two-thirds of the PAR Committee must be present. Such meetings shall take place during the regular teacher workday with a grant of release time to teachers, or during non-school time. Generally, the PAR Committee will meet within the panel's workday, however, work outside of the regular workday shall be compensated at the current curriculum rate.

10.3.3 The PAR Committee's primary responsibilities involve establishment of the annual budget for the Program and selection and oversight of the Consulting Teachers. In addition, the Committee is responsible for the following:

- Coordinate with the SLOCOE to provide training for the PAR Committee members and Consulting Teachers. New PAR panel members will receive an orientation as to the Program's purposes and functions.

- Establish procedures and regulations necessary to carry out the requirements of this Article, including a procedure for the selection of a Chairperson.

- Assign the Consulting Teachers.

- In conjunction with the Human Resources Director, send written notification of participation in the Program to the Mandatory Participating Teacher, the consulting Teacher, and the Evaluating Administrator.

- Assess the availability of resources and/or personnel to accommodate the needs of the self-referred teachers.

- Use a consensus model for decision-making.

- Establish a procedure for application as a Consulting Teacher.

- Determine the number of Consulting teacher(s) or a percentage of a 1.0 full-time employee (FTE) in any school year, based upon participation in the PAR Program, the budget available, and other relevant considerations.

- Review and approve the initial plan prepared by the Consulting Teacher.

- Review the final report prepared by the Consulting Teacher regarding the progress in the PAR Program of the Mandatory Participating Teacher.

- Submit to the Superintendent and SLOCEA an annual evaluation of the Program's impact, including recommendations regarding Mandatory Participating Teachers. If necessary, the Consulting Teacher shall forward names of individuals who, after sustained assistance, are unable to demonstrate satisfactory improvement.

  The annual PAR Program evaluation may include interviews of Program participants, administrators, and others as deemed appropriate. This evaluation shall be in writing and shall be submitted at the same time that the proposed budget is submitted.

10.4    Not later than May 30 of each year, for the coming school year, the PAR Committee shall submit a proposed budget to the Superintendent.

   10.4.1  The proposed budget shall be designed to carry out the provisions of this Article and shall take into consideration (1) the number of Consulting Teachers which will be required in the coming year in light of the projected level of participation in the Program, (3) the recommendations for improvement of the Program which were made in the annual report to the Board, and (4) other relevant factors.

**33/48**

10.4.2 The proposed budget shall not exceed the state funding allocation for the coming year as estimated by the SLOCOE's chief financial officer. This proposal shall be submitted in the form requested by the SLOCOE.

10.4.3 The PAR Committee shall recommend that the Superintendent authorize the necessary number of Consulting Teacher positions or any increase or decrease thereof. The Superintendent will be provided the rationale for the request.

## Program Participation

10.5 By Mandatory Participating Teachers:

10.5.1 Any tenured teacher with an unsatisfactory designation in planning, instruction, and/or management must participate in the Program.

10.5.2 The Mandatory Participating Teacher will be assigned a Consulting Teacher. If available, a different Consulting Teacher may be assigned to work with the Mandatory Participating Teacher either upon request of the Mandatory Participating Teacher or upon request of the Consulting Teacher. In either case, however, approval of the PAR Committee is required.

10.5.3 The Consulting Teacher's assistance and review shall focus on the area(s) designated unsatisfactory in the final evaluation.

- The Administrator and the Consulting Teacher assigned to the Mandatory Participating Teacher shall meet and discuss the recommended areas of improvement outlined by the Administrator and the types of assistance that should be provided by the Consulting Teacher.

- The Administrator's recommendations shall be in writing consistent with certificated staff performance standards, clearly stated, and consistent with Education Code Section 44662. These recommendations will be considered the performance goals required by Education Code Sections 44664(a) and 44500(b) (2). SLOCOE shall provide sufficient staff development activities to assist a teacher to improve his or her teaching skills and knowledge. [Education Code Section 44500 (b) (5).]

- The Consulting Teacher and the evaluating Administrator are expected to establish a cooperative relationship and shall coordinate and align the assistance provided to the Mandatory Participating Teacher.

- The Consulting Teacher and the Mandatory Participating Teacher shall meet to discuss the plan for assistance. After that meeting, the Consulting Teacher will

### 34/48

provide the assistance which shall include conducting multiple observations of the Mandatory Participating Teacher in the performance of his/her job responsibilities.

10.5.4 The final report will be submitted to the PAR Committee at least 45 calendar days before the end of the Mandatory Participating Teacher's school year. The final report shall consist solely of: (1) a description of the assistance provided to the Mandatory Participating Teacher; and (2) a description of the results of the assistance in the targeted areas. This report shall be submitted to the PAR Committee, with a copy also submitted to the Mandatory Participating Teacher and the Administrator.

10.5.5 The results of the teacher's participation in the Program shall be available for use as part of the Mandatory Participating Teacher's annual evaluation.

- The evaluating Administrator shall have the discretion as to whether, and how, to use the results set forth in the report in the annual evaluation.

- The Consulting Teacher's report on participation in the Program, as defined above, shall be made available to the SLOCOE for placement in the Mandatory Participating Teacher's personnel file, if the report is referenced by the Administrator in the evaluation.

10.5.6 After receiving the report, the PAR Committee shall determine whether the Mandatory Participating Teacher will benefit from continued involvement in the Program. The Mandatory Participating Teacher will continue participating in the Program until the PAR Committee determines the teacher no longer benefits from participation in the Program, or the teacher receives a satisfactory evaluation, or the teacher is separated from the SLOCOE. The Superintendent has the sole authority to determine whether the Mandatory Participating Teacher has been able to demonstrate satisfactory improvement.

10.6    By Voluntary Participating Teachers

10.6.1 Permanent teachers who seek to improve their teaching performance may self-refer to the PAR Committee for intervention under this program. Voluntary Participating Teachers may be individuals who wish to grow and learn with assistance from a peer, or who seek assistance due to a change in assignment or the institution of new curriculum. The Program for Voluntary Participating Teachers will focus on practical application of either certain teaching skills or the acquisition of a new subject matter.

10.6.2 The Voluntary Participating Teacher must submit a request for professional growth in a specific, targeted area to the PAR Committee for approval and assignment of a Consulting Teacher. Upon approval by the PAR Committee, the Voluntary

Participating Teachers shall notify his/her immediate supervisor. Disclosure of the specific focus area is not required.

10.6.3 A Voluntary Participating Teacher who has received a "Needs Improvement" in one or more areas of his/her final evaluations may be given greater consideration for assistance.

10.6.4 The purpose of participation in the Program for the Voluntary Participating Teacher is for peer assistance only and the Consulting Teacher shall not participate in a performance review of the Voluntary Participating Teacher. The Voluntary Participating Teacher may terminate his or her participation in the Program at any time.

10.6.5 Neither the Consulting Teacher nor the PAR Committee will forward to the Superintendent the names of Voluntary Participating Teachers.

10.6.6 All communications between the Consulting Teacher and a Voluntary Participating Teacher shall be confidential. Without the written consent of the Voluntary Participating Teacher, such communication shall not be shared with others (this includes, but is not limited to, the site Administrator, the evaluator, or the PAR Committee).

## Consulting Teachers (CT)

10.7    The qualifications for the Consulting Teacher shall, at a minimum, include:

10.7.1 A "Teacher" with permanent status.

10.7.2 Substantial (at least 5 years) recent experience in relevant instruction.

10.7.3 Demonstrated exemplary teaching ability, as indicated by, among other things, effective communication skills, subject matter knowledge, knowledge and commitment to SLOCOE curricular goals and standards, the California Standards for the teaching profession, and mastery of a range of teaching strategies necessary to meet the needs of the pupils in different contexts.

10.7.4 Ability to work cooperatively and effectively with other teachers and administrators, demonstrated effective leadership skills, and experience in working on school or SLOCOE committees.

10.7.5 Ability to communicate effectively orally and in writing.

10.8    Each applicant interested in serving as a Consulting Teacher must provide a letter of interest, resume, and two letters of recommendation from individuals with specific knowledge of his or her qualifications, as follows:

     10.8.1  One reference from a SLOCOE Administrator or immediate supervisor.

     10.8.2  One from another "Teacher" or another member of the educational community. All applications and references shall be treated with confidentiality. References shall be submitted directly to the Human Resources Department by the author of the reference.

10.9  Consulting Teachers shall be selected by a consensus vote of the PAR Panel after a minimum of two (2) representative(s) of the PAR Panel have conducted a classroom observation and interview with each of the candidates. At least one teacher and one administrator shall participate in the classroom observation.

10.10  The term of the Consulting Teacher shall be one (1) year The current Consulting Teacher may reapply for the position.

10.11  Release time and/or additional compensation will be awarded to the Consulting Teacher(s) by the PAR Panel based upon the number of the program participants. This position(s) may be designated by the PAR Panel as full or part-time.

10.12  Consulting Teacher(s) essential functions shall include, but are not limited to:

     10.12.1  Assist Voluntary and Mandatory Participating Teachers by demonstrating, observing, coaching, conferencing, referring, or by other activities which, in their professional judgment, will assist the Participating Teacher in remedying the specific areas recommended for improvement by the evaluating Administrator.

     10.12.2  Assist the Mandatory Participating Teacher in remedying the specific areas recommended for improvement by the evaluating Administrator by meeting with the Mandatory Participating Teacher to develop a plan to assist the teacher in complying with the Performance Improvement Plan and to develop a process for assessing the teacher's participation in the Program.

     10.12.3  Conduct multiple informal observations of the Mandatory Participating Teacher during the performance of his/her job responsibilities, and a minimum of two formal observations with both Pre-Observation and Post-Observation Conferences.

     10.12.4  Monitor the progress of the Participating Teacher with an unsatisfactory designation in one or more areas on his/her final evaluation and shall provide periodic written reports to the teacher for discussion and review.

     A "draft" copy of the Consulting Teacher's report shall be submitted to and discussed with the Mandatory Participating Teacher. The Mandatory Participating Teacher shall have ten (10) days to submit written comments to the Consulting Teacher before the report is finalized and presented to the teacher for signature. The Mandatory

**37/48**

Participating Teacher's signing of the report does not necessarily mean agreement, but rather than he or she has received a copy of the report. The Consulting Teacher shall submit a final report to the PAR Committee. The Mandatory Participating Teacher with an unsatisfactory evaluation shall have the right to submit a written response, within ten (10) working days, and have it attached to the final report.

## Other Provisions

10.13 Functions performed by unit members as Consulting Teachers or members of the PAR Committee pursuant to this Article shall not constitute either management or supervisory functions as defined by Government Code Section 3540.1(g) and (m). Such unit members shall continue to enjoy all rights afforded to other bargaining unit members.

10.14 Unit members who perform functions as Consulting Teachers or PAR Committee members under this document shall have the same protection from liability and access to appropriate defense as other public school employees pursuant to Division 3.6 (commencing with Section 810) of Title 1 of the California Government Code.

10.15 All documents and information relating to a specific employee's participation in this Program is regarded as a personnel matter. Such records are, therefore, exempt from disclosure under the California Public Records Act (Government Code Section 6250, et seq.) as a personnel record.

    10.15.1 The annual evaluation of the Program's impact, excluding any information on identifiable individuals, shall be subject to disclosure under the Public Records Act.

    10.15.2 The selection process for Consulting Teachers, to the extent it contains records related to identifiable individuals, will be treated as confidential and will not be disclosed except as required by law.

    10.15.3 All documents related to the Program will be filed by the Human Resources Department separately from an individual's personnel file.

10.16 This Article shall not be grievable. Any claims that the Article has not been properly implemented shall be presented in writing to the PAR Committee with copies to the SLOCOE and SLOCEA. Any such claim shall be addressed in the annual report.

10.17 Expenditures for this Program shall not exceed the revenue received under AB-XXI .

10.18 Nothing in this Article shall, in any way, modify or affect the rights of the SLOCOE under provisions of the Education Code relating to the employment, classification, retention, non-reelection, or release of certificated employees.

## ARTICLE XI

## SAFETY CONDITIONS OF EMPLOYMENT

11.1    Employees of the San Luis Obispo County Office of Education shall be safety conscious in their own conduct and actions and shall cooperate with the Employer in the implementation of its safety program.

11.2    Employees shall report any unsafe or unhealthy conditions directly to their supervisors without reprisal.

11.3    There shall be a safety committee composed of 12 members. Four members shall be selected by the Employer, and four members shall be selected by the Exclusive Representative of the certificated employees and four members from the classified service. The committee shall:

11.3.1    Meet on a monthly basis on release time to review any accident reports and make recommendations for new programs of inservice safety training.

11.3.2    Receive and review reports of possible dangerous situations and make recommendations to the proper person for corrective action.

11.3.3    Determine which safety equipment is reasonably necessary or required to be furnished by the Employer.

11.4    The Employer shall not discipline an employee for the proper exercise of physical control over a student unless an investigation shows that the employee exceeded his or her authority under the provisions of Education Code Section 44807 or violated the provisions of Education Code Section 49001. The Employer will make training in the area of student control available.

## ARTICLE XII

### EMPLOYEE/MANAGEMENT RIGHTS
### TO INFORMATION AND COMMUNICATIONS

12.1    The Association's Interest Based Bargaining Team shall be granted reasonable release time for negotiating without loss of compensation.

12.2    The Association shall have the right to:

    12.2.1  Access at reasonable times employee work areas.

    12.2.2  Use the County Office of Education's mailboxes.

    12.2.3  Use other reasonable means of communication with employees.

    12.2.4  Release time for the Association President or designee to attend County Board of Education meetings. Substitute costs will be borne by the Employer.

    12.2.5  Ten days leave for Association business per school year. Written notification shall be provided to the Superintendent as soon as the need is known. The Association shall reimburse SLOCOE for the cost of substitutes secured while the employee is on leave at the substitute rate of pay.

12.3    The Employer will provide the Association with a complete Board agenda and minutes prior to the Board meetings, public information (class size, statistical reports, budgetary information, etc.), and relevant fiscal information provided to the State Department of Education. The costs of duplication of documents shall be borne by the Association.

12.4    There will be payroll deduction of Association dues upon receipt of a signed authorization from a certificated employee. This authorization may be canceled by giving a 30-day written notice to the Employer and the Association. An employee may modify the authorization once each school year. Should an employee modify the authorization a second, or subsequent time, there shall be a $5.00 processing fee, to be paid by the Exclusive Representative.

    12.4.1  "Any bargaining unit member who is not a member of the Association shall pay to the Association a fee in an amount equal to membership dues, payable to the Association in the same manner as required for payment of membership dues. In the event that a bargaining unit member does not pay such fee directly to the Association, the Association shall so inform the Employer, and the Employer shall immediately begin automatic payroll deduction as provided in Education Code Section 45061 and in the same manner as set forth in this Article. There shall be no charge to the Association for such mandatory agency fee deductions."

**40/48**

12.4.2 Any bargaining unit member who is a member of a religious body whose traditional tenets or teachings include objections to joining or financially supporting employees organizations shall not be required to join or financially support the Association as a condition of employment; except that such bargaining unit member shall pay, in lieu of a service fee, sums equal to such service fee to one of the following non-religious, non-labor organization, charitable funds exempt from taxation under Section 501 (c) (3) of Title 26 of the Internal Revenue Code:

        a. Camp Hapitok

        b. Ronald McDonald House

        c. Susan G. Komen for the Cure

To receive a religious exemption, the bargaining unit member must submit a detailed written statement establishing the basis for religious exemption. The Association executive board shall communicate in writing to the bargaining unit member its acceptance or rejection of the exemption. If accepted, the bargaining unit member shall make the payment to one of the charities named above. Such payment shall be made on or before the due date for cash dues/fees for each school year. Proof of payment shall be made on annual basis to the Association and the Employer as a condition of continued exemption from the payment of agency fee. Proof of payment shall be in the form of receipts and/or cancelled checks indicating the amount paid, date of payment, and to whom payment in lieu of service fee has been made. No in-kind services may be received for payments, nor may the payment be in a form other than money such as the donation of used items. Such proof shall be presented on or before the due date for cash dues/fees for each school year."

12.4.3 "With respect to all sums deducted by the Employer pursuant to this Article, whether for membership dues or agency fee, the Employer agrees to remit such moneys promptly to the Association accompanied by an alphabetical list of bargaining unit members for whom deductions have been made, categorizing them as to membership or non-membership in the Association, and indicating any changes in personnel from the list previously furnished. This list shall be provided a minimum of once annually, as soon as possible after the start of the school year but no later than September 10th. The Association and the Employer agree to furnish to each other any information needed to fulfill the provisions of this Article."

12.5 An Interest Based Alliance will be established for the purpose of resolving issues of concern to the Employer and/or the Association. The Interest Based Alliance will meet by October 15 of each school year to establish a meeting schedule.

12.5.1 Any issue that presents an immediate or ongoing concern can be addressed by the Interest Based Alliance. This includes, but is not limited to contract issues, budget issues, issues between employees, and other work conditions. The Director of Human Resources and the Association designee will provide an agenda for the Interest Based

Alliance meetings. It is also recognized that issues may arise that may not be on a planned agenda.

12.5.2 The Interest Based Alliance may refer an issue to another County Office of Education group/committee for discussion/action, such as Expanded Cabinet or Leadership Team.

12.5.3 The Interest Based Alliance will make minutes of the meetings available to all employees.

12.6 The Association and the County Superintendent of Schools recognizes and supports the San Luis Obispo County Office of Education's Vision, statement, Mission statement, Organizational Philosophy, and Standards and Expectations for staff.

12.6.1 All employees have a shared responsibility to create and maintain a positive climate within the workplace. To this end, the following standards and expectations shall apply to all staff in the performance of their duties:

- Treat each individual with dignity and worth.
- Assist each individual to realize her/his greatest potential in the use of talent and skills.
- Support teamwork and initiative.
- Interact with others in a professional, responsible, and respectful manner.
- Promote high expectations for performance and accountability to achieve established goals.
- Value quality, excellence, and continuous improvement.
- Support innovation and creativity.
- Model and promote clear, frequent, and honest communication within the organization.
- Recognize and reward excellence in performance.
- Utilize participatory decision-making and problem solving.

12.6.2 It is of mutual interest that the San Luis Obispo County Office of Education be competitive in attracting and hiring qualified teachers through salary, benefits, and work environment. It is also of mutual interest that the County Office of Education be equally competitive in retaining qualified teachers by adherence to the Standards and Expectations for staff.

## ARTICLE XIII

### GRIEVANCE PROCEDURE

#### 13.1 **Definitions**

13.1.1 "Grievance" shall mean an allegation by an employee that there has been a violation of one or more express provisions of this Agreement. No issues outside this contract may be subject to the grievance procedure.

13.1.2 "Grievant" shall mean an employee who is a member of the bargaining unit. The Association may grieve, with written authorization, on behalf of a unit member.

13.1.3 "Day" shall mean a day when the County Office of Education is normally open for business.

13.1.4 "Immediate supervisor" is the administrator having immediate jurisdiction over the grievant.

13.2. The grievant may elect to be represented by the Exclusive Representative at all formal levels of the grievance procedure and must inform the Employer in writing of such election prior to the first meeting.

13.2.1 The grievant, a designated bargaining unit representative, and witnesses, if any, participating in the processing of the grievance, shall suffer no loss in pay if meetings or appointments are mutually scheduled by the Employer and the Exclusive Representative.

13.2.2 An employee may present a grievance to the Employer and have such grievance adjusted without the intervention of the Exclusive Representative.

- Any adjustment shall not be inconsistent with the terms of this Agreement.

- The Employer shall not agree to a resolution of the grievance until the Exclusive Representative has received a copy of the grievance and the proposed resolution and has been given an opportunity to file a response.

13.2.3 At all levels of the grievance procedure, the grievant shall provide the Exclusive Representative with all details and copies of correspondence relative to the grievance.

13.3 Once a grievance has been initiated, all matters of dispute relating to it which occur during the processing of the grievance shall become a part of and be resolved in the grievance proceeding.

Once a grievance has been resolved, or a final decision rendered, a grievant shall not been titled to initiate a new grievance on any matter or occurrence which properly could have been included in the first grievance.

13.4   The grievant may request an extension of the timeline if the time limit is extended beyond her/his work year. Failure of the grievant or the grievant's representative to adhere to the time limits of this Article shall constitute waiver of the grievance and acceptance of the Employer's action or decision at the appropriate level.

13.5   No reprisal will be taken by the Employer against any grievant or participant in the grievance procedure by virtue of such participation. All written materials pertinent to a grievance, except decisions which affect the employee's employment status, shall be filed separately from the personnel file of the grievant or any participant.

13.6   Until final disposition of the grievance takes place, the grievant shall conform to the original direction of the Employer.

## Formal Level One
13.7   An employee may discuss any grievance with the immediate supervisor by requesting a meeting in writing within 10 days of the alleged violation. The immediate supervisor shall attempt to adjust the grievance and shall respond verbally within two days of the meeting.

## Formal Level Two
13.8   Within 10 days of the occurrence or of first knowledge of the occurrence of the alleged violation of the Agreement, or within 10 days of the Level One meeting, the grievant shall present the grievance in writing to the immediate supervisor.

   13.8.1 The written grievance shall contain the following minimum information:

   - The grievant's name.
   - The date of filing.
   - The date of the alleged violation.
   - The specific Article(s) or section(s) violated.
   - A brief description of the alleged violation.
   - A brief synopsis of the informal conference.
   - The specific relief requested.

13.8.2 Grievances not containing the required information shall be rejected as being improperly filed.

13.8.3 The grievant may request a conference with the immediate supervisor. The conference shall be held within 10 days of the request.

13.8.4 Within 10 days of receipt of the grievance by the supervisor or within 10 days of the conference, if one is requested, a written decision shall be issued to the grievant. If the supervisor does not respond within the time limit, the grievance is denied and the grievant may appeal to the next level.

**Formal Level Three**

13.9  In the event that the grievance is denied at Level Two, a written appeal to the Superintendent or designated representative shall be filed within 10 days of the issuance of the Level One denial decision.

13.9.1 The appeal shall contain all materials utilized in the prior level, including the decision rendered, if any, and a specific and concise statement of the reason for the appeal.

13.9.2 No new information, statements, or charges, if known at an earlier level, may be introduced by the grievant in any appeal. The issue shall be determined on the basis of one, and only one, set of facts and allegations.

13.9.3 The Superintendent or designated representative shall meet with the grievant within 10 days of the receipt of the appeal.

- The Superintendent or designee shall, within 10 days of the meeting, issue a written decision which shall be final and binding on the parties.

- Nothing contained herein shall deny an employee the right to seek judicial review.

## ARTICLE XIV

## CONCLUSION

### Completion of Negotiations

14.1    This Agreement represents complete collective bargaining and full agreement by the parties in respect to wages, hours of employment, and other terms and conditions of employment which shall prevail during the term or terms hereof. Any matter or subject not herein covered has been satisfactorily adjusted, compromised, or waived by the parties for the life of this Agreement. The parties agree to meet and to negotiate further on any items of interest to either party during the term of this agreement.

### Past Practices

14.2    The specific provisions of this Agreement shall prevail over any past practice or procedure of the Employer.

      14.2.1  Since prior to the ratification of this Agreement, any past practice or procedure of the Employer was discretionary on the part of the Employer subject to Board policy, in the absence of a specific provision in this Agreement, any past practice or procedure is agreed to continue to be discretionary on the part of the Employer.

      14.2.2  When references are made to statutes (e.g., Education Code), such references are informational only and do not subject the provisions of such statutes to the grievance processes of this Agreement.

14.3    It is agreed and understood that the Employer retains all rights, powers, prerogatives, privileges, duties, and authorities vested in it by any source to manage, control, and direct the operation and affairs of the Employer except to the extent that such rights, powers, prerogatives, privileges, duties, and authorities are limited by express terms of this Agreement. The exercise of the rights, powers, prerogatives, privileges, duties, and authorities by the Employer, the adoption of policies, rules, regulations, and practices in furtherance thereof, and the use of judgment and discretion therewith shall be limited only by the express terms of the Agreement.

### Severability

14.4    In the event that any portion of this Agreement is found to be unlawful by a court of competent jurisdiction, the rest of the Agreement shall remain in full force and effect. Should a federal or state agency with jurisdiction invalidate any portion of this Agreement, the parties shall meet to negotiate over the affected provision(s).

### Continuation of Economic Benefits

14.5    Upon expiration of this Agreement, or of any interim salary or fringe benefit payment Article, employees who are reemployed for the following year shall be paid the same salary as for the final (or interim) year of the Agreement, and Employer contributions for fringe benefits shall

remain the same, until such time as a new Agreement is ratified by the parties or the duty to bargain has been completed.

## Duration of Agreement

14.6    This Agreement shall be in full force and effect from the date of ratification by the parties to June 30, 2015, at which time this Agreement shall expire and become null and void.

14.6.1    The parties recognize the possibility that the Superintendent's ability to meet certain obligations set forth in this Agreement may be impaired, restricted, or limited by statutory or constitutional changes of which effects would reduce state and/or local income.

a. Should the Superintendent determine that such a situation has occurred and take action to implement modification of any provisions of this Agreement, the Superintendent shall notify the Exclusive Representative.

b. The Exclusive Representative shall have the right to negotiate the effect of such a modification only if it serves written notice to the Superintendent within five days of notice to the Exclusive Representative.

14.6.2    The parties agree that the salary schedules are attached as Appendix A1-A4.

**ACCEPTED AND RATIFIED**

By their signatures below, the signatories certify that they are authorized representatives of either the Employer or the Exclusive Representative as the contracting parties; that all actions necessary for the Employer or the Exclusive Representative to ratify and accept this Agreement as a binding and bilateral agreement have been completed in the manner required by that party and the law; and that this Agreement is hereby entered into without the need for further ratification and acceptance.

**SAN LUIS OBISPO COUNTY**
**SUPERINTENDENT OF SCHOOLS**

**JULIAN D. CROCKER,**
**Superintendent of Schools**

DATE: 6/14/2012

**SAN LUIS OBISPO COUNTY**
**EDUCATION ASSOCIATION, CTA/NEA**

**JULIE SCHUYLER**
**President**

DATE: 6/8/12

**48/48**

Appendix A-1

## San Luis Obispo
## County Office of Education
## Teacher/Therapist Salary Schedule
### Effective July 1, 2007

| STEP | Pre-Credential (Emergency/ Provisional) Annual | Column I B.A. < 45 Semester units Fully Credentialed Annual | Column II B.A. + 45 Semester units or M.A. Fully Credentialed Annual | Column III B.A.+ 60 Semester units or MA + 15 Semester units Annual |
|---|---|---|---|---|
| 1 | $32,838.00 | $40,915.00 | $40,915.00 | $40,915.00 |
| 2 | | $40,915.00 | $40,915.00 | $40,915.00 |
| 3 | Years of service credit | $40,915.00 | $40,915.00 | $42,735.00 |
| 4 | are earned while serving | $40,915.00 | $42,579.00 | $44,805.00 |
| 5 | in pre-credential status. | $42,451.00 | $44,675.00 | $46,896.00 |
| 6 | | $44,520.00 | $46,739.00 | $48,965.00 |
| 7 | | $46,586.00 | $48,812.00 | $51,060.00 |
| 8 | | $48,682.00 | $50,905.00 | $53,127.00 |
| 9 | | $50,748.00 | $52,972.00 | $55,192.00 |
| 10 | | $50,748.00 | $55,065.00 | $57,287.00 |
| 11 | | $50,748.00 | $57,136.00 | $59,359.00 |
| 12 | | $50,748.00 | $57,136.00 | $59,359.00 |
| 13 | | $50,748.00 | $57,136.00 | $59,359.00 |
| 14 | | $52,202.00 | $62,299.00 | $64,722.00 |
| 15 | | $52,202.00 | $62,299.00 | $64,722.00 |
| 16 | | $52,202.00 | $62,299.00 | $64,722.00 |
| 17 | | $52,202.00 | $65,820.00 | $68,382.00 |
| 18 | | $52,202.00 | $65,820.00 | $68,382.00 |
| 19 | | $52,202.00 | $65,820.00 | $68,382.00 |
| 20 | | $52,202.00 | $70,314.00 | $76,731.00 |

Minimum Teacher pay is $34,000.

Based on 186 duty days including 3 staff development days.

$800 annually will be awarded for a Doctorate from a university or
college accredited by the Western Association of Schools & Colleges.

Approved by the County Superintendent of Schools

Dr. Julian Crocker                    Date  12/6/07

Revised 11/19/07 with an increase of 4.53%,retroactive to 7/1/07.

For HR Reference only:
Revised 4/4/06: 1% to steps + addition of longevity retroactive to 2/1/06.
Revised 4/23/07 retroactive to 7/1/2006: 3% longevity now incorporated into the cells. Salary Schedule completely restructured.
Steps 1-13 increased 4.7%. Steps 14-19 increased 7.7%
Step 20: Column I increased 7.7%, Column II increased 9.20%, Column III increased 14.7%

Appendix A2

## San Luis Obispo County Office Of Education

### Educational Occupational Therapist Salary Schedule
### Effective retroactive to July 1, 2007

| STEP | COLUMN I<br>B.A. + 44 Semester units<br>Fully Licensed<br>Annual | COLUMN II<br>B.A. + 45 Semester units or M.A.<br>Fully Licensed<br>Annual | COLUMN III<br>B.A.+ 60 Semester units or MA + 15 Semester units Fully Licensed<br>Annual |
|---|---|---|---|
| 1 | $40,914.00 | $40,914.00 | $40,914.00 |
| 2 | $40,914.00 | $40,914.00 | $40,914.00 |
| 3 | $40,914.00 | $40,914.00 | $42,734.00 |
| 4 | $40,914.00 | $42,578.00 | $44,804.00 |
| 5 | $42,450.00 | $44,674.00 | $46,895.00 |
| 6 | $44,519.00 | $46,737.00 | $48,964.00 |
| 7 | $46,585.00 | $48,811.00 | $51,059.00 |
| 8 | $48,681.00 | $50,904.00 | $53,126.00 |
| 9 | $50,747.00 | $52,971.00 | $55,191.00 |
| 10 | $50,747.00 | $55,064.00 | $57,286.00 |
| 11 | $50,747.00 | $57,135.00 | $59,358.00 |
| 12 | $50,747.00 | $57,135.00 | $59,358.00 |
| 13 | $50,747.00 | $57,135.00 | $59,358.00 |
| 14 | $52,201.00 | $62,298.00 | $64,721.00 |
| 15 | $52,201.00 | $62,298.00 | $64,721.00 |
| 16 | $52,201.00 | $62,298.00 | $64,721.00 |
| 17 | $52,201.00 | $65,819.00 | $68,381.00 |
| 18 | $52,201.00 | $65,819.00 | $68,381.00 |
| 19 | $52,201.00 | $65,819.00 | $68,381.00 |
| 20 | $52,201.00 | $70,313.00 | $76,730.00 |

Based on 186 duty days; 7 hour daily schedule

$600 annually will be awarded for a Doctorate from a university or
college accredited by the Western Association of Schools & Colleges.

**Julian D. Crocker**                    12/6/07    Date

**Revised 11/16/07 with an increase of 4.53%, retroactive to 7/1/07.**

For HR Reference only:
Revised 5/03/07 retroactive to 7/1/2006: All previous longevity now incorporated into the cells.
Salary Schedule completely restructured, Steps 1-13 increased 4.7%, Steps 14-19 increased 7.7%,
Step 20: Column I increased 7.7%, Column II increased 9.20%, Column III increased 14.7%
Revisions: July 2002; 12/2/2002; 4/4/06 (retroactive to February 1, 2006); 4/23/06 retroactive to 7/1/06.

**SAN LUIS OBISPO COUNTY OFFICE OF EDUCATION**

**FIRST FIVE PRESCHOOL PROGRAM
SALARY SCHEDULE**

**EFFECTIVE July 1, 2007**

**FIRST FIVE PRESCHOOL PROGRAM SUPERVISOR**

| STEP 1 | STEP 1 | | STEP 2 | STEP 2 | | STEP 3 | STEP 3 |
|--------|--------|--|--------|--------|--|--------|--------|
| Annual | Hourly | | Annual | Hourly | | Annual | Hourly |
| $25,744 | $28.44 | | $27,026 | $29.86 | | $28,368 | $31.34 |

Annual salary based upon 181 duty days, 5 hours per day.

**FIRST FIVE PRESCHOOL TEACHER**

| STEP 1 | STEP 1 | | STEP 2 | STEP 2 | | STEP 3 | STEP 3 |
|--------|--------|--|--------|--------|--|--------|--------|
| Annual | Hourly | | Annual | Hourly | | Annual | Hourly |
| $18,535 | $22.75 | | $19,452 | 23.88 | | $20,422 | $25.07 |

Annual salary based upon 181 duty days, 4.5 hours per day.

Approved by the County Superintendent of Schools:

Julian D. Crocker

12/6/07
Date

Revised 4/30/07: 6.5% = 3% CTA unit longevity incorporated into the cells. All retroactive to 7/1/06 (excluding extended school '06)
Revised 12/3/07 4.53% retroactive to July 1, 2007

APPENDIX A-3

SLOCEA/CTA – SLOCOE AGREEMENT – 2012-2015

Appendix A4

2007-2008

## SAN LUIS OBISPO COUNTY OFFICE OF EDUCATION
3350 EDUCATION DRIVE, SAN LUIS OBISPO, CA 93405

### STATE PRESCHOOL TEACHER SALARY SCHEDULE
Including Programs Within the Paso Robles School District Boundaries

Effective July 1, 2007

| Years w/SLOCOE | I *<br>40 Sem. Units* | II *<br>80 Sem. Units | III *<br>B.A. / B.S.<br>or 120 Sem. Units | IV *<br>B A./B.S. + 15 Sem<br>Units or 135 Sem. Units | V *<br>B A./D.S. + 30 Sem<br>Units or 150 Sem. Units |
|---|---|---|---|---|---|
| 1 | $20,644 | $21,078 | $21,513 | $21,948 | $22,384 |
| 2 | $21,663 | $22,099 | $22,535 | $22,967 | $23,403 |
| 3 | $22,758 | $23,192 | $23,630 | $24,065 | $24,499 |
| 4 | $23,893 | $24,329 | $24,762 | $25,198 | $25,636 |
| 5 | $23,893 | $24,329 | $24,762 | $25,198 | $25,636 |
| 6 | $23,893 | $24,329 | $24,762 | $25,198 | $25,636 |
| 7 | $24,341 | $24,785 | $25,226 | $25,670 | $26,117 |
| 8 | $24,341 | $24,785 | $25,226 | $25,670 | $26,117 |
| 9 | $24,341 | $24,785 | $25,226 | $25,670 | $26,117 |
| 10 | $24,789 | $25,241 | $25,690 | $26,144 | $26,598 |
| 11 | $25,499 | $25,964 | $26,426 | $26,892 | $27,360 |
| 12 | $25,499 | $25,964 | $26,426 | $26,892 | $27,360 |
| 13 | $25,499 | $25,964 | $26,426 | $26,892 | $27,360 |
| 14 | $26,010 | $26,484 | $26,956 | $27,430 | $27,906 |

Schedule based on 178 duty days, 5 hours per day.

* Range 1 (40 Sem. Units) Required for Regular Permit (24ECE + 16 General Ed.)

NOTE: Semester units must be approved by the Program Supervisor in order to advance to Range IV and Range V.

Substitute teacher rate:            $57.00  per day/plus mileage, effective 07/01/2001
** Long Term Substitute rate:       $64.00  per day/plus mileage, effective 07/01/2001
** A teacher who works 20 consecutive days in one assignment; upon the 21st day, will be paid retroactively to the first day at the long-term rate.

Approved by the County Superintendent of Schools

Signature                    Date 12/6/07

Revised 4/23/07: All previous longevity now incorporated into cells.  Salary Schedule completely restructured. .
Steps 1-10 increased 4.7%. Steps 11-14 increased 7.7% Retroactive to July 1, 2006
11/16/07 4.53% cola retroactive to July 1, 2007

# Appendix B

## San Luis Obispo County Office of Education

### Stipends/Hourly
### Effective December 1, 2010

**CTA Agreement**
**Appendix B**

| Title | Support Factors | Support Hours | Amount |
|---|---|---|---|
| *BTSA Induction Coordinator | NA | NA | $2500 per year |
| BTSA Induction Mentor | NA | NA | $1300 per year |
| Teacher in learning role | NA | NA | Curriculum (First cell on appropriate salary schedule) |
| PAR Consulting Teacher: | Supporting a Mandatory Participating Teacher | NA | Daily rate of pay |
| | Supporting a Voluntary Participating Teacher | 1-5 hours of support per month | $1,105 per year (equals 85% of BTSA Mentor) |
| | Supporting a Voluntary Participating Teacher | 6-10 hours of support per month | $1,300 per year (equals 100% of BTSA Mentor) |

Annual stipends will be prorated for partial years.
*Not available until funding returns

Approved by the County Superintendent of Schools: _____ Date 6-2-11
Julian D. Crocker

APPENDIX C



**San Luis Obispo County Office of Education**
**HUMAN RESOURCES DEPARTMENT**

*CATASTROPHIC LEAVE*
*CERTIFICATED REQUEST FORM*

Name (print): _____  Position: _____

How many days are being requested? _____ Site: _____

Status *(check one)* Full-time: _____ Part-time: _____

Signature: _____  Date: _____

I hereby request Catastrophic Leave for the following reasons: (attached additional page if
necessary) _____

_____

_____

I have read the San Luis Obispo County Office of Education's Catastrophic Leave Policy as provided in
the CTA Contract *(the full text from the CTA Contract is attached for your reference)* and believe I meet
all the eligibility requirements regarding myself and my immediate family *(immediate family shall be defined
as: mother, father, grandmother, grandfather, or grandchild of the employee or the spouse of the employee, and the spouse,
son, son-in-law, daughter, daughter-in-law, brother, brother-in-law, step-son, step-daughter, sister, sister-in-law, step-
brother, or step-sister of the employee or any relative of the employee living in the immediate household of the employee.*
I understand that it is necessary to provide the appropriate written verification from the attending
physician stating the catastrophic illness or injury, type of leave needed, and projected length of leave
needed *(please attach to this form)*. Return this form with attachment(s) to the attention of Beth
Summers at the San Luis Obispo County Office of Education Human Resources Department.

If this application is approved *(check one)*:

( ) I will solicit donations for leave on my own and want this application kept confidential.

( ) I authorize Human Resources to release only my name to other SLOCOE employees in a
request for donation to unit members.

Date reviewed: _____

Request approved ( )

Request denied ( ) Reason: _____

_____

Catastrophic Leave Committee Designee Signature : _____
Date: _____

*Attachment: CTA Contract Catastrophic Leave*

APPENDIX C

**Catastrophic Leave**
8.16    Section 1 – Eligibility:  A probationary or permanent (temporary employees are not eligible) employee who suffers from a catastrophic injury or illness that is expected to incapacitate the unit member for an extended period of time (more than ten days), or who is required to take time off from work to provide care for an immediate family member who suffers from a catastrophic injury or illness, shall be eligible to receive Catastrophic Leave donations from other unit members subject to the restrictions and conditions outlined below:

8.16.1 Before using donated sick leave, the employee must have exhausted all accrued sick leave.

8.16.2 The Catastrophic Leave Committee determines that the employee is unable to work due to the employee's or his/her family member's catastrophic illness or injury.

8.16.3 The maximum amount of donated leave shall not exceed five school months.

8.17    Section 2 - Requests for Sick Leave Donation:  An employee who meets the eligibility requirements for Catastrophic Leave may request donation of sick leave from other unit members by submitting a "Catastrophic Leave Request for Donation Form" to the Human Resources Department.  The request shall clearly specify the circumstances of the catastrophe and the amount of sick leave requested.  Appropriate written verification of the catastrophic illness or injury must be included with the request.  The unit member should be prepared to provide additional documentation on the nature and severity of the illness or injury, if requested. Catastrophic Leave will commence on the same day that the differential sick leave pay calendar begins.  The employee will receive full pay, and the employee's differential pay rights will run concurrently with the Catastrophic Leave.

8.17.1 A committee consisting of two Employer representatives and two representatives appointed by the Association shall be established each fiscal year.  One member shall serve as recorder.  Minutes shall be kept.  The committee shall consider all requests for sick leave donations.  The committee may grant, partially grant, or reject a request.  All deliberations are confidential and the decisions to grant or deny requests shall require mutual agreement.  The decision of the committee is final and not grievable.  A written copy of the committee's decision shall be provided to the requesting employee, to the Association, and to the Human Resources Department so that the sick leave can be transferred from the unit member donors to the member's account, if necessary.

8.17.2 Requesting employees should apply for donated sick leave prior to exhausting regular sick leave.  At no time shall donated sick leave be applied to a pay period that has been closed and for which a pay warrant was issued.

8.17.3 Donated sick leave shall be established in an individual account for the recipient and will be utilized in a sequence that will use one day from each donor before utilizing the second day from each donor.  Unused sick leave will be returned to the donor(s).

8.17.4 An employee who uses a donated sick leave day shall be paid at his/her regular daily rate.  No distinction shall be made as to the differing pay rates of the donors or recipients.

8.17.5 An employee may not receive the benefits of this leave while receiving monies or leave from Workers' Compensation.

APPENDIX C

8.18 Section 3 – Donations for Catastrophic Leave:

    8.18.1 Donated sick leave may not be used for industrial illness or injury accident.

    8.18.2 Donations to the unit member will be made in one-day increments.

    8.18.3 Unit members may only donate five (5) days per school year.

    8.18.4 A sick leave donor may not donate sick leave that would cause his/her personal accrued sick leave to fall below (10) days.

    8.18.5 The donor list shall be confidential.

SAN LUIS OBISPO COUNTY OFFICE OF EDUCATION
Julian D. Crocker, Superintendent

**Appendix – D1**

# **CERTIFICATED STAFF**

## Timeline for Evaluating Permanent and Probationary

| PROBATIONARY EMPLOYEES CYCLE (2 Years) | |
|---|---|
| **Activities** | **Timeline** |
| 1. Group Orientation | Within 10 days of hire or the beginning of school, whichever is sooner. |
| 2. Orientation Conference | Prior to October 1 |
| 3. Pre-Observation Conference (minimum of two) | One prior to December 20<br>One prior to March 1 |
| 4. Formal Observation *(Form: FOF001)* | One prior to January 15<br>One prior to March 1 |
| 5. Post Observation *(Form: FOF001)* | Within five working days of Formal Observation |
| 6. Informal Observation Notation *(Form: IOF001)*<br>*(Minimum of two in probationary period)* | It is expected that there will be informal contacts throughout the school year including professional observations such as parent conferences, IEPs, student meetings, agency meetings, or other opportunities outside the instructional setting. |
| 7. Summative Report *(Form: SERF001)* | Due prior to Summative Conference (30 calendar days before the end of the school year) |
| 8. Self-Evaluation Verification *(Form: SEF001)*<br>9. Summative Conference | Due on or before April 1 |
| 10. Upon successful completion of probation, the first year as a permanent employee, the teacher shall not be formally evaluated. | None. |

| PERMANENT EMPLOYEES FORMAL EVALUATION | |
|---|---|
| **Activities** | **Timeline** |
| · Individual Orientation Conference | November 15 |
| · Formal Observation Cycle *(Form: FOF001)* ✱ | Prior to March 1 |
| · Informal Observation *(Form: IOF001)* | Ongoing (see Definitions) |
| · Self-Evaluation Verification *(Form: SEF001)*<br>Summative Evaluation - | Due 30 days before the end of the school year |

SAN LUIS OBISPO COUNTY OFFICE OF EDUCATION
**Julian D. Crocker, Superintendent**

## CERTIFICATED EVALUATION DEFINITIONS

**Appendix D2**

*(Alphabetically)*

| EVALUATION TERM | DEFINITION/REQUIREMENTS | FORM (IF APPLICABLE) |
|---|---|---|
| **Data Collection File (Evaluator document)** | · *Data collected by evaluator (e.g., client satisfaction surveys, bulletins, correspondence, observations, etc.)* <br> · *All contents must be signed by both evaluatee and evaluator at the time item is placed in file* <br> · *Signature indicates knowledge only and does not indicate agreement* <br> · *Contents retained through the current 2-year cycle only.* <br> · *New Data Collection File shall be established at the beginning of a new cycle.* <br> · *For a period of two (2) years the evaluator shall keep the data collection file with the exception of the work sample file, which will be kept by the evaluatee.* <br> · *Do not send to Human Resources Department.* | |
| **Evaluation Year (Permanent staff only)** | · *School Year/Fiscal Year* | |
| **Formal Observation/Contacts** | · *Time of observation/contact to be mutually established* <br> · *Length: Minimum of 30 minutes* <br> · *Post-Observation Conference must be held within five 5 working days following formal observation/contact.* | Pre-Observation Data Sheet/Post-Observation Report *Form: FOF001* |
| **Informal Observation- (2 in probationary period)** | *It is expected that there will be informal contacts throughout the school year including professional observations such as parent conferences, IEP, student meetings, agency meetings, or other opportunities outside the instructional setting.* | Informal Observation/ Communication *Form: IOF001* |
| **Orientation Conference (individual or group)** | · *Purpose: Explain and clarify evaluation system and timelines* <br> *If hired at start of school, at first staff meeting (Probationary)* <br> · *If hired after the beginning of school, make appointment with Human Resources Director (Probationary)* <br> · *First staff meeting (Permanent)* | |
| **Pre-Observation Conference** <br> V:\EVALS\cert.eval-form2000lbohl.wpd11/15/2000 | · *Purpose to review the lesson plan and mutually establish the focus of the observation based on criteria.* <br> · *Contact may be facilitated by phone conference, email, fax, or U.S. Mail.* <br> *Precedes all formal observations* <br> · | *Form: FOF001* |

SAN LUIS OBISPO COUNTY OFFICE OF EDUCATION
Julian D. Crocker, Superintendent

| EVALUATION TERM | DEFINITION/REQUIREMENTS | FORM (IF APPLICABLE) |
|---|---|---|
| **Probationary Period** | · *Two complete consecutive years (Ed. Code 44929.21) (Complete school year for probationary employee, defined in Ed. Code 44908)* | |
| **Retention/Re-placement on Evaluation Year Cycle** | *An employee who is deemed unable or unwilling to meet the SLOCOE's standards will be placed (or retained) on the Evaluation Year Cycle.* | |
| **Self Evaluation:** | · *Pre-Observation Contact*<br>· *Formal Observations*<br>· *Post-Observation (feedback) Conference*<br>· *Other data/input may include:*<br>  ➢ *Informal Classroom Observations*<br>  ➢ *Work Samples*<br>  ➢ *Other Job Specific Data*<br>**Required:** *Verification form certifying self-evaluation must be turned in on or before the Permanent Summative Evaluation Conference. The actual self-evaluation document may be shared with evaluator at the discretion of evaluatee but is not retained in the Data Collection File.* | *Form: SEF001* |
| **Summative Evaluation Components** | 1. *Written Report*<br>  ➢ *Due at conclusion of formal evaluation*<br>  ➢ *Placed in Personnel File*<br>2. *Conference*<br>  ➢ *Scheduled at mutually agreed upon time, but not later than 30 days before end of school* | |

SAN LUIS OBISPO COUNTY OFFICE OF EDUCATION
**Julian D. Crocker, Superintendent**

# CERTIFICATED STAFF

**Appendix-D3**

## SELF-EVALUATION FORM

By my signature below, I certify that I have completed a self-evaluation using the criteria listed on Form
SERF001. I understand that the actual self-evaluation may be shared with my evaluator at my discretion
(optional), but will not be retained in the Data Collection File.


**Employee's Name** *(Please type or Print)*          **Social Security No.**


**Employee's Signature**


**Date**

SAN LUIS OBISPO COUNTY OFFICE OF EDUCATION
**Julian D. Crocker, Superintendent**

## CERTIFICATED STAFF EVALUATION FORM

**Appendix – D4**

**Evaluatee:** **Classification:**

**Department:** **Rating Period:**

## OVERALL EVALUATION RATING
(Complete all three pages)

**Check one:** ☐ **Formal Evaluation** ☐ **Temporary**

**The employee is to be given a general rating which is felt to best describe his/her overall performance. Comments in support of the rating should be included.**

---

**PROBATIONARY:**

☐ **1.** At this time the employee's overall performance meets or exceeds the standards and requirements of the San Luis Obispo County Office of Education. The employee will be recommended for employment/reemployment.

☐ **2.** The employee is not meeting the standards and requirements of the San Luis Obispo County Office of Education. The employee will not be recommended for employment/reemployment.

---

**PERMANENT:**

☐ **1.** At this time the employee's overall performance meets or exceeds the standards and requirements of the San Luis Obispo County Office of Education. The employee will be recommended for employment/reemployment.

☐ **2.** At this time the permanent employee's overall performance is deficient in meeting the standards and requirements of the San Luis Obispo County Office of Education. The employee exhibits potential for improvement and will be placed/or continue on formal evaluation.

☐ **3.** At this time, the permanent employee has an unsatisfactory evaluation in one or more areas of subject matter knowledge, instructional strategies, or classroom management, and is referred to the Peer Assistance and Review Program. The employee will be placed/or continue on formal evaluation.

☐ **4.** The employee is not meeting the standards and requirements of the San Luis Obispo County Office of Education. The employee will not be recommended for employment/reemployment.

---

*NOTE: Prior to completing the underline(final probationary evaluation), the supervisor must review the evaluation with the Human Resources Director. To Schedule an appointment with the Human Resources Director, call the Human Resources Division Secretary at 782-7233.*

**Narrative Summary Evaluation:**

**Response:** (Employee has the right to initiate a written rebuttal to the performance appraisal within five (5) working days. Such response shall become a permanent attachment to the employee's personnel file.)

**Evaluatee's Signature:** _____ **Date:** _____
*(Note: A signature on this performance appraisal does not mean that the employee agrees with the opinions expressed, but merely indicates that the employee has read the performance appraisal and has been given the opportunity for discussion, comments, and written response.)*

**Evaluator's Signature:** _____ **Date:** _____

**HR Director Signature:** _____ **Date:** _____

*Original: Personnel Department     Copy: Employee     Copy: Personnel File*

SAN LUIS OBISPO COUNTY OFFICE OF EDUCATION
**Julian D. Crocker, Superintendent**

**Appendix- D5**

# CERTIFICATED
## SUMMATIVE EVALUATION REPORT FORM

**DIRECTIONS:** Place a check mark on the appropriate line for the rating of each criterion. A comment space has been provided. Use of this space is encouraged. When a Distinguished or Unsatisfactory rating is given, comments must be written. Each criterion is to be rated.

**DEFINITIONS:** **Distinguished:** There is evidence that this effective behavior and/or professional responsibilities exceeds expectations.
**Accomplished:** There is evidence that this effective behavior and/or professional responsibilities is consistently exhibited.
**Growth Area:** There is evidence that many of the components of effective behavior and/or professional responsibilities have not been met yet, growth is needed.
**Unsatisfactory:** There is evidence that this effective behavior and/or professional responsibilities is not exhibited with any degree of quality.

| CRITERIA | LEVELS OF PERFORMANCE *(MARK ONE)* | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **PERFORMANCE AREA I: PLANNING** | **DISTINGUISHED** | X | **ACCOMPLISHED** | X | **GROWTH AREA** | X | **UNSATISFACTORY** | X |
| 1. Demonstrates effective planning skills. | Demonstrates flexibility and creativity within an overall plan. | ☐ | Plans the use of teaching resources including time, materials, and equipment effectively. | ☐ | Plans the use of teaching resources ineffectively. | ☐ | Does not plan the use of teaching resources. | ☐ |
| Comments: | | | | | | | | |
| 2. Displays a thorough knowledge of prescribed curriculum. | Shows initiative and leadership in the review and development of curriculum. | ☐ | Learning content relates to approved curriculum | ☐ | Learning content is marginally related to approved curriculum. | ☐ | Learning content does not reflect approved curriculum | ☐ |
| Comments: | | | | | | | | |
| 3. Provides opportunities for individual differences. | Diagnoses individual student learning styles and provides instruction accordingly. | ☐ | Provides for individual rates of learning and student capabilities. | ☐ | Shows little concern for individual differences. | ☐ | Does not provide for individual differences. | ☐ |
| Comments: | | | | | | | | |
| 4. Sets high expectations for student achievement. | Uses student achievement data daily for setting high expectations for student achievement. | ☐ | Effectively sets high expectations for student achievement. | ☐ | Uses data about student achievement which is marginal when setting expectations. | ☐ | Does not set high expectations for student achievement. | ☐ |
| Comments: | | | | | | | | |
| **PERFORMANCE AREA II INSTRUCTION** | **DISTINGUISHED** | X | **ACCOMPLISHED** | X | **GROWTH AREA** | X | **UNSATISFACTORY** | X |
| 5. Implements the lesson plan. | Implements the lesson plan in a manner that could serve as an exemplary model. | ☐ | Implements the lesson plan effectively. | ☐ | Marginally implements the lesson plan. | ☐ | Inappropriately implements the lesson plan. | ☐ |
| Comments: | | | | | | | | |
| 6. Motivates students. | Motivates students to achieve beyond | ☐ | Clearly motivates students to perform | ☐ | Inconsistently requires students to | ☐ | Unrealistic expectations | ☐ |

|  | previous performance levels. |  | assigned tasks according to their abilities. |  | perform according to their abilities. |  | dissuade students from performing to their abilities. |  |
|---|---|---|---|---|---|---|---|---|
| Comments: | | | | | | | | |
| 7. Communicates effectively with the students. | Uses a variety of verbal and nonverbal techniques effectively | ☐ | Communications are clear and relevant dialogue is encouraged. | ☐ | Communications are clear but student input is not encouraged. | ☐ | Communications are unclear; students appear confused. | ☐ |
| Comments: | | | | | | | | |

| PERFORMANCE AREA III MANAGEMENT | DISTINGUISHED | X | ACCOMPLISHED | X | GROWTH AREA | X | UNSATISFACTORY | X |
|---|---|---|---|---|---|---|---|---|
| 8. Organizes the classroom for effective use of instructional time and resources. | Demonstrates exemplary individual and collaborative use of time, materials, and resources | ☐ | Utilizes carefully structured instructional practices to organize the classroom environment. | ☐ | Organization is evident only occasionally. | ☐ | Organization is ineffective. | ☐ |
| Comments: | | | | | | | | |
| 9. Sets high standards for student behavior. | Promotes student self-management. | ☐ | Establishes rules which are fair. | ☐ | Inconsistently sets high standards for student behavior. | ☐ | Does not set high standards for student behavior. | ☐ |
| Comments: | | | | | | | | |
| 10. Meets established standards for student performance. | Concentrates on high standards for all students to meet. | ☐ | Challenges all students to meet performance standards. | ☐ | Occasionally meets established standards for student performance. | ☐ | Does not attempt to meet established standards. | ☐ |
| Comments. | | | | | | | | |

| PERFORMANCE AREA IV POSITIVE INTERPERSONAL RELATIONS | DISTINGUISHED | X | ACCOMPLISHED | X | GROWTH AREA | X | UNSATISFACTORY | X |
|---|---|---|---|---|---|---|---|---|
| 11. Demonstrates effective interpersonal relationships | Involves students in activities to create an understanding and acceptance of all individuals. | ☐ | Maintains effective interpersonal relationships with others. | ☐ | Intermittently demonstrates effective interpersonal relationships. | ☐ | Does not demonstrate effective interpersonal relationships. | ☐ |
| Comments: | | | | | | | | |
| 12. Promotes positive self-concept, responsibility, and self-discipline in students. | Encourages all students to demonstrate responsible behaviors in a wide variety of settings. | ☐ | Provides opportunities for students to demonstrate positive self-concept, responsibility, and self-discipline. | ☐ | Inconsistently provides opportunities for students to demonstrate positive self-concept, responsibility, and self-discipline. | ☐ | Discourages students from being self-disciplined through constant exposure to activities requiring supervision. | ☐ |
| Comments: | | | | | | | | |

| PERFORMANCE AREA V PROFESSIONAL RESPONSIBILITIES | DISTINGUISHED | X | ACCOMPLISHED | X | GROWTH AREA | X | UNSATISFACTORY | X |
|---|---|---|---|---|---|---|---|---|
| 13. Demonstrates collegial teamwork and collaboration. | Promotes collegial teamwork and collaboration with others | ☐ | Regularly participates as a team member. | ☐ | Habitually needs to be reminded about collegial teamwork and collaboration. | ☐ | Does not participate in teamwork activities. | ☐ |

| Comments: | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 14. Supports organizational regulations and policies. | Informs, participates, and assists in the development and review of regulations and policies. | ☐ | Supports all regulations and policies. | ☐ | Intermittently supports regulations and policies. | ☐ | Openly refuses to comply with regulations and policies. | ☐ |

| Comments: | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 15. Effectively utilizes professional growth opportunities. | Initiates and encourages other staff members to utilize professional growth opportunities. | ☐ | Seeks out and voluntarily participates in relevant professional growth opportunities. | ☐ | Is involved in professional growth opportunities when directed. | ☐ | Shows no interest in professional growth opportunities. | ☐ |

| Comments: |
|---|

**Evaluatee's Signature:** _____ Date: _____

(Note: A signature on this performance appraisal does not mean that the employee agrees with the opinions expressed, but merely indicates that the employee has read the performance appraisal and has been given the opportunity for discussion and written comment. The employee has the right to initiate a written rebuttal to all or part of the performance appraisal within five (5) working days. Such response shall become a permanent attachment to the employee's personnel file.)

**Evaluator's Signature:** _____ Date: _____

**Reviewer's Signature:** _____ Date: _____

Julian D. Crocker, Superintendent

# CERTIFICATED STAFF

**Appendix-D6**

## CLASSROOM OBSERVATION FORM
(FILLABLE)

**Evaluatee:**     **Location:**     **Date:**     **Time:**

**PRE-OBSERVATION DATA (_briefly_ list three (3) work behaviors from the criteria.):**

1.

2.

3.

---

### POST-OBSERVATION/FEEDBACK

---

### OVERALL PERFORMANCE

| STRENGTHS: | CONCERNS: |
|---|---|
|  |  |

**Evaluatee**                               **Date**

**Evaluator**                               **Date**

## SAN LUIS OBISPO COUNTY OFFICE OF EDUCATION

**Julian D. Crocker, Superintendent**

**Appendix-D7**

# CERTIFICATED STAFF

## INFORMAL OBSERVATION/COMMUNICATION FORM

**School:**     **Teacher:**     **Period/Time:**     **Date:**

---

Supervisor's Signature

Original-Teacher     Copy-Supervisor

SAN LUIS OBISPO COUNTY OFFICE OF EDUCATION

**Julian D. Crocker, Superintendent**

## CRITERIA

### Performance Area I, Planning:

- Demonstrates effective planning

- Displays a thorough knowledge of prescribed curriculum

- Provides opportunities for individual differences

- Sets high expectations for student achievement

### Performance Area II, Instruction:
- Implements the lesson plan

- Motivates students

- Communicates effectively with the students

### Performance Area III, Management:
- Organizes the classroom for effective use of instructional time and resources

- Sets high standards for student behavior

- Meets established standards for student performance

## CRITERIA

### Performance Area IV, Positive Interpersonal Relations:
- Demonstrates effective interpersonal relationships

- Promotes positive self-concept, responsibility, and self-discipline in students

### Performance Area V, Professional Responsibilities:
- Demonstrates collegial teamwork and collaboration

- Supports organizational regulations and policies

- Effectively utilizes professional growth opportunities

SAN LUIS OBISPO COUNTY OFFICE OF EDUCATION
Julian D. Crocker, Superintendent

## SAN LUIS OBISPO COUNTY OFFICE OF EDUCATION
Julian D. Crocker, Superintendent

**Appendix-D8**

# CERTIFICATED STAFF
PERFORMANCE IMPROVEMENT PLAN

| Evaluatee | Assignment | Date |
|---|---|---|
| | | |

| Performance area needing improvement: *(Check one)* | Criterion from Summative Evaluation Report on Performance Improvement Plan is based: |
|---|---|
| ☐ Planning <br> ☐ Instruction <br> ☐ Management <br> ☐ Positive Interpersonal Relations <br> ☐ Professional Responsibilities | |
| | |

**I. GOAL (General Intent)**
**(Focus statement is necessary for "Needs Improvement.")**

| II. ACTIVITIES (Specific & Measurable) TIMELINE <br> *(Sequence activities, and indicate when it will be addressed or completed.)* | Timeline |
|---|---|
| | |

SAN LUIS OBISPO COUNTY OFFICE OF EDUCATION
**Julian D. Crocker, Superintendent**

---

**This PIP was:**

☐ **Fully Accomplished**
☐ **Partially Accomplished**
☐ **Not Accomplished**

---

**EVALUATOR'S COMMENTS:**
*(Include reference to and comments regarding evidence that the PIP was met in the comments above.)*


---

**Signature**                          **Date**

---

**EVALUATEE'S COMMENTS:**


**Signature**                          **Date**

Exhibit B



**KERN HIGH TEACHERS ASSOCIATION**
3409 CALLOWAY DR. SUITE#202
BAKERSFIELD, CALIFORNIA 93312

**MITCH OLSON, PRESIDENT**

VICKIE SHOENHAIR, VICE PRESIDENT
MINDY MONTANIO, SECRETARY
LISA LAYSHOT, TREASURER

Dear KHSTA Non-Member:

I'd like you to know that I respect your decision to not join our Association, but I also feel compelled to share with you an opportunity that you may not be aware exists. Some of the most heart wrenching situations that I've dealt with since becoming the Association President occur when members are critically ill, and they use up all of their sick time. The double whammy of dealing with a health problem and a financial problem at the same time can be an emotional roller coaster that can bring the afflicted to the brink.

When you exhaust your sick leave, you go on what is known as "differential pay" for up to 100 days where the district deducts from your check the cost of a substitute teacher. Most people that find themselves in this situation require a long term sub that gets paid the same as a new teacher. If you are extremely ill, you may exceed the 100 day max losing your job and all income.

If you join CTA, you are eligible for income protection through the insurance provider The Standard. The product they have offered is far superior to anything else I've come across. I've included information on the rates and a description of the benefits provided in this packet. Feel free to investigate and compare.

For the next month, all members of the Association will be able to get this insurance without having to state a pre-existing condition. Normally, if you do not sign up when you are first hired with the district, the insurance company can require that you fill out a medical questionnaire and will deny your coverage if you're sick or have a history of disease. We have gotten the company to agree to waive this requirement and you will be given a guarantee issue as long as we can get 80 people across the district to participate.

On the back of this letter is a letter written by one of our colleagues talking about how this income protection saved he and his family. It is both sad and inspiring. I encourage you to read it. It is a powerful testimonial. Additionally, we have provided you with a CTA membership form if you decide to reconsider your decision so that you can avail yourself to this great product.

If you would like to know more details, please talk to the site representative on your campus.

Regards,

Mitch Olson, President
Kern High School Teachers Association

**CALIFORNIA TEACHERS ASSOCIATION**
**NATIONAL EDUCATION ASSOCIATION**

Exhibit C

# California Teachers Association

Combined Financial Statements for the
Year Ended August 31, 2011, and Supplemental
Summary and Detail Schedules of Nonchargeable
and Chargeable Expenditures of Agency Fees
for the Year Ended August 31, 2011, and
Independent Auditors' Report

# CALIFORNIA TEACHERS ASSOCIATION

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| INDEPENDENT AUDITORS' REPORT | 1 |
| COMBINED FINANCIAL STATEMENTS FOR THE<br>YEAR ENDED AUGUST 31, 2011: | |
| Statement of Financial Position | 2 |
| Statement of Activities and Changes in Net Assets | 3 |
| Statement of Cash Flows | 4 |
| Notes to Combined Financial Statements | 5–12 |
| SUPPLEMENTAL SCHEDULES: | 13 |
| Summary of Nonchargeable and Chargeable Expenditures of Agency Fees for 2010–2011 | 14 |
| Supplemental Detail of Nonchargeable and Chargeable Expenditures of Agency Fees<br>for 2010–2011 | 15–26 |
| Notes to the Summary and Supplemental Detail Schedules of Nonchargeable and<br>Chargeable Expenditures of Agency Fees for 2010–2011 by Major Budget Category | 27–35 |

# Deloitte.

Deloitte & Touche LLP
555 Mission Street
Suite 1400
San Francisco, CA 94105
USA

Tel: +1 415 783 4000
www.deloitte.com

## INDEPENDENT AUDITORS' REPORT

To the Board of Directors of
California Teachers Association:

We have audited the accompanying combined statement of financial position of the California Teachers
Association (the "Association," a California not-for-profit corporation) as of August 31, 2011, and the
related combined statements of activities and changes in net assets and cash flows for the year then ended.
These combined financial statements are the responsibility of the Association's management. Our
responsibility is to express an opinion on these combined financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of
America. Those standards require that we plan and perform the audit to obtain reasonable assurance about
whether the combined financial statements are free of material misstatement. An audit includes
consideration of internal control over financial reporting as a basis for designing audit procedures that are
appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of
the Association's internal control over financial reporting. Accordingly, we express no such opinion. An
audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the
combined financial statements, assessing the accounting principles used and significant estimates made
by management, as well as evaluating the overall combined financial statement presentation. We believe
that our audit provides a reasonable basis for our opinion.

In our opinion, such combined financial statements present fairly, in all material respects, the combined
financial position of the Association as of August 31, 2011, and the combined changes in its net assets
and its cash flows for the year then ended in conformity with accounting principles generally accepted in
the United States of America.

Our audit was conducted for the purpose of forming an opinion on the basic combined financial
statements taken as a whole. The accompanying summary and detail schedules of nonchargeable and
chargeable expenditures of agency fees for the year ended August 31, 2011, on pages 13 through 35 are
presented for the purpose of additional analysis and are not a required part of the basic combined financial
statements. This supplementary information is the responsibility of the Association's management and
was derived from and relates directly to the underlying accounting and other records used to prepare the
financial statements. Such information has been subjected to the auditing procedures applied in our audit
of the basic combined financial statements and certain additional procedures, including comparing and
reconciling such information directly to the underlying accounting and other records used to prepare the
financial statements or to the financial statements themselves, and other additional procedures in
accordance with auditing standards generally accepted in the United Statements. In our opinion, such
information is fairly stated in all material respects when considered in relation to the basic combined
financial statements taken as a whole.

Deloitte & Touche LLP

December 22, 2011, except as to the summary and detail schedules of nonchargeable and chargeable
expenditures of agency fees, Note 13, and subsequent event in Note 1 for which the date is October 5,
2012.

Member of
Deloitte Touche Tohmatsu Limited

# CALIFORNIA TEACHERS ASSOCIATION

### COMBINED STATEMENT OF FINANCIAL POSITION
### AS OF AUGUST 31, 2011

### ASSETS

| | |
|---|---:|
| **CURRENT ASSETS:** | |
| Cash and cash equivalents | $ 37,237,365 |
| Short-term investments | 68,329,421 |
| Membership dues and accounts receivable — net | 4,181,951 |
| Supplies, deposits, and prepaid expenses | 2,666,010 |
| Total current assets | 112,414,747 |
| PROPERTY AND EQUIPMENT — Net | 55,563,221 |
| LONG-TERM INVESTMENTS | 17,180,500 |
| TOTAL | $185,158,468 |

### LIABILITIES AND NET ASSETS

| | |
|---|---:|
| **CURRENT LIABILITIES:** | |
| Accounts payable and accrued expenses | $ 9,701,582 |
| Accrued payroll and related liabilities | 4,508,134 |
| Dues payable to affiliated organizations | 15,625,836 |
| Deferred membership dues income | 551,907 |
| Current portion of long-term obligations | 6,737,285 |
| Total current liabilities | 37,124,744 |
| **LONG-TERM OBLIGATIONS — Less current portion:** | |
| Capital lease obligations | 17,738 |
| Accrued vacation, sick leave, and other related costs | 27,508,197 |
| Total long-term obligations | 27,525,935 |
| **NET ASSETS:** | |
| Unrestricted: | |
| Undesignated | 99,280,052 |
| Designated | 18,795,188 |
| Total unrestricted | 118,075,240 |
| Temporarily restricted | 2,432,549 |
| Total net assets | 120,507,789 |
| TOTAL | $185,158,468 |

See notes to combined financial statements.

# CALIFORNIA TEACHERS ASSOCIATION

## COMBINED STATEMENT OF ACTIVITIES AND CHANGES IN NET ASSETS
## FOR THE YEAR ENDED AUGUST 31, 2011

| | |
|---|---:|
| UNRESTRICTED NET ASSETS: | |
| Revenues: | |
| Membership dues and fees | $177,911,205 |
| Investment gain (loss) | 7,882,593 |
| Other | 5,474,284 |
| Total revenues | 191,268,082 |
| Expenses: | |
| Statewide programs | 73,807,589 |
| Local service delivery | 78,119,653 |
| Support services | 25,611,975 |
| Other | 10,070,902 |
| Total expenses | 187,610,119 |
| Net assets released from restriction | 108,207 |
| Increase (decrease) in unrestricted net assets | 3,766,170 |
| TEMPORARILY RESTRICTED NET ASSETS: | |
| Contributions | 119,697 |
| Interest and investment income | 117,838 |
| Net assets released from restriction | (108,207) |
| Increase (decrease) in temporarily restricted net assets | 129,328 |
| INCREASE (DECREASE) IN NET ASSETS | 3,895,498 |
| NET ASSETS — Beginning of year | 116,612,291 |
| NET ASSETS — End of year | $120,507,789 |

See notes to combined financial statements.

## CALIFORNIA TEACHERS ASSOCIATION

### COMBINED STATEMENT OF CASH FLOWS
### FOR THE YEAR ENDED AUGUST 31, 2011

| | |
|---|---:|
| CASH FLOWS FROM OPERATING ACTIVITIES: | |
| Increase (decrease) in net assets | $ 3,895,498 |
| Adjustments to reconcile change in net assets to net cash | |
| provided by operating activities: | |
| Depreciation and amortization | 2,677,336 |
| Net realized and unrealized (gain) loss on investments | (5,587,121) |
| Loss on disposal of property and equipment | 5,495 |
| Changes in operating assets and liabilities: | |
| Membership dues and accounts receivable | 597,344 |
| Supplies and prepaid expenses | (630,130) |
| Accounts payable and accrued expenses | (1,008,532) |
| Accrued payroll and related liabilities | (2,152,542) |
| Dues payable to affiliated organizations | 3,755,307 |
| Deferred membership dues income | (387,106) |
| Accrued vacation, sick leave, and other related costs | 1,631,586 |
| Net cash provided by operating activities | 2,797,135 |
| | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | |
| Purchases of investments | (45,438,800) |
| Sales of investments | 43,066,935 |
| Purchase and construction of property and equipment | (5,101,468) |
| Proceeds from sale of property and equipment | |
| Net cash used in investing activities | (7,473,333) |
| | |
| CASH FLOWS FROM FINANCING ACTIVITIES — Payments on capital | |
| lease obligations | (51,058) |
| | |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | (4,727,256) |
| | |
| CASH AND CASH EQUIVALENTS — Beginning of year | 41,964,621 |
| | |
| CASH AND CASH EQUIVALENTS — End of year | $37,237,365 |
| | |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW | |
| INFORMATION — Cash paid for interest | $    2,099 |

## CALIFORNIA TEACHERS ASSOCIATION

**NOTES TO COMBINED FINANCIAL STATEMENTS
AS OF AND FOR THE YEAR ENDED AUGUST 31, 2011**

### 1.   ORGANIZATION

The California Teachers Association (the "Association" or CTA) is a California not-for-profit corporation organized to advance the interests of the teaching profession and to promote and improve public education in the state. The Association has controlling interest of the California Teachers Association Institute for Teaching (the "Institute"), an affiliate that was created in 1968 and that provides educational programs. The Association also has controlling interest of the California Teachers Association Disaster Relief Fund (the "Fund"), which was created to provide disaster relief assistance for members impacted by natural and other disasters and California Teachers Association Foundation for Teaching and Learning (the "Foundation") which was created in 2008 to support high-quality teaching and high-quality public schools in the state of California, to make grants of scholarships to qualified students, to provide disaster relief, and to perform all things incidental to or appropriate for the achievement of said specific purposes.

The accompanying combined financial statements have been prepared on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("generally accepted accounting principles"). Management has evaluated subsequent events during the period from August 31, 2011 to December 22, 2011, and has updated this assessment through October 5, 2012, the date the combined financial statements were available to be issued.

### 2.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Principles of Combination** — The accompanying combined financial statements include the accounts of the Association and its affiliates, the Institute, the Fund, and the Foundation. All significant intercompany balances and transactions have been eliminated.

**Use of Estimates** — The preparation of financial statements in conformity with generally accepted accounting principles in the United States of America (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the combined financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**Revenues and Expenses** — Membership dues are recognized as earned on the accrual basis of accounting. Dues received prior to being earned are reported as deferred income until such time as they are earned. Other income consists principally of interest and dividends and both realized and unrealized gains and losses on investments and payments from affiliates. Other ancillary revenues, such as rent, fees, advertising, and reimbursements are not considered to be central to the Association's operation and are offset against related expenses.

Expenses are recognized when incurred on the accrual basis of accounting.

**Cash and Cash Equivalents** — The Association considers all highly liquid investments with a maturity of three months or less when purchased to be cash equivalents. Financial instruments that potentially subject the Association to concentrations of credit risk are primarily cash equivalents, short-term investments, membership dues, and accounts receivable.

**Investments** — Investments consist of marketable equity securities, certificates of deposit with original maturities greater than 90 days, treasury bills, corporate bonds, and liquid asset funds. Investments are stated at fair market value or at amounts approximating fair market value. Fair market value of marketable equity securities is based upon the last quoted market price on the last business day of the fiscal year. Realized gains and losses from investment transactions are calculated using the weighted-average method.

Investments in fixed-income securities that mature over one year from the date of the combined statements of financial position are classified as long-term investments.

**Membership Dues** — Membership dues and accounts receivable expose the Association to certain credit risks. The Association manages its risk by regularly reviewing its accounts and contracts and by providing allowances for uncollectible accounts.

The Association collects membership dues and fees on behalf of the National Education Association and others and periodically remits these dues and fees to these organizations. Such dues and fees are not recognized as membership revenue but instead reported as dues payable to affiliated organizations.

**Property and Equipment** — Property and equipment are carried at cost. Provisions for depreciation and amortization of property and equipment are computed using the straight-line method over estimated useful lives as follows:

| | |
|---|---|
| Buildings | 15–40 years |
| Furniture and equipment | 3–10 years |
| Leasehold improvements | Life of lease or estimated useful life, whichever is shorter |

**Accrued Vacation, Sick Leave, and Other Related Costs** — Accrued vacation, sick leave, and other related costs are accrued as earned. Such costs are allocated between current and long-term liabilities based on estimates of settlement dates. Upon termination, employees are entitled to compensation for accrued vacation. All employees are allowed to carry over balances of unused sick leave to the following years. Upon termination, unused sick leave is generally forfeited. If an employee retires, accrued sick leave is credited to years of service for purposes of determining retirement benefits. Eligible employees accrue postemployment benefits paid upon termination. Such accrual is estimated based on employment agreement terms, years of service, estimated forfeitures, and estimated salary increases. The Association participates in a multiemployer pension plan (the "Plan"). The Association is contractually obligated to make lump-sum payments to the Plan for additional service credit for employees who retire with unused earned sick days. The additional service credit is based on formulas in the respective employment contracts.

**Income Taxes** — The Association, the Institute, the Fund, and the Foundation are entities described in the Internal Revenue Code (IRC) Section 501(c). Consequently, these entities are generally exempt from federal and state income taxes under IRC Section 501(a) and the corresponding California statute whereby only unrelated business income, as defined by Section 512(a)(1) of the IRC, is subject to federal income tax.

**Net Assets** — The Association classifies its net assets as unrestricted and temporarily restricted.

*Temporarily Restricted* — Net assets subject to externally imposed restrictions that can be fulfilled by the actions of the Association or by the passage of time.

- 6 -

*Unrestricted* — Net assets are not subject to externally imposed restrictions. Unrestricted net assets may be designated for use by the Board of Directors of the Association. Such designations limit the area of Association's operations for which expenditures of designated net assets may be made.

**Recent Accounting Pronouncements** — In January 2010, the FASB issued ASU 2010-06, *Improving Disclosures about Fair Value Measurements*, which, among other things, amends ASC 820 to require entities to separately present purchases, sales, issuances and settlements in their reconciliation of Level 3 fair value measurements (i.e. to present such items on a gross basis rather than on a net basis), and which clarifies existing disclosure requirements provided by ASC 820 regarding the level of disaggregation and the inputs and valuation techniques used to measure fair value for measurements that fall within either Level 2 or Level 3 of the fair value hierarchy. ASU 2010-06 is effective for fiscal years beginning after December 15, 2009, except for the disclosures about purchases, sales, issuances and settlements in the roll forward of activity in Level 3 fair value measurements (which are effective for fiscal years beginning after December 15, 2010). Effective September 1, 2010, the Association has adopted ASU 2010-06, which did not have a material impact on the combined financial statements.

## 3.   INVESTMENTS

Financial Accounting Standards Board (FASB) ASC 820, *Fair Value Measurement and Disclosures, a* framework for measuring fair value, establishes a fair value hierarchy based on the quality of inputs used to measure fair value, and enhances disclosure requirements for fair value measurements. The three-level fair value hierarchy gives the highest priority to quoted prices in active markets for identical assets or liabilities (Level 1), securities not traded on an active market but for which observable market inputs are readily available (Level 2), and the lowest priority to unobservable inputs (Level 3).

The following table summarizes the Association's investments as of August 31, 2011 under the ASC 820 fair value hierarchy levels:

| | Fair Value Measurements at August 31, 2011 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| Certificates of deposit | $ | $ 413,004 | $ | $ 413,004 |
| Mutual funds | | | | |
| Blend funds | 2,853,797 | | | 2,853,797 |
| Equity funds | 22,410,339 | | | 22,410,339 |
| Fixed income funds | 10,763,971 | | | 10,763,971 |
| Commodity funds | 2,073,229 | | | 2,073,229 |
| Other | 319,449 | | | 319,449 |
| Common stocks | | | | |
| Basic materials | 2,760,705 | | | 2,760,705 |
| Capital goods | 297,316 | | | 297,316 |
| Consumer goods | 3,682,273 | | | 3,682,273 |
| Consumer services | 310,219 | | | 310,219 |
| Energy | 3,148,391 | | | 3,148,391 |
| Financial services | 2,589,567 | | | 2,589,567 |
| Health care | 1,923,855 | | | 1,923,855 |
| Industrial materials | 1,894,416 | | | 1,894,416 |
| Technology | 2,121,144 | | | 2,121,144 |
| Telecommunications | 1,133,048 | | | 1,133,048 |
| Utilities | 459,613 | | | 459,613 |
| Other | 995,486 | | | 995,486 |
| Preferred securities | 5,974,884 | 1,037,520 | | 7,012,404 |
| U.S. government bonds | 258,845 | 1,140 | | 259,985 |
| Corporate bonds | | | | |
| Domestic corporate obligations | | 15,991,466 | | 15,991,466 |
| International corporate obligations | | 544,488 | | 544,488 |
| Government securities | 369,662 | | | 369,662 |
| Municipal bonds | | 1,182,094 | | 1,182,094 |
| Total | $ 66,340,209 | $ 19,169,712 | $ | $ 85,509,921 |

The investment gain (loss) in the accompanying combined statement of activities and changes in unrestricted net assets for the year ended August 31, 2011, is summarized as follows:

| | |
| --- | --- |
| Interest and dividends | $2,392,272 |
| Net unrealized gain | 2,730,755 |
| Net realized gain (loss) | 2,759,566 |
| Investment income (loss) | $7,882,593 |

### 4.   MEMBERSHIP DUES AND ACCOUNTS RECEIVABLE

Membership dues and accounts receivable at August 31, 2011, consisted of the following:

| | |
|---|---:|
| Membership dues and fees | $3,383,757 |
| Accounts receivable | 1,401,731 |
| | 4,785,488 |
| Less allowance for doubtful accounts | (603,537) |
| Membership dues and accounts receivable — net | $4,181,951 |

### 5.   PROPERTY AND EQUIPMENT

Property and equipment at August 31, 2011, consisted of the following:

| | |
|---|---:|
| Property and equipment: | |
| Land | $   9,598,386 |
| Buildings and leasehold improvements | 58,973,329 |
| Furniture and equipment | 12,595,605 |
| Work in progress | 1,517,247 |
| | 82,684,567 |
| Less accumulated depreciation and amortization | (27,121,346) |
| Total | $ 55,563,221 |
| Net book value of assets under capital leases | $        30,761 |

### 6.   EMPLOYEE BENEFIT PLANS

The Association provides retirement benefits to substantially all employees through participation in a multiemployer defined benefit retirement plan. In addition, under a health and welfare plan, the Association provides health insurance benefits to substantially all employees on a defined contribution basis and to certain retired employees on a defined benefit basis. Each plan is administered by a Joint Board of Trustees. Contributions to these plans are determined by provisions of negotiated labor contracts.

The Association maintains a 401(k) Retirement Plan (the "401(k) Plan") covering substantially all full-time employees. The Association contributes annually to the 401(k) Plan based on the 401(k) Plan's provisions in accordance with employment agreements.

Contributions at August 31, 2011, to the plans by the Association were as follows:

| | |
|---|---:|
| Defined benefit retirement plan | $18,265,045 |
| Health and welfare plan | 15,934,246 |
| 401(k) plan | 2,314,883 |

## 7. RELATED-PARTY TRANSACTION

The Association is the Plan sponsor for the Economic Benefits Trust (EBT), which provides certain welfare benefits to members of the Association. The senior management of the Association serves as the trustees of EBT. The Association and EBT have entered into an expense reimbursement agreement in which the Association provides certain administrative services and EBT reimburses the Association for its direct expenses, which amounted to $1,231,513 during 2011.

## 8. DEBT FACILITIES

The Association had two revolving loan agreements, one in the amount of $10,000,000 and the other for $20,000,000. Interest is payable monthly at the prime rate or the London InterBank Offered Rate (LIBOR), plus 1.15%, whichever is lower, and the agreements provide for a standby letter of credit in the amount of $750,000. At August 31, 2011, there were no balances outstanding on the revolving loans. The agreements expire on September 30, 2012 and 2017, respectively.

The Association is in compliance with the financial covenants of its revolving loan agreements.

## 9. LEASES

Capital Leases — The Association leases certain equipment under capital lease arrangements. The capitalized lease obligations reflect the present value of the future minimum commitments, discounted at the interest rates implicit in the leases.

Future minimum payments under capital leases at August 31, 2011, consist of the following:

| | |
|---|---|
| 2012 | $14,952 |
| 2013 | 12,462 |
| 2014 | 5,685 |
| Total minimum lease payments | 33,099 |
| Less amounts representing interest | (1,159) |
| Present value of minimum lease payments (including $14,202 classified as current) | $31,940 |

Rental Agreements — The Association occupies certain premises throughout California under rental agreements expiring at various dates through fiscal year 2017. Substantially, all leases provide for minimum annual rentals with escalation clauses for specified cost increases.

For the year ended August 31, 2011, gross rent expense amounted to approximately $1,677,707, and rental income, principally from affiliated organizations, totaled approximately $231,057. The future minimum rental commitments for all noncancelable operating leases having initial terms in excess of one year as of August 31, 2011, are as follows:

|  | Rental Commitments | Sublease Income | Net Rental Commitments |
|---|---|---|---|
| 2012 | $1,570,787 | $13,369 | $1,557,418 |
| 2013 | 1,235,723 |  | 1,235,723 |
| 2014 | 1,187,143 |  | 1,187,143 |
| 2015 | 707,490 |  | 707,490 |
| 2016 | 218,354 |  | 218,354 |
| 2017 | 8,795 |  | 8,795 |
| Total | $4,928,292 | $13,369 | $4,914,923 |

## 10. DESIGNATED NET ASSETS

The following funds have been designated by the Association's Board of Directors for specific purposes:

*Debt Service Fund* — This fund was established for the purpose of debt servicing and reduction.

*Political Allocation Fund* — This fund serves as a funding structure through which the Association's members may give support for certain state and local issues and candidates for office.

*Public Information Program Fund ("Media Fund")* — The purpose of this fund is to provide for advertisements to educate the public about the achievements, the problems, and the needs of public education from preschool through graduate school.

*Initiative Fund* — This fund was established for the purpose of participating in the support of or opposition to certain ballot measures.

*Advocacy Fund* — The purpose of the fund is to promote policies to improve and fight back attacks on public education.

Designated unrestricted net assets at August 31, 2011, are summarized below:

|  | Balance at August 31, 2010 | Increase (Decrease) in Designated Net Assets During the Year | Balance at August 31, 2011 |
|---|---|---|---|
| Debt Service Fund | $ 4,902,592 | $ 137,815 | $ 5,040,407 |
| Political Allocation Fund | 331,975 | (87,169) | 244,806 |
| Media Fund | 3,604,291 | (1,994,057) | 1,610,234 |
| Initiative Fund | 10,786,356 | (2,425,167) | 8,361,189 |
| Advocacy Fund | 2,846,498 | 692,054 | 3,538,552 |
| Total | $22,471,712 | $(3,676,524) | $18,795,188 |

## 11. TEMPORARILY RESTRICTED NET ASSETS

**Temporarily Restricted Net Assets** — Temporarily restricted net assets are restricted for the following purposes:

*Disaster Relief Fund* — The Fund is endowed to provide financial assistance to the Association members who have experienced losses due to disasters in California.

*Institute for Teaching* — Includes an intensive, long-term process to strengthen school communities and improve student achievement.

Temporarily restricted net assets at August 31, 2011, are summarized as follows:

| | |
|---|---|
| Disaster Relief Fund | $2,381,593 |
| Institute for Teaching | 50,956 |
| Total | $2,432,549 |

## 12. COMMITMENTS AND CONTINGENCIES

In the ordinary course of business, the Association is a party to claims and legal actions by members, vendors, and others. The Association's policy is to accrue for amounts related to these claims and legal actions if it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated. The combined financial statements reflect any liabilities that meet the policy described above. After consulting with legal counsel, the Association management is of the opinion that any liability that may ultimately result of claims or legal actions will not have a material effect on the combined financial position or results of operations of the Association.

## 13. CORRECTION OF INVESTMENT ACTIVITY PRESENTATION ON STATEMENT OF CASH FLOWS

Subsequent to the issuance of the 2011 combined financial statements, management determined that, under generally accepted accounting principles, purchases and sales of investments should be presented on a gross, rather than net, basis in the combined statement of cash flows. Accordingly, the presentation of investing activity in the accompanying 2011 statement of cash flows has been corrected from Net purchase and sales of investments of ($2,371,865) to separate line items of Purchases of investments ($45,438,800) and Sales of investments ($43,066,935). This correction had no effect on net cash used in investing activities.

\* \* \* \* \* \*

**SUPPLEMENTAL SCHEDULES**

# CALIFORNIA TEACHERS ASSOCIATION

## SUMMARY OF NONCHARGEABLE AND CHARGEABLE
## EXPENDITURES OF AGENCY FEES FOR 2010-2011 (NOTE 1)

| Budget Category (Note 2) | Expenditures | Nonchargeable (Note 3) | % | Chargeable (Note 4) | % | Allocable | % |
|---|---|---|---|---|---|---|---|
| Governance | $ 10,445,126 | $ 483,400 | 4.6% | $ 8,483,343 | 81.2% | $1,478,383 | 14.2 % |
| Governmental Relations | 7,607,773 | 7,607,773 | 100.0% | | | | |
| Association for Better Citizenship | 7,924,156 | 7,924,156 | 100.0% | | | | |
| Legal Services | 9,205,221 | 5,380,060 | 58.4% | 3,825,161 | 41.6% | | |
| Regional Services | 71,537,655 | 4,911,941 | 6.9% | 66,625,714 | 93.1% | | |
| Negotiations and Organizational Development | 7,077,841 | 243,076 | 3.4% | 6,834,765 | 96.6% | | |
| Training, Information & Development | 1,863,950 | 1,081,964 | 58.0% | 781,986 | 42.0% | | |
| Communications | 6,180,021 | 2,824,426 | 45.7% | 3,355,595 | 54.3% | | |
| Human Rights/Community Outreach | 4,929,365 | 2,269,445 | 46.0% | 2,659,920 | 54.0% | | |
| Instruction and Professional Development | 2,902,994 | 160,611 | 5.5% | 2,742,383 | 94.5% | | |
| Accounting | 5,957,304 | | | 5,957,304 | 100.0% | | |
| Business Services | 929,318 | | | 929,318 | 100.0% | | |
| Central Services | 2,858,484 | | | 2,858,484 | 100.0% | | |
| Conference Coordination Center | 2,263,586 | 470,407 | 20.8% | 1,793,179 | 79.2% | | |
| Governance Support | 2,236,167 | 102,863 | 4.6% | 1,815,767 | 81.2% | 317,537 | 14.2% |
| Human Resources Management | 1,851,127 | | | 1,851,127 | 100.0% | | |
| Integrated Systems and Strategies | 4,223,508 | 11,524 | 0.3% | 4,211,984 | 99.7% | | |
| Management | 4,971,145 | 349,255 | 7.0% | 1,124,684 | 22.6% | 3,497,206 | 70.4% |
| Occupancy/Properties | 5,332,913 | 406,334 | 7.6% | 4,926,579 | 92.4% | | |
| Capital Expenditures/Depreciation | 3,711,851 | 370,832 | 10.0% | 3,341,019 | 90.0% | | |
| Debt Reduction and Service | 182,571 | | | 182,571 | 100.0% | | |
| Crisis Assistance Fund | 140,649 | | | 140,649 | 100.0% | | |
| Advocacy/Foundation | 1,338,704 | 1,338,704 | 100.0% | | | | |
| Media Advertising Fund | 6,101,241 | 6,101,241 | 100.0% | | | | |
| Initiative Fund | 15,370,766 | 15,370,766 | 100.0% | | | | |
| Subtotal | 187,143,436 | 57,408,778 | 31.6% | 124,441,532 | 68.4% | 5,293,126 | |
| Allocable Expenditures | | 1,672,628 | | 3,620,498 | | $5,293,126 | |
| Total Nonchargeable and Chargeable Expenditures | $187,143,436 | $59,081,406 | | $128,062,030 | | | |
| Final Nonchargeable and Chargeable Percentages | | | 31.6 % | | 68.4 % | | |

See notes to the summary and supplemental detail schedule of nonchargeable and chargeable expenditures of agency fees.

# CALIFORNIA TEACHERS ASSOCIATION

## SUPPLEMENTAL DETAIL OF NONCHARGEABLE AND CHARGEABLE
## EXPENDITURES OF AGENCY FEES FOR 2010-2011

| Governance | Total Expenses | Nonchargeable | % | Chargeable | % | Allocable | % |
|---|---|---|---|---|---|---|---|
| Departmental Programs: | | | | | | | |
| 1.0 State Council of Education | $ 2,944,108 | $ 147,205 | 5.0% | $2,796,903 | 95.0% $ | - | - % |
| 2.0 NEA Convention | 925,485 | | | 925,485 | 100.0% | | |
| 3.0 Advisory Groups | 826,841 | 336,195 | 40.7% | 490,646 | 59.3% | | |
| 4.0 Board of Directors | 4,270,309 | | | 4,270,309 | 100.0% | | |
| 5.0 Executive Officers | 1,478,383 | | | | | 1,478,383 | 100.0% |
| Governance | $10,445,126 | $483,400 | | $8,483,343 | | $1,478,383 | |
| Departmental Nonchargeable, Chargeable and Allocable Percentages | | 4.6 % | | 81.2 % | | 14.2 % | |

See notes to the summary and supplemental detail schedule of nonchargeable and chargeable expenditures of agency fees.

(Continued)

# CALIFORNIA TEACHERS ASSOCIATION

## SUPPLEMENTAL DETAIL OF NONCHARGEABLE AND CHARGEABLE
## EXPENDITURES OF AGENCY FEES FOR 2010-2011

| Legal Services | Total Expenses | Nonchargeable | % | Chargeable | % |
|---|---|---|---|---|---|
| Payroll (Note 5) | $ 4,817,489 | $   645,544 | 13.4% | $4,171,945 | 86.6% |
| Staff Travel and Expenses (Note 6) | 255,209 | 34,198 | 13.4% | 221,011 | 86.6% |
| Office Expenses (Note 6) | 50,169 | 6,723 | 13.4% | 43,446 | 86.6% |
| Law Library | 85,856 | | | 85,856 | 100.0% |
| Departmental Programs: | | | | | |
| 1.1 Legal Services | | | | | |
| Public Employment Relations Board | 10,973 | 3,285 | 29.9% | 7,688 | 70.1% |
| Arbitration | 77,026 | 5,928 | 77.0% | 71,098 | 92.3% |
| Other Legal Services | 7,627,810 | 7,627,810 | 100.0% | | |
| 1.3 Group Legal Services Attorneys Meeting | 28,572 | 28,572 | 100.0% | | |
| 1.4 Commission on Professional Competency Panel | 18,540 | 18,540 | 100.0% | | |
| 2.1 Kate Frank/DuShane Unified Legal Services Program (Note 8) | (3,766,423) | (2,990,540) | 79.4% | (775,883) | 20.6% |
| Legal Services | $ 9,205,221 | $ 5,380,060 | | $3,825,161 | |
| Departmental Nonchargeable and Chargeable Percentages | | 58.4 % | | 41.6 % | |

See notes to the summary and supplemental detail schedule of nonchargeable and chargeable expenditures of agency fees.                           (Continued)

# CALIFORNIA TEACHERS ASSOCIATION

### SUPPLEMENTAL DETAIL OF NONCHARGEABLE AND CHARGEABLE
### EXPENDITURES OF AGENCY FEES FOR 2010-2011

| Regional Services | Total Expenses | Nonchargeable | % | Chargeable | % |
|---|---|---|---|---|---|
| Payroll (Note 5) | $34,837,784 | $1,707,051 | 4.9% | $33,130,733 | 95.1% |
| Staff Travel and Expenses (Note 6) | 2,598,158 | 127,310 | 4.9% | 2,470,848 | 95.1% |
| Office Expenses (Note 6) | 477,908 | 23,417 | 4.9% | 454,491 | 95.1% |
| Departmental Programs: | | | | | |
| 1.1 Service Center Councils | 1,357,809 | 152,075 | 11.2% | 1,205,734 | 88.8% |
| 2.1 UniServ (Note 9) | 18,735,411 | 1,030,448 | 55.0% | 17,704,963 | 94.5% |
| 3.1 Chapter Liability Insurance | 163,869 | | | 163,869 | |
| 4.1 Regional Conferences | 143,327 | 15,766 | 11.0% | 127,561 | 89.0% |
| 4.2 Regional Training | 121,632 | | | 121,632 | 100.0% |
| 4.3 Regional Organizing/Community Outreach and Regional Political Academies | 84,351 | 84,351 | 100.0% | | |
| 5.1 UTLA Consulting (Note 10) | 12,241,911 | 1,554,723 | 12.7% | 10,687,188 | 87.3% |
| 5.2 CFA Consulting (Note 10) | 365,000 | 116,800 | 32.0% | 248,200 | 68.0% |
| 6.1 Internal Organizing | 282,635 | | | 282,635 | 100.0% |
| 6.2 Ethnic Minority Early Identification Development Program | 27,860 | | | 27,860 | 100.0% |
| 7.1 Charter Schools, ESEA and Public School Choice Programs and Support | 100,000 | 100,000 | 100.0% | | |
| Regional Services | $71,537,655 | $4,911,941 | | $66,625,714 | |
| Departmental Nonchargeable and Chargeable Percentages | | 6.9 % | | 93.1 % | |

See notes to the summary and supplemental detail schedule of nonchargeable and chargeable expenditures of agency fees.

(Continued)

# CALIFORNIA TEACHERS ASSOCIATION

## SUPPLEMENTAL DETAIL OF NONCHARGEABLE AND CHARGEABLE
## EXPENDITURES OF AGENCY FEES FOR 2010-2011

| Negotiations and Organizational Development | Total Expenses | Nonchargeable | % | Chargeable | % |
|---|---|---|---|---|---|
| Payroll (Note 5) | $6,233,530 | $205,706 | 3.3% | $6,027,824 | 96.7% |
| Staff Travel and Expenses (Note 6) | 524,989 | 17,325 | 3.3% | 507,664 | 96.7% |
| Office Expenses (Note 6) | 69,837 | 2,305 | 3.3% | 67,532 | 96.7% |
| Departmental Programs: | | | | | |
| 1.1 Subscriptions | 3,257 | | | 3,257 | 100.0% |
| 1.2 Negotiations Database and Contract Reference Manual | 96,000 | | | 96,000 | 100.0% |
| 1.3 Bargaining Strategy and Implementation | 46,083 | 12,000 | 26.0% | 34,083 | 74.0% |
| 1.4 Publications | 52,586 | | | 52,586 | 100.0% |
| 1.5 Salary and Benefits Data | 27,500 | | | 27,500 | 100.0% |
| 2.1 Staff Training | 22,959 | 5,740 | 25.0% | 17,219 | 75.0% |
| 2.2 Multimedia Resources and Materials | 1,100 | | | 1,100 | 100.0% |
| Negotiations and Organizational Development | $7,077,841 | $243,076 | | $6,834,765 | |
| Department Nonchargeable and Chargeable Percentage | | 3.4 % | | 96.6 % | |

See notes to the summary and supplemental detail schedule of nonchargeable and chargeable expenditures of agency fees. (Continued)

- 18 -

# CALIFORNIA TEACHERS ASSOCIATION

## SUPPLEMENTAL DETAIL OF NONCHARGEABLE AND CHARGEABLE
## EXPENDITURES OF AGENCY FEES FOR 2010-2011

| Training, Information & Development | Total Expenses | Nonchargeable | % | Chargeable | % |
|---|---|---|---|---|---|
| Payroll (Note 5) | $1,425,962 | $ 770,019 | 54.0% | $655,943 | 46.0% |
| Staff Travel and Expenses (Note 6) | 110,938 | 59,907 | 54.0% | 51,031 | 46.0% |
| Office Expenses (Note 6) | 28,225 | 15,242 | 54.0% | 12,983 | 46.0% |
| Departmental Programs: | | | | | |
| 1.1 Multimedia Development | 1,829 | | | 1,829 | 100.0% |
| 2.1 Organizing Projects Assistance | 14,500 | 14,500 | 100.0% | | |
| 3.1 Polling | 282,496 | 222,296 | 78.7% | 60,200 | 21.3% |
| Training, Information & Development | $1,863,950 | $1,081,964 | | $781,986 | |
| Departmental Nonchargeable and Chargeable Percentages | | 58.0 % | | 42.0 % | |

See notes to the summary and supplemental detail schedule of nonchargeable and chargeable expenditures of agency fees.

(Continued)

- 19 -

# CALIFORNIA TEACHERS ASSOCIATION

## SUPPLEMENTAL DETAIL OF NONCHARGEABLE AND CHARGEABLE
## EXPENDITURES OF AGENCY FEES FOR 2010-2011

| Communications | Total Expenses | Nonchargeable | % | Chargeable | % |
|---|---|---|---|---|---|
| Payroll (Note 5) | $3,850,731 | $1,913,813 | 49.7% | $1,936,918 | 50.3% |
| Staff Travel and Expenses (Note 6) | 270,328 | 134,353 | 49.7% | 135,975 | 50.3% |
| Office Expenses (Note 6) | 68,343 | 33,966 | 49.7% | 34,377 | 50.3% |
| Departmental Programs: | | | | | |
| 1.1 Information Services/Media Contact | 64,019 | 31,991 | 50.0% | 32,028 | 50.0% |
| 1.2 John Swett Awards | 26,423 | 26,423 | 100.0% | | |
| 2.1 California Educator (Note 7) | 1,191,816 | 257,432 | 21.6% | 934,384 | 78.4% |
| 2.2 California Community College Advocate (Note 7) | 53,368 | 19,052 | 35.7% | 34,316 | 64.3% |
| 2.3 Pocket Calendar | 89,927 | 89,927 | 100.0% | | |
| 2.4 Organizational Handbook | 32,973 | | | 32,973 | 100.0% |
| 2.5 Internal Communications | 75,328 | 75,328 | 100.0% | | |
| 2.6 Special Publications | 18,079 | | | 18,079 | 100.0% |
| 2.7 Communications Awards | 1,850 | 1,850 | 100.0% | | |
| 2.8 Video Services | 217 | 217 | 100.0% | | |
| 2.9 Web Page | 183,800 | 59,919 | 32.6% | 123,881 | 67.4% |
| 2.10 Internet Site | 107,810 | 35,146 | 32.6% | 72,664 | 67.4% |
| 3.1 Membership Promotion | 93,313 | 93,313 | 100.0% | | |
| 3.2 Information Promotion | 51,696 | 51,696 | 100.0% | | |
| Communications | $6,180,021 | $2,824,426 | | $3,355,595 | |
| Departmental Nonchargeable and Chargeable Percentages | | 45.7 % | | 54.3 % | |

See notes to the summary and supplemental detail schedule of nonchargeable and chargeable expenditures of agency fees.     (Continued)

# CALIFORNIA TEACHERS ASSOCIATION

### SUPPLEMENTAL DETAIL OF NONCHARGEABLE AND CHARGEABLE
### EXPENDITURES OF AGENCY FEES FOR 2010-2011

| Human Rights/Community Outreach | Total Expenses | Nonchargeable | % | Chargeable | % |
|---|---|---|---|---|---|
| Payroll (Note 5) | $3,842,310 | $1,586,874 | 41.3% | $2,255,436 | 58.7% |
| Staff Travel & Expenses (Note 6) | 462,107 | 190,850 | 41.3% | 271,257 | 58.7% |
| Office Expenses (Note 6) | 57,166 | 23,610 | 41.3% | 33,556 | 58.7% |
| **Human Rights Programs:** | | | | | |
| 1.1 Human Rights Awards | 9,466 | 9,466 | 100.0% | | |
| 2.1 Leadership Development Program | 2,260 | | | 2,260 | 100.0% |
| 2.2 Women's Leadership Training | 7,612 | | | 7,612 | 100.0% |
| 2.3 Specialty Workshops | 3,772 | | | 3,772 | 100.0% |
| 2.4 Gay/Lesbian Program | 5,125 | | | 5,125 | 100.0% |
| 2.5 Running for Office | 1,254 | 1,254 | 100.0% | | |
| 3.1 Teacher/Student High-Risk Program | 32,311 | | | 32,311 | 100.0% |
| 4.2 Human Rights Contact Program/Women's Affairs Contact Program | 20,318 | | | 20,318 | 100.0% |
| 4.3 Minority Teacher Recruitment Program | 26,020 | 26,020 | 100.0% | | |
| 4.4 Unconscious Bias Training | 22,192 | | | 22,192 | 100.0% |
| 4.5 Ethnic Minority Representation Program | 6,081 | | | 6,081 | 100.0% |
| 5.1 Student CTA | 198,362 | 198,362 | 100.0% | | |
| **Community Outreach Programs:** | | | | | |
| 5.2 Meetings | 8,367 | 8,367 | 100.0% | | |
| 6.1 Community Organizing and Events | 113,669 | 113,669 | 100.0% | | |
| 6.2 Promotional Materials | 26,144 | 26,144 | 100.0% | | |
| 6.3 Community Based Organizing | 53,018 | 53,018 | 100.0% | | |
| Community Outreach — Summer Institute | 2,246 | 2,246 | 100.0% | | |
| Income/Grants | 7,042 | 7,042 | 100.0% | | |
| Teachers for Healthy Kids | 22,523 | 22,523 | 100.0% | | |
| **HUMAN RIGHTS/COMMUNITY OUTREACH** | $4,929,365 | $2,269,445 | | $2,659,920 | |
| Departmental Nonchargeable and Chargeable Percentages | | 46.0 % | | 54.0 % | |

See notes to the summary and supplemental detail schedule of nonchargeable and chargeable expenditures of agency fees.                    (Continued)

# CALIFORNIA TEACHERS ASSOCIATION

## SUPPLEMENTAL DETAIL OF NONCHARGEABLE AND CHARGEABLE
## EXPENDITURES OF AGENCY FEES FOR 2010-2011

| Instruction and Professional Development | Total Expenses | Nonchargeable | % | Chargeable | % |
|---|---|---|---|---|---|
| Payroll (Note 5) | $2,182,799 | $141,882 | 6.5% | $2,040,917 | 93.5% |
| Staff Travel and Expenses (Note 6) | 243,878 | 15,852 | 6.5% | 228,026 | 93.5% |
| Office Expenses (Note 6) | 36,858 | 2,396 | 6.5% | 34,462 | 93.5% |
| Departmental Programs: | | | | | |
| 1.1 Special Interest Projects | 29,539 | | | 29,539 | 100.0% |
| 2.1 Intervention Support | 35,594 | 481 | 1.4% | 35,113 | 98.6% |
| 2.3 English Language Learners | 150 | | | 150 | 100.0% |
| 3.1 Accountability Support | 232,892 | | | 232,892 | 100.0% |
| 3.2 QEIA Evaluation Contract | 141,284 | | | 141,284 | 100.0% |
| Instruction and Professional Development | $2,902,994 | $160,611 | | $2,742,383 | |
| Departmental Nonchargeable and Chargeable Percentages | | 5.5 % | | 94.5 % | |

See notes to the summary and supplemental detail schedule of nonchargeable and chargeable expenditures of agency fees.                    (Continued)

# CALIFORNIA TEACHERS ASSOCIATION

## SUPPLEMENTAL DETAIL OF NONCHARGEABLE AND CHARGEABLE
## EXPENDITURES OF AGENCY FEES FOR 2010-2011

| Conference Coordination Center | Total Expenses | Nonchargeable | % | Chargeable | % |
|---|---|---|---|---|---|
| Payroll (Note 5) | $1,118,603 | $232,669 | 20.8% | $ 885,934 | 79.2% |
| Staff Travel and Expenses (Note 6) | 25,139 | 5,229 | 20.8% | 19,910 | 79.2% |
| Office Expenses (Note 6) | 56,532 | 11,759 | 20.8% | 44,773 | 79.2% |
| Departmental Programs: | | | | | |
| 1.3 Good Teaching Conference | 128,906 | 1,805 | 1.4% | 127,101 | 98.6% |
| 1.4 Equity/Human Rights Conference | 74,999 | 9,900 | 13.2% | 65,099 | 86.8% |
| 1.5 Presidents Conference | 260,557 | 60,006 | 23.0% | 200,551 | 77.0% |
| 1.6 Summer Institute | 324,177 | 54,138 | 16.7% | 270,039 | 83.3% |
| 1.8 GLBT Conference | 26,476 | 7,599 | 28.7% | 18,877 | 71.3% |
| 1.9 Rural Issues/Urban Issues/ESP Conference | 122,442 | 8,693 | 7.1% | 113,749 | 92.9% |
| 2.1 Incentive Grants | 70,515 | 70,515 | 100.0% | | |
| 3.1 Conference and Hotel Management System | 38,915 | 8,094 | 20.8% | 30,821 | 79.2% |
| Caucus Conference | 16,325 | | 20.8% | 16,325 | 79.2% |
| Conference Coordination Center | $2,263,586 | $470,407 | | $1,793,179 | |
| Departmental Nonchargeable and Chargeable Percentages | | 20.8 % | | 79.2 % | |

See notes to the summary and supplemental detail schedule of nonchargeable and chargeable expenditures of agency fees.

(Continued)

- 23 -

# CALIFORNIA TEACHERS ASSOCIATION

### SUPPLEMENTAL DETAIL OF NONCHARGEABLE AND CHARGEABLE
### EXPENDITURES OF AGENCY FEES FOR 2010-2011

| Integrated Systems & Strategies | Total Expenses | Nonchargeable | % | Chargeable | % |
|---|---|---|---|---|---|
| Payroll (Note 5) | $3,609,758 | $10,829 | 0.3% | $3,598,929 | 99.7% |
| Staff Travel and Expenses (Note 6) | 214,386 | 643 | 0.3% | 213,743 | 99.7% |
| Office Expenses (Note 6) | 17,415 | 52 | 0.3% | 17,363 | 99.7% |
| Departmental Programs: | | | | | |
| 1.1 Association Technical Support | 142,743 | | | 142,743 | 100.0% |
| 1.3 Telecommunications | 181,898 | | | 181,898 | 100.0% |
| 2.1 Document Management System Deployment | 2,074 | | | 2,074 | 100.0% |
| 2.2 Software Application Training | 1,750 | | | 1,750 | 100.0% |
| 2.3 IP Telephony | 51,078 | | | 51,078 | 100.0% |
| 3.2 Cyber Café | 2,406 | | | 2,406 | 100.0% |
| Integrated Systems & Strategies | $4,223,508 | $11,524 | | $4,211,984 | |
| Department Nonchargeable and Chargeable Percentages | | 0.3 % | | 99.7 % | |

See notes to the summary and supplemental detail schedule of nonchargeable and chargeable expenditures of agency fees.        (Continued)

# CALIFORNIA TEACHERS ASSOCIATION

## SUPPLEMENTAL DETAIL OF NONCHARGEABLE AND CHARGEABLE
## EXPENDITURES OF AGENCY FEES FOR 2010-2011

| Management | Total Expenses | Nonchargeable | % | Chargeable | % | Allocable | % |
|---|---|---|---|---|---|---|---|
| Payroll (Note 5) | $3,074,040 | $ - | - % | $ - | - % | $3,074,040 | 100.0% |
| Staff Travel and Expenses (Note 6) | 340,130 | | | | | 340,130 | 100.0% |
| Office Expenses (Note 6) | 83,036 | | | | | 83,036 | 100.0% |
| Departmental Programs: | | | | | | | |
| 1.1 Corporate Counsel | 668,565 | 15,494 | 2.3% | 653,071 | 97.7% | | |
| 1.2 Audit Fees and Expenses | 196,831 | | | 196,831 | | | |
| 1.3 Consultants | 445,587 | 333,761 | 74.9% | 111,826 | 25.1% | | |
| 1.4 Association Membership Fees | 10,239 | | | 10,239 | | | |
| 1.5 Professional Liability Insurance | 152,717 | | | 152,717 | | | |
| Management | $4,971,145 | $349,255 | | $1,124,684 | | $3,497,206 | |
| Departmental Nonchargeable, Chargeable and Allocable Percentages | | 7.0 % | | 22.6 % | | 70.4 % | |

See notes to the summary and supplemental detail schedule of nonchargeable and chargeable expenditures of agency fees.                                    (Continued)

# CALIFORNIA TEACHERS ASSOCIATION

### SUPPLEMENTAL DETAIL OF NONCHARGEABLE AND CHARGEABLE
### EXPENDITURES OF AGENCY FEES FOR 2010-2011

| Crisis Assistance Fund | Total Expenses | Nonchargeable | % | Chargeable | % |
|---|---|---|---|---|---|
| Departmental Programs: | | | | | |
| Negotiations | $103,546 | $ - | - % | $103,546 | 100.0% |
| Arbitration Fund | 29,989 | | | 29,989 | 100.0% |
| Crisis Panel | 7,114 | | | 7,114 | 100.0% |
| Crisis Assistance Fund | $140,649 | $ - | | $140,649 | |
| Departmental Nonchargeable and Chargeable Percentages | | - % | | 100.0 % | |

See notes to the summary and supplemental detail schedule of nonchargeable and chargeable expenditures of agency fees.

(Concluded)

## CALIFORNIA TEACHERS ASSOCIATION

**NOTES TO THE SUMMARY AND SUPPLEMENTAL DETAIL SCHEDULES OF
NONCHARGEABLE AND CHARGEABLE EXPENDITURES OF AGENCY FEES
FOR 2010 - 2011 BY MAJOR BUDGET CATEGORY**

**1.    AGENCY FEE NONCHARGEABLE AND CHARGEABLE EXPENDITURES CALCULATION**

The California Teachers Association ("Association" or "CTA") is required by law to have procedures in
effect to determine the amount of its expenditures which can be charged to objecting agency fee payers
for "representational" or "chargeable" purposes, i.e., generally those related to collective bargaining,
consultation, contract administration, and employee representation related to terms and conditions of
employment.

Based on relevant federal and state judicial and administrative decisions, the Association analyzed its
expenditures and determined which of those expenditures were nonchargeable to objecting agency fee
payers and which were chargeable to objecting agency fee payers.

The Association's annual expenses are divided into major departmental budget categories. For agency
fee purposes, these budget categories are designated as either "non-allocable" or "allocable." The
Association's non-allocable budget categories are: Governance (non-allocable portions only);
Governmental Relations; Association for Better Citizenship; Legal Services; Regional Services;
Negotiations and Organizational Development; Training, Information & Development;
Communications; Human Rights/Community Outreach; Instruction and Professional Development;
Accounting; Business Services; Central Services; Conference Coordination Center; Governance Support
(non-allocable portions only); Human Resources Management; Integrated Systems and Strategies;
Management (non-allocable portions only); Occupancy/Properties; Capital Expenditures/Depreciation;
Crisis Assistance Fund; Advocacy/Foundation; Media Advertising Fund; Initiative Fund. The
Association's allocable budget categories are: Governance (allocable portions only); Governance
Support (allocable portions only); Management (allocable portions only).

Expenditures in non-allocable budget categories are analyzed according to the type of activity involved
and are categorized as "nonchargeable" or "chargeable." See Notes 3 and 4, below, for definitions of
nonchargeable and chargeable activities. Once all non-allocable budget categories have been analyzed
for nonchargeable and chargeable expenditures, such expenditures are totaled and the overall
nonchargeable and chargeable percentages f or all non-allocable budget categories are determined.
Expenditures in budget categories designated allocable are allocated as nonchargeable or chargeable in
proportion to these percentages.

All nonchargeable and chargeable expenditures are totaled. These totals provide the Final
Nonchargeable and Chargeable Percentages.

The Summary of Nonchargeable and Chargeable Expenditures of Agency Fees for 2010-2011 by Major
Budget Category represents, to the best of the Association's knowledge and belief, the Association's
actual nonchargeable and chargeable expenditures for the 2010-2011 year. The calculations have been
prepared using historical costs incurred by the Association during the year ended August 31, 2011,
which have been included in the Association's audited financial statements, and the application of
various assumptions in the allocation of these costs as nonchargeable and chargeable as discussed in the
accompanying notes.

## 2. DESCRIPTION OF MAJOR BUDGET CATEGORIES OF EXPENDITURES

**Governance** — Provides for all of the direct membership involvement in the control, operation and direction of the Association. The Governance budget also provides for the direct cost of membership policymaking and guidance of the program activities of the Association. The Governance structure with its various internal processes serves membership needs as perceived and directed by the Association's elected leadership.

**Governmental Relations** — Represents the Association in all aspects of governmental and political relations. It designs, coordinates and implements advocacy programs to achieve the Association's political goals and objectives. It provides political information and assistance to members. It serves as liaison to government and private agencies.

**Association for Better Citizenship** — Provides bi-partisan funding to CTA recommended candidates for local and state offices. It coordinates and directs the Association's involvement in issues and initiatives. It provides membership political action training; membership database and maintenance; member and general public surveying and polling to support CTA's political agenda. It supports CTA's member oversight and involvement in funding decisions.

**Legal Services** — Provides three main services to CTA, its chapters and members – legal representation, legal guidance and legal training. The Legal Services represents, and oversees the representation of, CTA, its chapters and members in both affirmative and defensive court litigation as well as administrative proceedings. Most, but not all of this representation is provided through legal services programs that the Legal Department administers – the Group Legal Services Program (GLS), the NEA Kate Frank/DuShane Unified Legal Services Program, and the Educators Employment Liability Insurance Program. Legal Services also advises CTA, its officers and staff regarding labor, employment, and education laws and decisions as well as other matters. Finally, the Legal Services provides training for chapters, staff and members and produces an array of publications for staff, chapters and members regarding various legal issues. The training the Legal Services provides includes two separate legal tracks at the CTA Summer Institute, periodic conferences on arbitration, labor and education law issues for staff, an annual conference for the GLS attorneys who provide legal services to CTA chapters and members and an annual conference to train those teachers who serve as panel members on Commissions on Professional Competence.

**Regional Services** — Regions are responsible for the provision and/or coordination of most CTA programs and services to chapters and members through a system of offices and staff located throughout each region. The 2010-2011 program placed emphasis on: Organizing in support of quality health care and health benefits; Expanding the field emphasis on building stronger local chapters; Expanding the CTA membership base with K-12 teachers, higher education faculty and education support professionals; Support implementation of the Ethnic Minority Early Identification Development Program (EMEID); Organizing in support of school improvement and restructuring activities with attention to CTA-based charter schools, Immediate Intervention/Underperforming Schools Program (II/USP) and Schools of Greatest Need, Elementary and Secondary Education Act (ESEA) requirements, standards and accountability, and peer assistance and review; Assistance with chapter organization, with development of leadership, liaison with chapters, development of communication systems among members, leaders and the community, and identification and development of local issues; Provide collective bargaining assistance to chapters with particular emphasis on negotiations, contract monitoring, grievance representation procedures, identification and processing of unfair practice charges, and chapter recognition status; Organizing and training for political action and community outreach; Support the implementation of an all member survey; Providing support for the implementation of permissive bargaining issues within the framework of California collective bargaining laws, including professional development and program consultation; Assistance with servicing the Group Legal Services Program for chapters and members; Consultation to Service Center

Councils; Staffing and funding of local service delivery program; Maintaining of mandated peer review assistance and review including consulting teacher training.

**Negotiations and Organizational Development** — The Negotiations and Organizational Development Department (NODD) is a field based, client driven department in the Regional Services Division. The Department provides resources and expertise in the areas of bargaining, training, budget analysis, mediation, fact-finding support, organizational development and health benefits strategies to assist Primary Contact Staff (PCS) and leaders to achieve the best possible contracts for our members. The department supports local bargaining teams when faced with mediation, fact-finding, and organizing around bargaining issues. In addition to School District Budget Analysis, Bargaining Advisories are sent to staff as necessary on topics that may arise during negotiations; A major department function is the coordination and implementation of training for the Presidents Conference, Summer Institute, and Rural Issues/Urban Issues/ESP Conference; NODD developed, maintains, and provides training on two CTA software programs that are designed to assist the PCS and bargaining teams. Budget Essentials for Negotiations (BEN) analyzes school district budgets and Salary Schedule Analysis (SSA) allows staff and leadership to accurately cost out salary, benefits, step and column, and other aspects of the salary schedule; NODD works with several coalitions to address health care issues, serves as consultant to various CTA committees and provides training to members on health care related topics; NODD maintains CTA Search, an additional resource available to chapter presidents, bargaining chairs and CTA staff. The CTA website has been expanded to allow staff and leaders to download contract language from negotiated agreements and the CTA Contract Reference Manual. The site now includes Arbitrations Decisions, Bargaining Advisories, Legal Advisories, Fact Finding Reports, Chapter Presidents Handbooks, and other guides; The department analyzes the State Budget for staff and members and explains implications and uses for this information for chapter activities; NODD develops, coordinates and delivers multi-day training sessions for staff to remain current on relevant issues; NODD provides assistance as consultants to a variety of CTA workgroups and State Council committees. In addition, the department works with the Governmental Relations Department on issues such as the State Budget, liaison activities, and negotiations/school finance related legislation; NODD responds to requests from leaders, members, staff and the general public for research about California public schools, public education and other topics of interest; NODD develops and coordinates the CTA Staff Intern Program.

**Training, Information & Development** — This division is responsible for the coordination of several CTA departments and programs: Communications, Human Rights/Community Outreach, Instruction and Professional Development, multi-media, video and website projects and the CTA Media Fund. The Training, Information and Development Division provides services to elected leadership, members, staff, community organizations and other departments like Governmental Relations and Regional Services. The division is also in charge of CTA's message, brand and overall image.

**Communications** — The Communications Department is responsible for interpreting and promoting the Association's total program including the specific programs of other departments both to educators and the public. The Department is specifically charged with representing the Association's goals, policies, programs, services and achievements in the best possible light and with working to raise the image of educators, of public education and of the Association itself. Those responsibilities dovetail with the Department's further mission to produce materials for and to coordinate the Association's overall effort to recruit and retain members. In discharging its responsibilities, the Department issues news releases and otherwise maintains contact with people in the media; participates in the administration of the Association's advertising program; publishes two periodicals and many other publications and printed materials for educators. The Department operates and coordinates all content for the CTA websites and produces an electronic newsletter and other communications for members and other departments. In addition, the Department conducts training sessions in media relations, community action, internal communication, and membership promotion; and assists other Association units to prepare, produce and distribute materials.

- 29 -

**Human Rights/Community Outreach** — The Human Rights/Community Outreach Department serves as a support base for local affiliates, Service Center Councils, member leaders, staff, community based organizations, advocacy groups, students and parents. Human Rights supports the goals and objectives of the California Teachers Association by advocating equity in all aspects of CTA activities. The Department provides training programs, acts as a consultant to various Association committees, and administers several Association sponsored scholarships and award programs. The Club Ed and Student CTA programs work to recruit minorities into the teaching profession as well as prepare teacher candidates for active participation in CTA. The High Risk Training Program, Women's Leadership Program, Ethnic Minority Leadership Program, the Gay, Lesbian, Bisexual, Transgender Leadership Program, and the Unconscious Bias Training are highlighted trainings that assist our members with current social issues.

The focus of Community Outreach is to delve deeper into the relationship established with organizations outside of CTA over the previous years. The objective is to continue to strengthen the ties with organizations interested in meeting the diverse needs of members, students and neighborhood schools. Through a program of grants to local associations, community partnerships, trainings and statewide organizational efforts, Community Outreach now works more closely and directly with associations and service center councils in all four CTA regions. Grants have been utilized for a wide range of activities including: community fairs, education forums, parental involvement workshops and school clean-ups. The department highlight is the Community Outreach Strand of the Summer Institute.

**Instruction and Professional Development** — The mission of the Instruction and Professional Development (IPD) Department is to advance the interest of teachers as organized professionals and to assist in the maintenance of the integrity of public education. The issues related to standards-based education, assessment, accountability and school change guide the Department efforts to meet the needs of educators and students. The IPD Department:

Works to maintain an active Association influence with state agencies and other related organizations in the development of educational policy; Provides leadership and support for commitment to, maintenance of, and improvement of public education; Provides assistance in support of efforts to improve student learning, especially in Schools of Greatest Need; Reinforces CTA efforts to renew public confidence in California public schools by providing materials and assistance to local chapters for building their capacity to meet member needs, especially in areas of improving schools and student learning; Promotes standards for quality professional development to be used by local chapters in bargaining and consultation with districts; Assists local chapters to identify and select resources to support the profession; Works to assist educators to assert their professional rights and responsibilities; Provides support when professional and school improvement issues are bargained and/or advocated; Proposes, promotes and implements practices, policies and legislation, which advance the professional interest of educators and education support professionals; Facilitates the development of training and other professional growth experiences for educators; Synthesizes and disseminates research and information on educational issues that promote student learning and the profession of teaching.

**Accounting** — Accounting provides for the recording, maintenance and analysis of financial and membership data. Major functions provided are: Processing, verification, recording and monitoring of all receipts and disbursements in compliance with CTA policies and procedures and generally accepted accounting principles; Preparation of financial statements and reports for Association members, staff, external auditors, and other entities as required; Coordination with other departments and affiliates in the collection of data and information pertinent to the operation and program development of the Association; Reports and filings required by regulatory agencies; Budget monitoring in accordance with Association guidelines and procedures; Record keeping, reporting and coordinating in compliance with legal requirements for agency fee; Service and assistance to affiliates, members and staff on membership processing and dues accounting, and other fiscal matters; Training sessions for affiliate financial representatives and staff in the areas of membership processing, general accounting, and other financial

- 30 -

areas; Development, maintenance and analysis of the CTA membership database and connected systems that support the programs and services of the Association; Identify opportunities and implement processes to provide member information via the web; Implement systems and processes that provide efficiencies and make better use of the Association's assets.

**Business Services** — The Business Services Department objectives are: (1) provide a centralized organizational purchasing function. The Department works closely with other departments to determine capital needs as well as working to secure favorable pricing and terms on a variety of goods and services acquired by the Association. (2) Provide direct support to business application and system initiatives. Business Services works with other departments in the Business Division regarding application software selection, implementation as well as enhancements and upgrades to current business systems and processes. (3) Identify and develop key strategic vendor relationships. Business Services works with CTA's suppliers in an effort to deliver a high level of value and service for the Association at the right price. Additionally, Business Services works closely with the Accounting Department and the Controller's Office to ensure proper controls and procedures are in place for certain business and financial transactions.

**Central Services** — Produces materials, maintains facilities and provides general office support for CTA departments:

In Office Services, graphics staff design, develop, and assist others in the creation of eye-catching document covers, posters, printed media ads, flyers, pamphlets and other items for use at CTA leadership meetings, conferences, training programs, in the print media, and elsewhere. Using state-of-the-art digital presses to generate quality color work, high speed copiers to make millions of black and white impressions and off-set presses to produce letterhead stationary and envelopes, staff in the copy centers and print shop provide printed materials for CTA departments, Service Center Councils, UniServ Units and Chapters. Bindery staff use equipment to finish, fold, sort, bind, staple and turn printed material into completed products which are then processed to be mailed, shipped or delivered wherever needed.

Record Center staff maintain and catalogue the Association's historical records and manage the off-site storage facility.

The Property Management department, on a statewide basis, oversees the maintenance of CTA owned property and buildings, handles tenant relations, coordinates construction projects, searches for new properties, makes recommendations for the sales of property when appropriate and manages the off-site storage facility.

Building Services handles maintenance and repair projects at the Headquarters and Santa Fe Springs facilities and the skilled staff from this department are deployed to other CTA offices as well. They also store CTA branded forms, envelopes, and stationary, and coordinate receipt of office supplies from the Association's primary vendor, and handle internal distribution of these items.

**Conference Coordination Center** — Working with other CTA departments, the Conference Coordination Center is responsible for coordination and delivery of CTA statewide conferences. The Department provides increased services and value to conference attendees with the support and coordinated efforts of all respective participating departments and member conference planning committees. Conference and events under the purview of the Conference Coordination Center include the President's Conference, Summer Institute, Good Teaching Conference-North, Good Teaching Conference-South, Equity and Human Rights Conference, Rural Issues/Urban Issues/ESP Conference, Regional Leadership Conferences, GLBT Conference and the quarterly State Council of Education Meetings. The Conference Coordination Center also coordinates statewide meetings for CTA staff training. Conference Coordination Center administers and funds minority and new leader grants to CTA

members so they can benefit from the many professional development opportunities at the CTA conferences. Grants are also available to members from small chapters. The Conference Coordination Center provides support to various other meetings of CTA affiliates and service centers, including site selection, hotel contract negotiations, on-line registration and other logistics planning.

**Governance Support** — Governance Support coordinates all governance functions for the State Council, the Executive Officers, and the Board of Directors including scheduling, logistics record keeping and secretarial services. Governance Support provides:

Preparation, development and support for State Council meetings, including preparation of State Council minutes; Preparation and support for Board of Directors meetings including the preparation and distribution of minutes; Staff support for the Executive Officers and the Board of Directors; Coordination of California's participation in the NEA Representative Assembly; Development and maintenance of State Council Representation records; Staff support to the Representation Committee; Staff support to the Elections and Credentials Committee; Staff support to the Local Governance Documents Review Committee; Preparation and maintenance of the Board Advisory Group listing; Facilitation of membership involvement on CTA task forces and attendance at non-CTA conferences; Reconciliation of leader/member expenses; Development of the Orientation Handbook for State Council Members; Development of the Handbook for State Council Committee Chairpersons; Preparation of the State Council Representation Report; Preparation of election publications, including the CTA Elections Manual and Guidelines for Chapter Election Procedures; Preparation of Guidelines for Development of Bylaws and Standing Rules for Charter Chapters of CTA.

**Human Resources Management** — Human Resources Management is responsible for the conduct of all phases of the employer-employee relationship between CTA as an employer and its staff. Specifically, the department performs the following functions:

Coordinates implementation of staff collective bargaining agreements; Coordinates implementation of policies governing non-bargaining unit staff; Coordinates implementation of staff grievance procedures; Conducts staff recruitment, screening and hiring; Conducts new employee orientations; Coordinates staff training programs and the CTA Diversity Program; Coordinates workshops for members who want to become UniServ staff; Coordinates implementation of the NEA UniServ Pre-Employment Development Program; Implements staff recognition program; Implements staff compensation program; Implements CTA's Safety Programs which include: Injury and Illness Prevention Program, CTA Ergonomic Program, Workplace Violence Prevention Program, Hazard Communication Program and CTA's Emergency Action Plan; Liaison with the Health & Welfare Benefits Trust regarding administration of staff benefits; Liaison to the CTA Employees' Retirement Benefits Trust; Provides Human Resources services to affiliates that employ staff; Provides communications and data collection and dissemination relative to personnel, labor relations and staffing matters; Represents CTA to governmental agencies concerned with Employer-Employee Relations; Responsible for Code of Ethics.

**Integrated Systems & Strategies** — Integrated Systems and Strategies Department provides for the development and coordination of the Association's electronic data collection, processing, retrieval and reporting system. The Integrated Systems and Strategies Department provides:

Statistical information of monitoring performance, measuring variances from CTA's goals, and projecting alternative methods of action or possible results based on trend analysis, economic conditions, demographics, and other information for all Association activities; Coordinates the operation and monitors the reliability of NEA computer systems; Coordination of a variety of technology-related projects including, but not limited to, new computer applications; Evaluation, deployment, and coordination of new computer hardware and software as it relates to CTA organizational use; Coordination of the acquisition and implementation of computer equipment for CTA offices and affiliates; Support of staff on the proper use of equipment and related software; On-going support and

assistance to computer users in CTA offices statewide; Coordination of CTA staff access to the Internet and maintain CTA presence as a World Wide Web site; Deployment and support of the Association's Wide Area Network.

**Management** — Management is responsible for the overall supervision of operations and execution of programs. Management also provides: Assistance to CTA Executive Officers, Board of Directors, and other Governance groups in the formulation of goals and policies in accordance with the needs and desires of the membership; Planning and execution of Governance directed programs designed to fulfill the goals and objectives of the Association; Coordination and direction of all staff activities to ensure efficient use of staff time; Legal assistance to the Association; Coordination of independent financial reporting for the Association; Maintenance and preservation of the Association's properties and other assets; Establishment and maintenance of contacts with other education associations including state agencies and related organizations; Administration of the Association's corporate insurances; Budget preparation in accordance with Association's guidelines and procedures.

**Occupancy/Properties** — Provides for: Payments of rents, taxes, utilities, insurance and other miscellaneous expenses of CTA properties and offices.

**Capital Expenditures/Depreciation** — Provides for: Purchase of equipment, furniture and fixtures deemed necessary to improve, expand or create services essential to members and employee performance; replacement of equipment; conversion of obsolete equipment; capitalized improvements to buildings and properties for maintenance of property value, safety standards or improvements of space utilization.

**Crisis Assistance Fund** — Provides for: Financial support to chapters undergoing elections, negotiations, crisis, and arbitration as administered by the Crisis Assistance Panel.

**Advocacy/Foundation** — The contribution is in the form of a voluntary $20.00 reverse dues check-off to support CTA advocacy efforts for public education and a CTA foundation to support member scholarship and grant programs, and teacher driven solutions for public schools. The default allocation option for fiscal year 2010-2011 is $15.00 Advocacy $5.00 CTA Foundation.

**Media Advertising Fund** — The Media Advertising Fund consists of revenues designated for paid advertisement to educate the public about the achievements, the problems, and the needs of public education from preschool through graduate school.

**Initiative Fund** — The Initiative Fund supports initiatives that advance the cause of free, universal, and quality public education, or to combat initiatives that are hostile to the CTA mission to advance the cause of free, universal and quality education. The annual amount is $36.00 per applicable FDE and is to be kept in reserve for the aforementioned purposes.

3.  **DEFINITION OF NONCHARGEABLE EXPENSES**

Nonchargeable expenses are those which do not relate to performing the duties of the exclusive representative in dealing with the employer on labor-management issues. Nonchargeable expenses generally include those related to:

- Political candidate donations or support, including endorsement process and donations to political parties;

- Campaign donations or support on behalf of state or local ballot initiatives;

- Support for political action committees;

- Voter registration, get-out-the-vote, and political action training;

- Lobbying and political efforts before state legislatures and state administrative agencies;

- Public relations designed to enhance the image of the teaching profession generally and/or the image of the association;

- Litigation unless specifically related to the collective bargaining law, contract administration or organizational maintenance;

- Charitable contributions;

- Membership recruitment;

- Establishing new or expanded bargaining units, or defending against challenges to exclusive bargaining representative status or severance petitions;

- Members-only benefits (e.g. educators employment liability insurance, and advisory groups on members-only benefits); and

- CTA retired and CTA student program activities.

4. **DEFINITION OF CHARGEABLE EXPENSES**

Chargeable expenses are expenses incurred by the Association in "performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues." These expenses include "not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit." *Cumero v. Public Employment Relations Board* (1989) 49 Cal.3d 575, 588. Chargeable expenses generally include those related to:

- Negotiating collective bargaining agreements, including preparation for negotiations;

- Organizing activities undertaken to support the union's efforts in bargaining, including lawful strikes;

- Consultation with the employer pursuant to the EERA on educational objectives, curriculum and textbooks (Gov. Code section 3543.2 (a));

- Contract administration, including investigating and processing grievances;

- Arbitrations;

- Advising bargaining unit members on workplace problems;

- Professional development, curriculum development and implementation, teaching methods, and other instructional skills;

- Site-based decision-making that impacts on other chargeable subject areas;

- Strategic planning and polling on priorities for association activities;

- CTA State Council and Board of Directors; and

- Litigation related to the collective bargaining law, contract administration and organizational maintenance.

**5. PAYROLL**

Staff payroll includes salaries and fringe benefits of professional & associate staff and is allocated according to time sheets which indicate the percentage of time spent by professional staff on chargeable and nonchargeable activities.

**6. STAFF TRAVEL AND EXPENSES, AND OFFICE EXPENSES**

Staff travel and expenses, and office expenses, are allocated according to the percentages reflected in staff payroll.

**7. CALIFORNIA EDUCATOR AND CALIFORNIA COMMUNITY COLLEGE ADVOCATE**

California Educator and California Community College Advocate are allocated according to a column-inch measurement of the chargeable and nonchargeable content of those publications. Advertising income has been subtracted from the publication cost to yield a net cost.

**8. KATE FRANK/DUSHANE UNIFIED LEGAL SERVICES PROGRAM**

The Kate Frank/DuShane Unified Legal Services Program includes money received from National Education Association ("NEA") to offset the costs of legal services provided by the Association and is allocated according to the percentage of chargeable and nonchargeable expenditures for which reimbursement is received.

**9. UNISERV**

UniServ expenditures are for salaries and fringe benefits of field staff assigned to UniServ Units. Like staff payroll, the expenditures are allocated according to time sheets which indicate the percentage of time spent by these field staff on chargeable and nonchargeable activities. Salaries and fringe benefits of field staff assigned to Regional Resource Centers ("RRCs") are found under staff payroll. All field staff are assigned to either an RRC or a UniServ unit.

**10. UNITED TEACHERS LOS ANGELES ("UTLA") AND CALIFORNIA FACULTY ASSOCIATION ("CFA")**

These block grants support the programs of UTLA and CFA. The costs are allocated between chargeable and nonchargeable categories based on percentages provided by UTLA and CFA from their own agency fee calculations.

\* \* \* \* \* \*

-35-

Exhibit D

# National Education Association Of the United States and Subsidiaries

**Consolidated Financial Statements and
Supplemental Schedules
For the years ended August 31, 2011 and 2010
And Report of Independent Auditors Thereon**

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## TABLE OF CONTENTS

|  | Page |
|---|---|
| INDEPENDENT AUDITORS' REPORT | 1 |
| CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010: | |
| Statements of Financial Position | 2 |
| Statements of Activities and Changes in Net Assets | 3 |
| Statements of Cash Flows | 4 |
| Notes to Financial Statements | 5–27 |
| SUPPLEMENTAL SCHEDULES: | |
| Supplemental Summary Schedules of Agency Fee Chargeable and Nonchargeable Expenditures for the Year Ended August 31, 2011 | 28–40 |
| Notes to Supplemental Summary Schedule of Agency Fee Chargeable and Nonchargeable Expenditures for the Year Ended August 31, 2011 | 41–46 |



**REPORT OF INDEPENDENT AUDITORS**

To the Executive Committee and Members of
National Education Association of the United States
Washington, D.C.

In our opinion, the accompanying consolidated statements of financial position and the related statements of activities, and cash flows present fairly, in all material respects, the financial position of the National Education Association of the United States (a nonprofit corporation incorporated by an Act of the United States Congress) and its subsidiaries ("NEA") at August 31, 2011, and August 31, 2010, and the changes in their net assets and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America. These consolidated financial statements are the responsibility of NEA's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

Our audits were conducted for the purpose of forming an opinion on the basic consolidated financial statements taken as a whole. The supplemental schedules listed in the Table of Contents are presented for the purpose of additional analysis and are not a required part of the basic consolidated financial statements. This additional information is the responsibility of NEA's management. Such information has been subjected to the auditing procedures applied in our audits of the basic consolidated financial statements and, in our opinion, is fairly stated in all material respects when considered in relation to the basic consolidated financial statements taken as a whole.

*PricewaterhouseCoopers LLP*

November 28, 2011

*PricewaterhouseCoopers LLP, 1800 Tysons Boulevard, McLean, VA 22102-4261*
*T: (703) 918-3000, F: (703) 918 3100, www.pwc.com/us*

## NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF FINANCIAL POSITION
### AUGUST 31, 2011 AND 2010

|  | 2011 | 2010 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 71,145,580 | $ 72,716,616 |
| Investments | 11,771,200 | 9,669,193 |
| Membership dues and notes receivable - net | 32,705,662 | 46,351,266 |
| Amount due from affiliates and other organizations | 676,191 | 469,002 |
| Accounts receivable | 7,609,468 | 5,663,502 |
| Prepaid expenses | 1,811,311 | 2,245,879 |
| Deferred income taxes | 281,117 | 271,028 |
| Other current assets | 1,173,037 | 1,096,694 |
| Total current assets | 127,173,566 | 138,483,180 |
| **LONG-TERM ASSETS:** | | |
| Notes receivable - net | 7,335,213 | 3,692,769 |
| Investments | 17,947,944 | 10,338,548 |
| Pension asset | 8,306,922 | 4,322,487 |
| Property and equipment - net | 67,427,904 | 66,357,574 |
| Total long-term assets | 101,017,983 | 84,711,378 |
| **TOTAL ASSETS** | $ 228,191,549 | $ 223,194,558 |
| **LIABILITIES AND NET ASSETS** | | |
| **CURRENT LIABILITIES:** | | |
| Accounts payable | $ 12,299,231 | $ 18,079,241 |
| Accrued liabilities | 18,171,403 | 14,161,999 |
| Accrued annual leave and fringe benefits | 10,742,017 | 8,129,083 |
| Amount held for affiliates and other organizations | 724,982 | 789,571 |
| Total current liabilities | 41,937,633 | 41,159,894 |
| **LONG-TERM LIABILITIES:** | | |
| Accrued severance payable | 6,888,669 | 6,836,866 |
| Deferred retirement benefit | - | 92,023 |
| Deferred income | 14,566,811 | 14,631,789 |
| Deferred income taxes | 2,329,732 | 802,234 |
| Total long-term liabilities | 23,785,212 | 22,362,912 |
| Total liabilities | 65,722,845 | 63,522,806 |
| **UNRESTRICTED NET ASSETS:** | | |
| Undesignated net assets | 143,457,925 | 129,660,296 |
| Net assets designated for Education Assistance Fund | 3,475,869 | 3,717,713 |
| Net assets designated for postretirement benefits | 15,534,910 | 26,293,743 |
| Total unrestricted net assets | 162,468,704 | 159,671,752 |
| **TOTAL LIABILITIES AND NET ASSETS** | $ 228,191,549 | $ 223,194,558 |

The accompanying notes are an integral part of these consolidated financial statements.

**NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF ACTIVITIES AND CHANGES IN NET ASSETS
YEARS ENDED AUGUST 31, 2011 AND 2010**

| | 2011 | 2010 |
|---|---:|---:|
| **OPERATING ACTIVITIES** | | |
| UNRESTRICTED REVENUES: | | |
| NEA Programs: | | |
| Dues | $ 352,667,265 | $ 354,357,992 |
| Other | 2,288,454 | 1,986,346 |
| Total NEA Programs | 354,955,719 | 356,344,338 |
| Member Benefits Programs: | | |
| Program Revenues - Suppliers | 56,699,186 | 56,562,040 |
| Other | 162,897 | 7,276 |
| Total Member Benefits Programs | 56,862,083 | 56,569,316 |
| NEA Properties: | | |
| Rental Income | 1,663,502 | 1,759,528 |
| Total NEA Properties | 1,663,502 | 1,759,528 |
| TOTAL UNRESTRICTED REVENUES | 413,481,304 | 414,673,182 |
| EXPENSES: | | |
| Program Services: | | |
| NEA Programs | 288,866,198 | 275,394,837 |
| Member Benefits Programs | 45,335,346 | 47,707,404 |
| NEA Properties | 939,572 | 906,843 |
| Total Program Services | 335,141,116 | 324,009,084 |
| Support Services: | | |
| NEA Programs | 67,908,526 | 67,059,034 |
| Member Benefits Programs | 8,243,532 | 6,894,914 |
| NEA Properties | 572,934 | 428,710 |
| Total Support Services | 76,724,992 | 74,382,658 |
| TOTAL EXPENSES | 411,866,108 | 398,391,742 |
| CHANGE IN NET ASSETS FROM OPERATIONS | 1,615,196 | 16,281,440 |
| **NON-OPERATING ACTIVITIES** | | |
| Change in Actuarial Gain(Loss) from Defined Benefit Plan and Other Charge | 1,181,756 | (173,037) |
| CHANGES IN NET ASSETS | 2,796,952 | 16,108,403 |
| NET ASSETS, BEGINNING OF YEAR | 159,671,752 | 143,563,349 |
| NET ASSETS, END OF YEAR | $ 162,468,704 | $ 159,671,752 |

The accompanying notes are an integral part of these consolidated financial statements.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CASH FLOWS
### YEARS ENDED AUGUST 31, 2011 AND 2010

|  | 2011 | 2010 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Changes in net assets | $    2,796,952 | $   16,108,403 |
| Adjustments to reconcile changes in net assets to net cash | | |
| provided by (used in) operating activities: | | |
| Depreciation | 7,444,285 | 8,251,813 |
| Bad debt expense | 4,589,626 | 1,034,834 |
| Net realized gain on investments | (1,558,185) | (841,311) |
| Net unrealized loss on investments | 505,156 | 25,517 |
| Loss on sale of furniture and equipment | 39,102 | 1,017 |
| Deferred income taxes | 1,517,409 | (171,760) |
| Deferred income | (618,050) | (413,558) |
| Change in actuarial (gain)loss from Defined Benefit Pension Plan | (1,196,801) | 173,037 |
| Changes in assets and liabilities: | | |
| Decrease in membership dues and notes receivable | 13,301,428 | 10,416,960 |
| (Increase)decrease in amount due from affiliates and other organizations | (207,189) | 227,820 |
| (Increase)decrease in accounts receivable | (1,973,308) | 984,282 |
| Decrease(increase) in prepaid expenses | 434,568 | (1,313,711) |
| (Increase)decrease in other current assets | (76,343) | 47,732 |
| Increase in notes receivable | (139,043) | (5,861,676) |
| (Increase)decrease in prepaid pension costs | (2,787,634) | 314,430 |
| (Decrease)increase in accounts payable | (5,780,010) | 11,340,622 |
| Increase(decrease) in accrued liabilities | 4,009,404 | (3,159,442) |
| Increase in accrued annual leave/fringe benefits | 2,612,934 | 326,257 |
| Decrease in amount held for affiliates and other organizations | (64,589) | (42,202) |
| Increase in accrued severance payable | 51,803 | 472,835 |
| Increase in deferred income | 553,072 | 98,564 |
| Decrease in deferred retirement benefit | (92,023) | (53,277) |
| Net cash provided by operating activities | 23,362,564 | 37,967,186 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Issuances of notes receivable | (7,768,653) | (5,786,031) |
| Repayments of notes receivable | 47,144 | 6,634,159 |
| Purchases of investments | (34,718,653) | (36,719,818) |
| Proceeds on sales of investments | 26,060,279 | 34,572,119 |
| Proceeds from sale of fixed assets | 56,671 | 275 |
| Purchases of furniture and equipment | (8,610,388) | (5,676,751) |
| Purchases of commercial real property | - | (14,000,000) |
| Net cash used in investing activities | (24,933,600) | (20,976,047) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Principal payments on mortgage loan payable | - | (5,077,272) |
| Net cash used in financing activities | - | (5,077,272) |
| NET CHANGES IN CASH AND CASH EQUIVALENTS | (1,571,036) | 11,913,867 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF YEAR | 72,716,616 | 60,802,749 |
| CASH AND CASH EQUIVALENTS, END OF YEAR | $ 71,145,580 | $ 72,716,616 |
| SUPPLEMENTAL DISCLOSURES OF CASH FLOW | | |
| INFORMATION-Cash paid during the year for: | | |
| Interest | $      8,842 | $      7,993 |
| Income taxes (Member Benefits Corporation) | $   1,463,250 | $   1,175,000 |

The accompanying notes are an integral part of these consolidated financial statements.

-4-

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

### 1. ORGANIZATION

The National Education Association of the United States ("NEA") is a not-for-profit organization incorporated under an Act of the United States Congress. Its mission statement reads: "to advocate for education professionals and to unite our members and the nation to fulfill the promise of public education to prepare every student to succeed in a diverse and interdependent world."

To help realize this mission, the NEA adopted a vision of "a great public school for every student." This vision guided NEA's strategic plan and budget, which is organized around three Strategic Goals and five Core Services Areas.

The Strategic Goals address three key challenges:

- *School Funding*—In partnership with state affiliates, establish public policy in at least six states by mobilizing members and the public to build tax and economic infrastructures for achieving adequate and equitable funding for public education.

- *Salary*— Improve starting salaries for teachers, achieve at least a living wage for education support professionals and assist higher education locals to engage in effective salary campaigns.

- *Priority Schools*—In partnership with state affiliates and targeted local affiliates, provide support and advocacy to struggling schools, as identified by states, to become a great public school as measured by NEA's criteria and indicators.

The Core Service areas of the General Operating Fund address regular, ongoing programs and services:

- *Student Learning & Workforce Quality*—Promote policies and programs that create teaching and learning conditions that close the achievement gaps and recruit and retain a quality workforce by improving compensation, retirement benefits, and other working conditions of education employees.

- *Membership*—Partner with state affiliates to provide programs and services that focus on membership growth, retention and engagement.

- *Advocacy*—Support pro-public education candidates, influence elected policy makers, advocate public policy and social justice through collective action, and utilize the best communication strategies to engage members and the public.

- *Partnership*—Develop partnerships that engage the ethnic minority, labor, faith-based, environmental, philanthropic, educational, civil and human rights, and business communities to enhance our ability to achieve great public schools for every student.

- *Business Operations*—Administer the business operations in a manner that supports the changing needs and priorities of the organization and ensures efficient and effective governance and shared services.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

### 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Principles of Consolidation*—The consolidated financial statements include the accounts of NEA and its wholly owned subsidiaries: NEA Properties, Inc. ("NEAPI"), NEA's Member Benefits Corporation ("MBC"), and MBC's wholly-owned subsidiary, the NEA Professional Services Corporation, and an affiliated entity, National Education Employees Assistance Fund, Inc., ("NEEAF"). MBC serves as a contractor for NEA's member benefits functions. NEEAF is combined with the accounts of NEA due to common control and an economic interest (Note 10). All intercompany accounts and transactions have been eliminated in consolidation.

*Measure of Operations*—NEA includes in its measure of operations all revenue and expenses that are integral to its continuing core program services with the key objective being predictability of indicated results. Non-operating income and expenses include unrealized appreciation (depreciation) and defined benefit pension charges included in Other Comprehensive Income of MBC.

*Basis of Accounting*—The accompanying statements are prepared on the accrual basis of accounting. To ensure observance of its bylaws, the resources of NEA are classified internally for accounting and reporting purposes into funds established according to their nature and purpose. The assets, liabilities, net assets, and changes in net assets are reported in the following two fund groups:

### General Fund

- *General Operating Fund*—The bylaws of NEA provide that the General Operating Fund shall comprise all income received in the form of dues, interest, dividends, fees, earnings from advertising, sales of NEA publications, payments for services, and funds received by gift, bequest, devise, or transfer to NEA, which are not specifically designated for deposit in the Capital Improvement Fund.

- *Special Purpose Funds*—NEA has various Special Purpose Funds that consist of funds designated for specific projects and purposes. Special Purpose Funds include activities such as the UniServ Fund, National Education Employees Assistance Fund (Note 10), Special Dues Ballot Fund, Special Dues Media Fund, Advocacy Fund, Cash Stabilization Fund, and NEA-Retired Program Fund. These Special Purpose Funds also include the activities of MBC, which provides support to the Member Benefits Programs, primarily in the areas of administrative, membership services, affiliate support, research and development, and marketing. Additionally, on July 22, 2009, NEA established a wholly owned subsidiary, NEA Properties, Inc. NEAPI is a real estate holding company exempt under section 501(c)(2) of the Internal Revenue Code. Currently, NEAPI's primary purpose is to hold title to and manage certain commercial real property in Indiana, collect income from that property and periodically surrender the net proceeds derived to NEA.

### Capital Improvement Fund

- The bylaws of NEA provide that the Capital Improvement Fund shall comprise the properties and permanent investments of NEA and other funds or properties received by gift, devise, bequest, or transfer for deposit in the Fund. Disbursements from the Capital Improvement Fund to acquire new properties or to provide for major long-term improvements in existing properties shall be authorized

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

by a two-thirds vote of the Board of Directors. Expenditures from this Fund for any other purpose shall be authorized by a two-thirds vote of the Representative Assembly.

*Use of Estimates*—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Significant items subject to such estimates and assumptions include the deferred revenue, useful life of fixed assets, pension liability, reserve for uncollectible, reserve for contingent liabilities, and deferred tax. Actual results could differ materially, in the near term, from the amounts reported.

*Concentration of Risks*—Financial instruments that potentially subject NEA to significant concentrations of credit risk principally consist of cash, accounts receivable, and investments. NEA places its cash in a financial institution that is federally insured under the Federal Depository Insurance Corporation Act ("FDICA"). At August 31, 2011 and 2010, the cash aggregate balances were in excess of the FDIC insurance limits by $5,559,795 and $57,037,173, respectively, and therefore, bear some risk, since they were not collateralized. NEA has not experienced any losses on its cash to date related to FDICA insurance limits.

MBC had material revenues from two suppliers representing approximately 42 percent and 42 percent of revenues, respectively, for the year ended August 31, 2011, and approximately 44 percent and 43 percent of revenues, respectively, for the year ended August 31, 2010. As of August 31, 2011, two suppliers accounted for approximately 34 percent and 44 percent of MBC's accounts receivable. As of August 31, 2010, two suppliers accounted for approximately 50 percent and 32 percent of MBC's total accounts receivable.

*Cash and Cash Equivalents*—Cash equivalents consist of interest-bearing deposits and securities with original maturity of less than three months when purchased and are recorded at cost, which approximates fair value.

*Investments*—Investments consist of mutual funds, exchange traded funds, and common stocks and are recorded at fair value, with any gains or losses reflected in the consolidated statements of activities and changes in net assets. Net realized gains from operating activities were $1,558,185 and $841,311 for the years ended August 31, 2011 and August 31, 2010, respectively. The net unrealized loss included in operating activities was $490,111 and the unrealized loss included in non-operating activities was $15,045, for a total net unrealized loss of $505,156 for the year ended August 31, 2011. The net unrealized loss included in operating activities were $25,517 for the year ended August 31, 2010.

*Property and Equipment*—Property and equipment are recorded at cost. Depreciation is provided using the straight-line method over the estimated useful lives of the respective assets. The estimated useful lives range from 2 to 15 years for furniture, fixtures, and equipment and 25 to 40 years for buildings and leasehold improvements.

NEA capitalizes direct costs incurred during the application development and implementation stages for developing software for internal use. These software costs are depreciated using the straight-line

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

method over the estimated useful life of the software, generally three to five years. All costs incurred during the preliminary project stage are expensed as incurred.

Depreciation expense were $7,444,285 and $8,251,813 for the years ended August 31, 2011 and 2010, respectively and is reflected in NEA's support services expenses in the consolidated statements of activities and changes in net assets.

*Accrued Severance Payable*—NEA has a policy entitling employees with over 10 years of service to severance pay equal to 10 weeks of salary. NEA's accrued severance pay has been calculated to approximate in accordance with Accounting Standards for *Compensation-Nonretirement Postemployment Benefits*.

*NEA-Retired Program ("NEA-Retired")*—NEA offers life membership through a Special Purpose Fund known as the NEA-Retired Program. NEA-Retired dues qualify retired members for certain services provided to active members, as well as services designed specifically for retired persons. NEA-Retired dues income is recorded as deferred income when received and amortized using the straight-line method over the estimated life expectancy of its members.

*Membership Dues*—Membership dues are recognized as income over the membership year, which is September 1 through August 31. Dues are assessed to members as provided in the bylaws. An estimated provision for uncollectibles, write-offs, and cancellations is charged against membership dues revenues.

In accordance with the bylaws, a percentage of the membership dues is allocated to UniServ grants, which are included in NEA's program services expenses, whereby NEA provides grants to state affiliates to assist in funding their staff representatives, whose responsibilities are to implement, improve, and coordinate programs of NEA and the state affiliates.

*Program Revenue*—MBC's program revenues from suppliers represent fees from contracts with various program suppliers. Fees are recognized as revenue in the period in which they are earned.

*Rental Revenue*—NEAPI rents office space to various tenants. Rental revenue from operating leases is recognized on a straight-line basis over the term of the lease.

*Income Taxes*—In June 2009, the FASB issued interpretation Accounting for Uncertainty in Income Tax. This interpretation prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. The interpretation also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition. MBC has adopted the interpretation Accounting for Uncertainty in Income Tax effective September 1, 2009. MBC has no uncertain tax positions at August 31, 2011.

*Reclassifications*—Certain amounts from the prior year have been reclassified to conform with the current year presentation.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

### 3.   INVESTMENTS

Investments, at fair value, consist of the following at August 31:

|  | 2011 | | 2010 |
|---|---|---|---|
| Equity securities | | | |
| Common stocks | $ - | $ | 5,487,045 |
| Mutual funds - common stocks | 11,771,200 | | 4,182,148 |
| Total equity securities | 11,771,200 | | 9,669,193 |
| Debt securities | | | |
| Mutual funds - fixed income | 17,947,944 | | 8,829,362 |
| Exchange traded funds | - | | 1,509,186 |
| Total debt securities | 17,947,944 | | 10,338,548 |
| Total investments | $ 29,719,144 | $ | 20,007,741 |

Equity securities are purchased and held for sale in the near future.

### 4.   NOTES RECEIVABLE

MBC has a notes receivable from the National Education Technology Funding Corporation, a not-for-profit corporation chartered to assist schools in financing technology, infrastructure, and other purposes to improve the quality of public education. In lieu of interest, borrower will pay risk premium of .0004 percent of certain certificates issued during the term of the loan. The note will mature on December 31, 2011. As of August 31, 2011 MBC has recognized an allowance for doubtful debt against this note in its entire amount.

On March 31, 2010, NEA loaned the Indiana State Teachers Association ("ISTA") $3,060,745. In August 2010, NEA increased the aforementioned note balance to $5,386,031. The note is unsecured and bears interest at a rate of .5% above the LIBOR rate.

During the fiscal year 2011, NEA provided $7,768,653 in additional support and monies to ISTA which increased the outstanding note balance to $13,154,684. As of August 31, 2011 NEA has recognized a $6,000,000 allowance for doubtful debt against this note.

As of August 31, 2011 and August 31, 2010, NEA has accrued interest related to this promissory note of $102,776 and $77,753, respectively.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

### 5.  PROPERTY AND EQUIPMENT

Property and equipment consists of the following at August 31:

|  | 2011 | 2010 |
|---|---|---|
| Land: |  |  |
| NEA headquarters | $ 1,753,777 | $ 1,753,777 |
| MBC headquarters | 837,002 | 837,002 |
| NEA Properties headquarters | 1,943,982 | 1,952,889 |
| Building and improvements: |  |  |
| NEA headquarters | 79,533,573 | 79,316,319 |
| MBC headquarters | 6,238,237 | 5,566,612 |
| NEA Properties headquarters | 13,824,620 | 12,402,498 |
| Furniture, fixtures, and equipment | 24,230,384 | 22,078,554 |
| Software development costs | 43,702,887 | 39,760,735 |
|  | 172,064,462 | 163,668,386 |
| Less accumulated depreciation and amortization | (104,636,558) | (97,310,812) |
| Total property and equipment | $ 67,427,904 | $ 66,357,574 |

### 6.  MORTGAGE PAYABLE

*Capital Improvement Fund*—A mortgage loan with a 20-year maturity in the amount of $52,000,000 was entered into with an insurance company in October 1991. The loan is evidenced by five notes, with varying maturity dates and interest rates. The interest rates of the mortgage notes range from 10.00% to 10.40%, which are collateralized by NEA's headquarters office building and personal property. The mortgage loan was paid off in full on July 15, 2010. Interest expense was $267,855 for the year ended August 31, 2010 and is reflected in NEA's program services expenses in the consolidated statements of activities and changes in net assets.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

### 7.   COMMITMENTS AND CONTINGENCIES

NEA and MBC lease office space and personal property at a number of locations under noncancelable operating leases expiring through 2014. Future minimum lease payments under these leases are as follows:

| Year Ending August 31 | | |
|---|---|---|
| 2012 | $ | 160,091 |
| 2013 | | 70,336 |
| 2014 | | 14,338 |
| Total future minimum lease payments | $ | 244,765 |

Rental expense for all operating leases was approximately $196,000 and $200,000 during 2011 and 2010, respectively.

NEA has been named as a party in several legal matters, the outcome of which cannot presently be determined. In the opinion of management an appropriate provision has been made to account for probably losses and the ultimate resolution of these matters will not have an impact on NEA's consolidated financial position or changes in net assets and cash flows.

The Internal Revenue Service ("IRS") examined NEA's income tax returns for the years 2000 through 2010 and proposed adjustments for those years. NEA appealed the proposed adjustments and while it believes the related tax returns are in accordance with prevailing tax rulings it has established a provision of $4,000,000 to cover any obligations that might arise from the unresolved issues.

### 8.   BANK LINE OF CREDIT

NEA had a line of credit from a commercial bank at an interest rate of LIBOR (London Interbank Offered Rate) plus 1.50%. At August 31, 2009, the prevailing rate was 1.76%. On October 8, 2009, NEA increased its operating line of credit from $10,000,000 to $20,000,000. This line of credit expired on February 28, 2010. On September 15, 2010 NEA initiated a new line of credit for $30,000,000. This line of credit expired on February 28, 2011.

### 9.   RETIREMENT BENEFITS

*NEA – Defined Benefit Plan*—NEA participates in a multiemployer, defined benefit retirement plan which was noncontributory for NEA employees and covers substantially all permanent employees. On June 1, 2009, the plan was amended to require employee contributions at a rate of 3.5% for employees employed by NEA on or after June 9, 2009. NEA employs approximately 45.3% of the employees covered under the plan; the remaining 54.7% are employees of participating state and local affiliates of NEA. NEA's policy is to fund retirement costs as accrued.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

NEA's retirement contribution expenses for the years ended August 31, 2011 and 2010, respectively, were $25,109,643 and $25,648,677. The accumulated plan benefits and plan net assets available for benefits as of the date of the latest actuarial valuation are presented below:

|  | January 1, | |
|  | 2011 | 2010 |
|---|---|---|
| Actuarial present value of accumulated plan benefits: | | |
| Total vested benefits | $ 613,649,407 | $ 567,208,175 |
| Total nonvested benefits | 31,096,215 | 32,453,856 |
| Total accumulated plan benefits | $ 644,745,622 | $ 599,662,031 |
| Net assets available for benefits | $ 556,340,336 | $ 486,957,182 |

The increase in the actuarial present value of accumulated plan benefits reflects interest earned on benefits.

The actuarial present value of accumulated plan benefits ignores the effects of future compensation increases on the benefits that participants will receive for their past service. If this value were adjusted for projected salary increases, consistent with the assumed rate of return, the projected benefits obligation would be $697,844,057 and $651,397,413 as of January 1, 2011 and 2010, respectively. The assumed rate of return used in determining the actuarial present value of accumulated plan benefits was 7.40% and 7.60% for January 1, 2011 and 2010, respectively. As of August 31, 2011 and 2010, the net assets available for benefits were $554,520,664 and $492,664,525, respectively.

*NEA – 401(k) Retirement Savings Plan*—NEA's employees are also eligible to participate in the 401(k) Retirement Savings Plan of the National Education Association (the "Plan") in which the employee can make voluntary, tax-deferred contributions within specified limits. The Plan was established under the provisions of Internal Revenue Code Subsection 401(k) and has received a favorable determination as to its tax status. NEA's contributions to the Plan, based on a set percentage of employee contributions, amounted to $2,425,300 and $2,523,356 for the years ended August 31, 2011 and 2010, respectively.

*NEA – Postretirement Benefit Plan*—In addition to providing pension benefits, NEA provides certain healthcare and life insurance benefits to retirees. Prior to March 1, 2000, NEA provided these benefits under a single employer defined postretirement plan.

Effective March 1, 2000, NEA established and adopted the National Education Association and Affiliate Retiree Health Plan (the "Plan") and Trust (the "Trust") for the purpose of providing certain healthcare and life insurance benefits to eligible and retired employees of NEA and to participating affiliates. The plan is a multiemployer postretirement benefits plan. The Internal Revenue Service has approved the Plan and the Trust.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

As a result of the adoption of the multiemployer plan, the Trust assumed the responsibility for the payment of benefits and all future obligations under the Plan. NEA's liability under the single employer plan as of March 1, 2000, which amounted to $29,427,901 was recognized as a nonoperating charge in NEA's consolidated statement of activities and changes in net assets. As of August 31, 2011 and 2010, NEA net assets of $15,534,910 and $26,293,743, respectively were designated for postretirement benefit obligation.

Postretirement benefit expense under the multiemployer plan was $10,457,000 and $6,944,507 for the years ended August 31, 2011 and 2010, respectively.

A discount rate of 7.75% was used to determine the postretirement benefit expense for the years ended August 31, 2011 and 2010.

***MBC – 401(k) Salary Deferral Plan***—NEA's Member Benefits Corporation ("MBC") maintains a Section 401(k) cash or deferred plan in which the employees can make voluntary, tax-deferred contributions within specific limits. The Plan was established under the provision of the Internal Revenue Code Subsection 401(k), and has received a favorable determination as to its tax status. MBC's contributions to the Plan, based upon a set percentage of employee contributions, amounted to $270,298 and $267,928, for the years ended August 31, 2011 and 2010, respectively.

***MBC – Defined Contribution Plan***—MBC maintains a Defined Contribution Plan and Trust, which is noncontributory for MBC's employees, and covers substantially all members of the NEA Staff Organization ("NEASO") Collective Bargaining Unit. MBC contributes to the Plan a percentage of compensation as set forth in a collective bargaining agreement with NEASO. MBC's contributions to the Plan during the years ended August 31, 2011 and 2010 were $667,648 and $469,688, respectively.

***MBC – Defined Benefit Plan***—MBC maintains a noncontributory defined benefit pension plan covering substantially all employees not covered by a collective bargaining agreement. MBC has an August 31 measurement date for its pension plan.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

**Benefit obligations, plan assets, and the funded status of the Plan at August 31 were as follows:**

|  | | 2011 | | 2010 |
|---|---|---|---|---|
| Benefit obligations | $ | 12,524,639 | $ | 11,707,369 |
| Fair value of plan assets | $ | 20,831,561 | $ | 16,029,856 |
| Funded status of the plan | $ | 8,306,922 | $ | 4,322,487 |

**Contributions to the Plan and Benefits paid for the year ended August 31 were:**

|  | | | | |
|---|---|---|---|---|
| Employer Contributions | $ | 3,157,000 | $ | 889,413 |
| Benefits paid | $ | 143,612 | $ | 69,643 |

**Amounts recognized in the Statement of Financial Position consist of:**

|  | | | | |
|---|---|---|---|---|
| Noncurrent assets | $ | 8,306,922 | $ | 4,322,487 |
| Current liabilities | | - | | - |
| Noncurrent liabilities | | - | | - |
|  | $ | 8,306,922 | $ | 4,322,487 |

**Amounts recognized in Other Non-Operating Expense consist of:**

|  | | | | |
|---|---|---|---|---|
| Net actuarial loss | $ | 4,414,002 | $ | 6,085,143 |
| Prior service cost | | 637,630 | | 870,825 |
| Unrecognized net initial obligation | | - | | - |
| Total (before tax effects) | $ | 5,051,632 | $ | 6,955,968 |

The accumulated benefit obligation is $10,824,210 and $9,747,643 at August 31, 2011 and 2010, respectively.

Net periodic benefit cost is $1,076,901 and $1,098,494 for the years ended August 31, 2011 and 2010, respectively.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

|  | 2011 | 2010 |
|---|---|---|
| **Other changes in Plan Assets and Benefit Obligations recognized in Other Non-Operating Expense** |  |  |
| Net (gain)/loss | $ (1,063,803) | $ 1,069,686 |
| Prior service cost | - | - |
| Amortization of net gain | (607,338) | (558,105) |
| Amortization of prior service cost | (233,195) | (233,195) |
| Total recognized in other comprehensive income | $ (1,904,336) | $ 278,386 |
| | | |
| Total recognized in net periodic benefit cost and other comprehensive income | $ (827,435) | $ 1,376,880 |

|  | 2012 |
|---|---|
| **Amounts expected to be recognized in Net Periodic Cost in the coming year** |  |
| Gain/Loss recognition | $ 335,857 |
| Prior service cost recognition | $ 233,195 |

Weighted-average assumptions used to determine benefit obligations at August 31 were as follows:

|  | 2011 | 2010 |
|---|---|---|
| Discount rate | 5.25% | 5.00% |
| Rate of salary increases | 4.00% | 4.00% |

Weighted-average assumptions used to determine net periodic benefit cost for the years ended August 31 were as follows:

|  | 2011 | 2010 |
|---|---|---|
| Discount rate | 5.00% | 6.00% |
| Rate of salary increases | 4.00% | 4.50% |
| Expected long-term rate of return on assets | 8.00% | 8.00% |

MBC determines the long-term expected rate of return on plan assets by examining historic capital market returns, correlations between asset classes and the Plan's normal asset allocation. Current and near-term market factors such as inflation and interest rates are then evaluated to arrive at the expected return on Plan assets. Peer group, or benchmarking data are also reviewed to ensure a reasonable and appropriate return assumption.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

MBC utilizes a total return investment approach based on modern portfolio theory. Multiple asset classes are implemented in order to obtain the benefits of diversification and maximize long-term total return for a given level of risk. Risk tolerance is developed by reviewing the funded status of the plan, duration of the plan liabilities, the income and liquidity requirements, legal constraints, and the financial condition of MBC. The investment portfolio is comprised of a diversified combination of equities, fixed income securities, and cash equivalents. MBC's investment policy states that the target allocations for plan assets are 70 percent equity securities, 28 percent fixed income securities, and 2 percent cash equivalents. The allocation among equities and fixed income securities is determined by prevailing market conditions and relative valuations between asset classes. The Plan's financial condition is monitored on an ongoing basis by means of quarterly investment portfolio reviews, an annual independent actuarial valuation, and periodic asset/liability studies.

Pension plan allocations at August 31 were as follows:

|                          | 2011 | 2010 |
|--------------------------|------|------|
| Equities                 | 73%  | 70%  |
| Fixed Income Securities  | 25%  | 28%  |
| Cash Equivalents         | 2%   | 2%   |
| Total                    | 100% | 100% |

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

The fair value of MBC's pension plan assets at August 31, 2011 by asset class are as follows:

| Asset Class | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| Cash and cash equivalents | $ 411,996 | $ - | $ - | $ 411,996 |
| Equity securities: | | | | |
| U.S. large-cap | 5,733,826 | - | - | 5,733,826 |
| U.S. mid-cap | 1,728,291 | - | - | 1,728,291 |
| U.S. small-cap | 1,626,260 | - | - | 1,626,260 |
| REIT | 923,770 | - | - | 923,770 |
| Global equity | 478,229 | - | - | 478,229 |
| International | 1,830,870 | - | - | 1,830,870 |
| Emerging markets | 592,524 | - | - | 592,524 |
| Other investment funds: | | | | |
| Equity long/short (a) | 543,938 | - | - | 543,938 |
| Equity market neutral (b) | 582,940 | - | - | 582,940 |
| Multi-strategy mutual fund (c ) | 956,108 | - | - | 956,108 |
| Managed futures (d) | 293,028 | - | - | 293,028 |
| Fixed income securities: | | | | |
| U.S fixed income | 2,917,540 | - | - | 2,917,540 |
| International fixed income | 2,212,241 | - | - | 2,212,241 |
| | $ 20,831,561 | $ - | $ - | $ 20,831,561 |

(a)  This separately managed account class includes funds that by prospectus, has the ability to take both long and short positions within the portfolio. The primary investment vehicle is Exchange Traded Funds (ETFs). The manager of this fund has the ability to rotate investments between various equity styles: Value, growth and blended; as well as multiple market capitalizations: Large Cap, Mid Cap & Small Cap.

(b)  This mutual fund class includes funds that invest in strategies that match long and short positions in different US Common Stocks. The managers also employ other strategies, such as merger arbitrage.

(c)  This mutual fund class invests in multiple strategies, across multiple asset classes, including but not limited to: global equities, global fixed income, REITS, and commodities, in an effort to diversify risks and reduce volatility.

(d)  This mutual fund class includes funds that invest in energy, agriculture, and currency markets (among others) using futures contracts.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

The fair value of MBC's pension plan assets at August 31, 2010 by asset class are as follows:

| Asset Class | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| | Fair Value Measurements at Reporting Date Using | | | |
| Cash and cash equivalents | $ 291,194 | $ - | $ - | $ 291,194 |
| Equity securities: | | | | |
| U.S. large-cap | 3,398,495 | - | - | 3,398,495 |
| U.S. mid-cap | 847,650 | - | - | 847,650 |
| U.S. small-cap | 1,248,681 | - | - | 1,248,681 |
| REIT | 546,596 | - | - | 546,596 |
| Global equity | 394,414 | - | - | 394,414 |
| International | 2,090,638 | - | - | 2,090,638 |
| Emerging markets | 556,100 | - | - | 556,100 |
| Other investment funds: | | | | |
| Equity long/short (a) | 489,488 | - | - | 489,488 |
| Equity market neutral (b) | 553,367 | - | - | 553,367 |
| Multi-strategy mutual fund (c ) | 787,632 | - | - | 787,632 |
| Managed futures (d) | 278,592 | - | - | 278,592 |
| Fixed income securities: | | | | |
| U.S fixed income | 2,971,009 | - | - | 2,971,009 |
| International fixed income | 1,576,000 | - | - | 1,576,000 |
| | $ 16,029,856 | $ - | $ - | $ 16,029,856 |

(a)  This separately managed account class includes funds that by prospectus, has the ability to take both long and short positions within the portfolio. The primary investment vehicle is Exchange Traded Funds (ETFs). The manager of this fund has the ability to rotate investments between various equity styles: Value, growth and blended; as well as multiple market capitalizations: Large Cap, Mid Cap & Small Cap.

(b)  This mutual fund class includes funds that invest in strategies that match long and short positions in different US Common Stocks. The managers also employ other strategies, such as merger arbitrage.

(c)  This mutual fund class invests in multiple strategies, across multiple asset classes, including but not limited to: global equities, global fixed income, REITS, and commodities, in an effort to diversify risks and reduce volatility.

(d)  This mutual fund class includes funds that invest in energy, agriculture, and currency markets (among others) using futures contracts.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

The following estimates and assumptions were used to determine the fair value of each class of financial instruments listed above.

- *Cash Equivalents* - Cash equivalents include cash deposits in investment funds, money market funds, and short-term U.S. Treasury securities, which are actively traded. Cash equivalents are priced using independent market prices in the primary trading market, and are classified as Level 1 based on the availability of quotes for identical assets.

- *Equity Securities* - Equity investments include stocks, separately held accounts, and mutual funds. These assets, which are grouped by investment objective, consist of publicly traded securities, diversified globally, and are classified as Level 1.

- *Fixed Income Securities* - These assets include mutual funds with fixed income portfolios. These assets are valued using market prices, such as broker quotes, for the same instruments; as these securities typically trade in active markets, they are categorized as Level 1.

For fiscal year 2012, MBC expects to contribute the maximum deductible amount to its pension plan as determined by the January 1, 2012, actuarial valuation.

Benefit payments expected to be paid over the next five years and accumulated over the five years thereafter are as follows as of August 31:

| | | |
|---|---|---|
| 2012 | $ | 221,199 |
| 2013 | $ | 318,108 |
| 2014 | $ | 402,187 |
| 2015 | $ | 491,592 |
| 2016 | $ | 580,549 |
| 2017-2021 | $ | 4,225,822 |

***MBC – Deferred Retirement Benefit***—MBC has recognized a noncurrent liability representing a deferred retirement benefit for a former officer that was due in 2007 and will be paid over a five-year period ending April 2012.

## 10. NATIONAL EDUCATION EMPLOYEES ASSISTANCE FUND, INC.

The National Education Employees Assistance Fund, Inc. ("NEEAF") is a nonprofit corporation established for the purpose of providing financial and other assistance to member organizations and their individual members involved in disputes over terms and conditions of employment. In this capacity, NEEAF, from time to time, has guaranteed loans made by lending institutions to members who were involved in such disputes. These loans are collateralized by letters of credit from those state affiliates that are members of NEEAF. NEA commits the unrestricted resources of the General Operating Fund to fulfill its obligation. NEA's commitment and the state affiliate's line of credit is approximately $6,951,738. In the event of default on a loan, the bylaws of NEEAF provide that the bank shall first

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

draw upon the letter of credit of the state affiliate from which the funds were transmitted and, thereafter, proportionately from all other letters of credit and/or lines of credit.

As of August 31, 2011 and 2010, NEA was contingently liable in the event of default for $6,457 and $6,613, respectively.

### 11. THE NEA FOUNDATION FOR THE IMPROVEMENT OF EDUCATION

The NEA Foundation for the Improvement of Education ("NFIE") was created in 1969 by NEA as a tax-exempt public charity to improve the quality of public education in the United States. The NFIE has a separate Board of Directors and operates independently of NEA. Accordingly, the accompanying financial statements do not include the activities of NFIE.

The NFIE empowers public education employees to innovate, take risks, and become agents for change to improve teaching and learning in our society.

During the years ended August 31, 2011 and 2010, payments totaling $2,052,120 and $2,118,202, respectively, were made to NFIE for an endowment that will help fund programs to meet critical needs of students and education employees in years to come. Such amounts are reflected as reductions in "NEA Programs—Dues" (see page 3) in the Consolidated Statements of Activities and Changes in Net Assets for the years ended August 31, 2011 and 2010.

### 12. NEA HEALTH INFORMATION NETWORK

The NEA Health Information Network ("NEA-HIN"), a legally separate 501 (c)(3) not-for-profit organization, was created in 1987 to provide a link between the education and health professions to assure that public school employees and their students have the knowledge and skills necessary to make decisions that enhance the quality of their lives, improve the environment in which they work and learn, and build relationships within the communities they serve.

NEA-HIN manages and implements programs that provide training, technical assistance, information, and referrals for NEA members and staff on a variety of health and safety issues affecting school employees and students. NEA-HIN secures funds from public and private sources to implement these programs.

NEA-HIN establishes collaborative partnerships with other public and private entities to enhance the content and scope of its activities and to bring the education employee/student perspective into the planning and development process of relevant health initiatives at the national, state, and local levels.

NEA's appropriations for NEA-HIN for each of the years ended August 31, 2011 and 2010 were $600,000 and $650,000, respectively.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010**

## 13. NEA MEMBERS INSURANCE TRUST

The National Education Association Members Insurance Trust ("NEA-MIT") was organized to provide certain employee welfare benefits to NEA members and their dependents, pursuant to the NEA Members Insurance Plan.

NEA is the sponsor and administrator of the welfare plans that NEA-MIT provides. NEA may appoint and remove the trustees of NEA-MIT. NEA-MIT maintains an agreement with MBC to provide administrative and promotional services for the programs.

NEA and NEA-MIT have an agreement whereby NEA provides systems administration, maintenance, software development and facilities management in the amount of $871,113 and $890,556 for the years ended August 31, 2011 and 2010, respectively.

## 14. INCOME TAXES

Under provisions of Section 501(c) of the Internal Revenue Code and the applicable income tax regulations of the District of Columbia, NEA is exempt from taxes on income, other than taxes on unrelated business income.

MBC follows the liability method of accounting for income taxes as required by the FASB Accounting Standards *Income Taxes*. Income tax expense is recognized based on the amount of income taxes currently payable or refundable plus the net change during the year in the deferred tax liability or asset. The current or deferred tax consequences of all events that have been recognized in the financial statements are measured based on provisions of enacted tax law.

The provision for Federal and State income taxes is included in MBC's support service expenses on the consolidated statements of activities and changes in net assets and consists of the following:

|  | 2011 | 2010 |
|---|---|---|
| **Current Provision** | | |
| Federal | $ 1,129,791 | $ 1,192,777 |
| State | 142,845 | 137,523 |
| | 1,272,636 | 1,330,300 |
| **Deferred Provision** | | |
| Federal | 698,537 | (59,426) |
| State | 111,338 | (6,986) |
| | 809,875 | (66,412) |
| **Total** | $ 2,082,511 | $ 1,263,888 |

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

A reconciliation of income taxes at the statutory rate to the provision for income taxes in the financial statements is as follows:

|  | 2011 | 2010 |
|---|---|---|
| Federal income tax provision at the statutory rate | $ 1,828,328 | $ 1,133,351 |
| State income tax expense, net of federal benefit | 254,183 | 130,537 |
| Total | $ 2,082,511 | $ 1,263,888 |

At August 31, 2011 and 2010, the deferred tax assets and liabilities represent the tax effects of the following temporary differences:

|  | 2011 | 2010 |
|---|---|---|
| Assets: |  |  |
| Deferred income | $ 521,597 | $ 659,124 |
| Accrued vacation | 287,925 | 292,468 |
| Bad debt | 162,828 | - |
| State taxes | 150,983 | 113,128 |
| Other | 33,450 | 78,527 |
| Gross deferred tax assets | 1,156,783 | 1,143,247 |
| Liabilities: |  |  |
| Pension costs | (3,165,140) | (1,635,748) |
| Other | (40,258) | (38,705) |
| Gross deferred tax liabilities | (3,205,398) | (1,674,453) |
| Total | $ (2,048,615) | $ (531,206) |

Amounts recognized in the consolidated statements of financial positions at August 31:

|  | 2011 | 2010 |
|---|---|---|
| Current deferred tax asset | $ 321,375 | $ 309,733 |
| Current deferred tax liability | (40,258) | (38,705) |
|  | 281,117 | 271,028 |
| Noncurrent deferred tax asset | 835,408 | 833,514 |
| Noncurrent deferred tax liability | (3,165,140) | (1,635,748) |
|  | (2,329,732) | (802,234) |
| Total | $ (2,048,615) | $ (531,206) |

- 22 -

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

During the fiscal year ended August 31, 2010, MBC adopted new recognition and measurement provisions for uncertain tax positions. For tax benefits to be recognized under this model, the tax position related to the benefit must be more likely than not to be sustained upon examination by the taxing authorities. MBC evaluated its tax positions and has determined that it does not have any uncertain tax positions. Accordingly, it does not recognize a liability for income taxes associated with unrecognized tax benefits in its financial statements for the year ended August 31, 2011. At August 31, 2011, tax years 2007 through 2010 remain open to examination under the statute of limitations.

### 15. OTHER NON-OPERATING EXPENSE

The tax effects allocated to each component of Other Non-Operating Expense for the year ended August 31, 2011 are:

|  | Before-Tax Amount | Tax (Expense) or Benefit | Net-of-tax Amount |
|---|---|---|---|
| Defined Benefit Pension Plan: | | | |
| Net gain arising during period | $ 1,063,803 | $ (395,244) | $ 668,559 |
| Less: amortization of net gain included in net periodic pension cost | 607,338 | (225,650) | 381,688 |
| Less: amortization of prior service cost included in net periodic pension cost | 233,195 | (86,641) | 146,554 |
| Gain(loss) from Defined Benefit Pension Plan | 1,904,336 | (707,535) | 1,196,801 |
| Less: unrealized loss from investments | (15,045) | - | (15,045) |
| Other Non-Operating Expense | $ 1,889,291 | $ (707,535) | $ 1,181,756 |

### 16. FAIR VALUE MEASUREMENTS

Accounting standards for fair value measurements defines fair value, establishes a framework for measuring fair value and enhances disclosures about fair value measurements. Accounting standards for fair value measurements defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. That framework provides a fair value hierarchy that prioritizes the inputs to the valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurements) and the lowest priority to measurements involving significant unobservable inputs (Level 3 measurements). The three levels of the hierarchy are as follows:

- *Level 1* - Observable inputs such as quoted prices for identical assets or liabilities in active markets;
- *Level 2* - Inputs other than the quoted prices in active markets that are observable, either directly or indirectly such as quoted prices for similar assets or liabilities in active markets,

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

quoted prices for identical or similar assets or liabilities in inactive markets, inputs other than quoted prices that are observable or inputs that are derived principally from or corroborated by observable market data by correlation or other means; and

- *Level 3* - Unobservable inputs in which there is little or no market data, which requires management to develop its own assumptions.

The asset's or liability's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to their fair value measurement. Valuation techniques used need to maximize the use of observable inputs and minimize the use of unobservable inputs.

The following is a description of the valuation techniques used for assets measured at fair value:

- *Money market funds* - Valued at cost, which approximates fair value. Valuation is from an unadjusted quoted price;
- *Repurchase agreements* - Valued at cost, which approximates fair value. Valuation is not obtained from a quoted price in an active market;
- *Corporate stocks/exchange traded funds* - Valued at the closing price reported in an active market in which the securities are traded; and
- *Mutual funds-equity and fixed income securities* - Valued at the net asset value ("NAV") of shares held and is calculated at the end of each business day;

The methods described above may produce a fair value calculation that may not be indicative of net realizable value or reflective of future fair values. Furthermore, while NEA believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different fair value measurement at the reporting date.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

The following table presents NEA's fair value hierarchy for financial assets measured on a recurring basis at August 31, 2011:

| | Fair Value Measurements at Reporting Date Using | | | |
|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| Money Market Funds | $ 5,559,795 | $ - | $ - | $ 5,559,795 |
| Repurchase Agreements | - | 12,367,168 | - | 12,367,168 |
| Exchange Traded Funds | - | - | - | - |
| Mutual Funds - Equity securities | | | | |
| Growth funds | 4,469,089 | - | - | 4,469,089 |
| Value funds | 4,472,521 | - | - | 4,472,521 |
| Blend fund | 2,829,590 | - | - | 2,829,590 |
| Mutual Funds - Fixed income securities | | | | |
| U.S fixed income fund | 16,416,809 | - | - | 16,416,809 |
| International fixed income fund | 1,531,135 | - | - | 1,531,135 |
| | $ 35,278,939 | $ 12,367,168 | $ - | $ 47,646,107 |

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

The following table presents NEA's fair value hierarchy for financial assets measured on a recurring basis at August 31, 2010:

| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| | | Fair Value Measurements at Reporting Date Using | | |
| Money Market Funds | $ 10,157,896 | $ - | $ - | $ 10,157,896 |
| Repurchase Agreements | - | 17,279,738 | - | 17,279,738 |
| Corporate Stocks | | | | |
| Energy | 553,030 | - | - | 553,030 |
| Industrial | 633,901 | - | - | 633,901 |
| Consumer | 1,102,515 | - | - | 1,102,515 |
| Health care | 731,891 | - | - | 731,891 |
| Financials | 798,956 | - | - | 798,956 |
| Information technology | 824,046 | - | - | 824,046 |
| Other | 842,706 | - | - | 842,706 |
| Exchange Traded Funds | 1,509,186 | - | - | 1,509,186 |
| Mutual Funds - Equity securities | | | | |
| Growth funds | 2,526,338 | - | - | 2,526,338 |
| Value funds | 763,220 | - | - | 763,220 |
| Blend fund | 892,590 | - | - | 892,590 |
| Mutual Funds - Fixed income securities | | | | |
| U.S fixed income fund | 8,829,362 | - | - | 8,829,362 |
| | $ 30,165,637 | $ 17,279,738 | $ - | $ 47,445,375 |

## 17.  SUBSEQUENT EVENTS

Management has performed a subsequent event review from September 1, 2011 to November 28, 2011, being the date that the consolidated financial statements were available to be issued.

On September 28, 2011, the United States Tax Court issued its ruling in the matter of the National Education Association of the United States v. Commissioner of Internal Revenue. At issue in the case is whether membership in the NEA conveyed the "legal right to receive" the published magazine as held by the Commissioner. The Tax Court in its departure from the Commissioner's reasoning held that NEA's members have the "legal right to receive" the published magazine. The Tax Court's ruling affirmed the Commissioner's assessments for the tax years at issue. The Tax Court's ruling takes effect ninety days after filed. In the interim, NEA increased its recorded tax reserve at August 31, 2011 to an amount sufficient to cover the total assessment as it considers its appeal options.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## AS OF AND FOR THE YEARS ENDED AUGUST 31, 2011 AND 2010

On October 5, 2011, NEA initiated a new line of credit for $30,000,000 with Bank of America for normal operating purposes with an interest rate of LIBOR (London Interbank Offered Rate) plus 1.50%. This new line of credit will expire January 31, 2012.

\* \* \* \* \* \*

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

## SUPPLEMENTAL SUMMARY SCHEDULE OF AGENCY FEE CHARGEABLE AND NONCHARGEABLE EXPENDITURES
### YEAR ENDED AUGUST 31, 2011

| | Chargeable Expenditure | Nonchargeable Expenditure | Total Expenditures |
|---|---|---|---|
| **EXPENSES BY STRATEGIC GOALS AND CORE SERVICE AREAS** | | | |
| **Tax and economic policies and school funding ("TEF")** | | | |
| 1. Provide research and technical assistance to all state affiliates on TEF issues | - | 2,226,918 | 2,226,918 |
| 2. Provide research and technical assistance to state affiliates to build tax and economic infrastructures for adequate and equitable funding | - | 310,650 | 310,650 |
| 3. Provide assistance to affiliates for implementing TEF-conscious advocacy, message development, and dissemination of TEF information | - | 403,226 | 403,226 |
| Total tax and economic policies and school funding ("TEF") | - | 2,940,794 | 2,940,794 |
| | | | |
| **Improved education members' salaries** | | | |
| 1. Provide technical and financial support to affiliates engaged in or preparing to engage in comprehensive salary campaigns | 1,272,396 | 401,355 | 1,673,751 |
| 2. Position NEA to be the national voice for the improvement of education employees' salaries | 1,500 | 48,007 | 49,507 |
| 3. Collect, store, analyze, and report information that supports NEA national and state affiliate salary campaigns | 743,599 | 30,350 | 773,949 |
| 4. Provide training to support the work of NEA and its affiliates to effectively advocate for professional pay for all members | 48,661 | 358,822 | 407,483 |
| Total improved education members' salaries | 2,066,156 | 838,534 | 2,904,690 |
| | | | |
| **Making priority schools great public schools for all students** | | | |
| 1. Provide technical assistance, training and resources to state and local affiliates to help them identify and support targeted priority schools | 2,646,377 | 645,118 | 3,291,495 |
| 2. Engage affiliates and members to support local efforts to transform priority schools while raising the awareness of the Priority Schools Campaign | 425,283 | 579,947 | 1,005,230 |
| 3. Communicate with members, partners, and the public to call attention to the urgency of, common issues and best practices for, transforming priority schools | 14,481 | 1,335,944 | 1,350,425 |
| Total making priority schools great public schools for all students | 3,086,141 | 2,561,009 | 5,647,150 |
| | | | |
| **Student learning and workforce quality** | | | |
| 1. Support Association effort to advocate for enhanced student learning and workforce quality and the advancement of NEA supported pro-public education and social justice policies | 213,475 | 763,389 | 976,864 |
| 2. Provide resources to assist affiliates build capacity to support their initiatives designed to advance pro-public education policies for student learning and workforce quality | 2,318,744 | 212,920 | 2,531,664 |
| 3. Partner with affiliates and others to support workforce quality designed to improved student achievement and increased graduation rates | 268,565 | 110,186 | 378,751 |
| 4. Provide support, research, and information to staff, members, and affiliates that improve workforce quality through improved working conditions and benefits, advocacy rights, and professional development products | 35,152,943 | 13,750,442 | 48,903,385 |
| Total student learning and workforce quality | 37,953,727 | 14,836,937 | 52,790,664 |
| | | | |
| **Affiliate programs and services that increase membership** | | | |
| 1. Build affiliate capacity for membership growth through project funding and constituency group assistance | 65,582,853 | 15,259,344 | 80,842,197 |
| 2. Develop and administer state affiliates' cooperative agreements and provide funding for the implementation of state and regional financial assistance | 1,296,052 | 432,017 | 1,728,069 |
| 3. Create and align all NEA infrastructures to support membership growth, with special attention to UniServ, research, and technology | 399,220 | 368,585 | 767,805 |
| 4. Collaborate with affiliates to increase membership in existing and new markets | 20,467 | 8,349,245 | 8,369,712 |
| Total affiliate programs and services that increase membership | 67,298,592 | 24,409,191 | 91,707,783 |

(continued)

See notes to supplemental summary schedule of agency fee chargeable and nonchargeable expenditures.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

## SUPPLEMENTAL SUMMARY SCHEDULE OF AGENCY FEE CHARGEABLE AND NONCHARGEABLE EXPENDITURES
### YEAR ENDED AUGUST 31, 2011

| | Chargeable Expenditure | Nonchargeable Expenditure | Total Expenditures |
|---|---:|---:|---:|
| **Advocate and communicate for public education** | | | |
| 1. Increase member support of pro-education candidates and increase public communications and advocacy for association political and legislative programs | - | 26,110,033 | 26,110,033 |
| 2. Increase pro-public education advocacy and develop relationships with the federal government to advance NEA's pro-public education agenda | - | 12,347,623 | 12,347,623 |
| 3. Communicate the NEA beliefs, qualities, and services to engage members and improve target audiences' recognition of NEA through print and electronic media | 2,606,768 | 16,891,501 | 19,498,269 |
| 4. Increase the capacity of NEA governance, members, and staff to advocate for all members through a greater use of campaign tools and resources and partner with affiliates to increase PAC participation | 130,849 | 2,724,409 | 2,855,258 |
| Total advocate and communicate for public education | 2,737,617 | 58,073,566 | 60,811,183 |
| | | | |
| **Develop and sustain strategic partnerships** | | | |
| 1. Advance NEA's mission, vision, goals, and core values with Education International and other international organizations and partners | - | 5,083,348 | 5,083,348 |
| 2. Engage national, state, and local partners to support effective transformation of priority schools and provide assistance to locals for partnership development | 17,382 | 134,427 | 151,809 |
| 3. Assist state affiliates in identifying partners and provide resources to strengthen coalitions and mobilize public and policy support for TEF | - | 176,802 | 176,802 |
| 4. Partner with business and nonprofit leaders to support the Salary Campaign | - | 66,991 | 66,991 |
| 5. Partner with organizations to inform and advance NEA's workforce quality agenda and promote healthy teaching and learning environments | 888,868 | 253,591 | 1,142,459 |
| 6. Develop partnerships that advance and achieve NEA's federal and regulatory policy priorities including funding to implement these priorities | - | 133,318 | 133,318 |
| 7. Partner with ethnic minority, civil rights, and other organizations to advance NEA's commitment to social justice | 93,536 | 160,882 | 254,418 |
| 8. Partner with the business community and other organizations to ensure that public schools receive the resources required to prepare students for success in the 21st century | - | 98,527 | 98,527 |
| 9. Develop national partnerships that support state affiliates in building and maintaining their capacity to achieve NEA priority policy goals at the state level | - | 184,450 | 184,450 |
| 10. Develop national partnerships that result in increased support for union membership, the recruitment and retention of NEA members, and minimized inter-union competition | - | 76,624 | 76,624 |
| 11. Develop, sustain, and leverage strategic alliances to advance NEA's core values and strategic priorities around partnerships | - | 3,869,146 | 3,869,146 |
| Total develop and sustain strategic partnerships | 999,786 | 10,238,106 | 11,237,892 |
| | | | |
| **Business and governance operations** | | | |
| 1. Provide business systems, legal, and financial expertise to NEA and affiliates | 10,505,848 | 9,855,496 | 20,361,344 |
| 2. Manage employee benefits and services, labor relations, and workforce costs | 5,106,893 | - | 5,106,893 |
| 3. Provide departmental infrastructure and business intelligence systems that align with NEA's strategic goals and core services | 16,471,914 | 17,404,243 | 33,876,157 |
| 4. Sustain NEA as a high-performance learning organization and archive its records for current and future generations | 1,513,370 | 7,945,410 | 9,458,780 |
| 5. Provide technologies for strategic, tactical, and daily operations | 9,916,817 | 10,530,228 | 20,447,045 |
| 6. Provide facility management, operational support, and meeting logistics | 16,366,082 | - | 16,366,082 |
| 7. Provide administrative and financial support to the national councils and constituency groups | - | 597,901 | 597,901 |
| 8. Provide support to governance and the NEA policy making process | 8,063,363 | 1,656,933 | 9,720,296 |
| 9. Provide members professional development and leadership training | 5,154,709 | 3,190,906 | 8,345,615 |
| Total business and governance operations | 73,098,996 | 51,181,117 | 124,280,113 |
| | | | |
| **TOTAL EXPENDITURES** | 187,241,015 | 165,079,254 | 352,320,269 |

(concluded)

See notes to supplemental summary schedule of agency fee chargeable and nonchargeable expenditures.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

## SUPPLEMENTAL SUMMARY SCHEDULE OF AGENCY FEE CHARGEABLE AND NONCHARGEABLE EXPENDITURES
## YEAR ENDED AUGUST 31, 2011

|  | Chargeable Expenditure | Nonchargeable Expenditure | Total Expenditures |
|---|---|---|---|
| **EXPENSES BY STRATEGIC GOALS AND CORE SERVICE AREAS** |  |  |  |
| **Tax and economic policies and school funding ("TEF")** |  |  |  |
| 1. Provide research and technical assistance to all state affiliates on TEF issues |  |  |  |
| 1.1    Provide research on tax and economic policies and education funding | - | 1,241,872 | 1,241,872 |
| 1.2    Provide technical support on tax, economic policies, and school funding | - | 985,046 | 985,046 |
| Total provide research and technical assistance to all state affiliates on TEF issues | - | 2,226,918 | 2,226,918 |
|  |  |  |  |
| 2. Provide research and technical assistance to state affiliates to build tax and economic infrastructures for adequate and equitable funding |  |  |  |
| 2.1    Provide TEF research and technical assistance for achieving adequate, equitable and stable funding for public education | - | 310,650 | 310,650 |
| Total provide research and technical assistance to state affiliates to build tax and economic infrastructures for adequate and equitable funding | - | 310,650 | 310,650 |
|  |  |  |  |
| 3. Provide assistance to affiliates for implementing TEF-conscious advocacy, message development, and dissemination of TEF information |  |  |  |
| 3.1    Provide research and technical assistance for implementing TEF-conscious advocacy | - | 8,800 | 8,800 |
| 3.2    Provide research and technical assistance to state affiliates to promote TEF | - | 394,083 | 394,083 |
| 3.3    Create cross-platform media that mobilizes targeted audiences around funding campaigns | - | 343 | 343 |
| Total provide assistance to affiliates for implementing TEF-conscious advocacy, message development, and dissemination of TEF information | - | 403,226 | 403,226 |

(continued)

See notes to supplemental summary schedule of agency fee chargeable and nonchargeable expenditures.

- 30 -

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

## SUPPLEMENTAL SUMMARY SCHEDULE OF AGENCY FEE CHARGEABLE AND NONCHARGEABLE EXPENDITURES
### YEAR ENDED AUGUST 31, 2011

| | Chargeable Expenditure | Nonchargeable Expenditure | Total Expenditures |
|---|---|---|---|
| **Improved education members' salaries** | | | |
| 1. Provide technical and financial support to affiliates engaged in or preparing to engage in comprehensive salary campaigns | | | |
|    1.1  Provide technical assistance and financial support to affiliates engaged in comprehensive salary campaigns | 959,321 | 299,543 | 1,258,864 |
|    1.2  Provide technical and financial assistance to state affiliates working toward a comprehensive salary campaigns | 313,075 | 101,812 | 414,887 |
| Total provide technical and financial support to affiliates engaged in or preparing to engage in comprehensive salary campaigns | 1,272,396 | 401,355 | 1,673,751 |
| | | | |
| 2. Position NEA to be the national voice for the improvement of education employees' salaries | | | |
|    2.1  Position NEA to be the national voice for the improvement of education employees' salaries | 1,500 | 48,007 | 49,507 |
| Total position NEA to be the national voice for the improvement of education employees' salaries | 1,500 | 48,007 | 49,507 |
| | | | |
| 3. Collect, store, analyze, and report information that supports NEA national and state affiliate salary campaigns | | | |
|    3.1  Collect, store, analyze, and report data that supports NEA national and state affiliate salary campaigns | 743,599 | 30,350 | 773,949 |
| Total collect, store, analyze, and report information that supports NEA national and state affiliate salary campaigns | 743,599 | 30,350 | 773,949 |
| | | | |
| 4. Provide training to support the work of NEA and its affiliates to effectively advocate for professional pay for all members | | | |
|    4.1  Provide the training necessary to support the work of NEA and its affiliates in moving the salary campaign | 48,661 | 358,822 | 407,483 |
| Total provide training to support the work of NEA and its affiliates to effectively advocate for professional pay for all members | 48,661 | 358,822 | 407,483 |

(continued)

See notes to supplemental summary schedule of agency fee chargeable and nonchargeable expenditures.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

## SUPPLEMENTAL SUMMARY SCHEDULE OF AGENCY FEE CHARGEABLE AND NONCHARGEABLE EXPENDITURES
### YEAR ENDED AUGUST 31, 2011

| | Chargeable Expenditure | Nonchargeable Expenditure | Total Expenditures |
|---|---|---|---|
| **Making priority schools great public schools for all students** | | | |
| 1. Provide technical assistance, training, and resources to state and local affiliates to help them identify and support targeted priority schools | | | |
| 1.1 Assess need and broker resources to support transformation of targeted priority schools by state and local affiliates | 586,789 | 214,733 | 801,522 |
| 1.2 Build capacity in targeted affiliates through professional development for state leaders and staff and provide resources and technical assistance | 1,801,474 | 427,970 | 2,229,444 |
| 1.3 Support school change in targeted priority schools by providing policy support and technical assistance utilizing Great Public Schools criteria | 247,440 | 2,415 | 249,855 |
| 1.4 Utilize the whole education workforce to support and advocate for improved learning and working conditions in targeted priority schools | 10,674 | - | 10,674 |
| Total provide technical assistance, training, and resources to state and local affiliates to help them identify and support targeted priority schools | 2,646,377 | 645,118 | 3,291,495 |
| | | | |
| 2. Engage affiliates and members to support local efforts to transform priority schools while raising the awareness of the Priority Schools Campaign | | | |
| 2.1 Establish public engagement and family school partnerships in support of targeted priority schools | 153,926 | 361 | 154,287 |
| 2.2 Identify, inform, and engage leaders and partners within the ethnic minority communities in support of efforts to transform targeted priority schools | 271,357 | 579,586 | 850,943 |
| Total engage affiliates and members to support local efforts to transform priority schools while raising the awareness of the Priority Schools Campaign | 425,283 | 579,947 | 1,005,230 |
| | | | |
| 3. Communicate with members, partners, and the public to call attention to the urgency of, common issues and best practices for, transforming priority schools | | | |
| 3.1 Provide earned media, paid media, outreach, and other public relations initiatives in support of targeted priority schools | - | 1,122,911 | 1,122,911 |
| 3.2 Create a media program that establishes and advances the central messaging components to targeted audiences | 3,150 | 211,068 | 214,218 |
| 3.3 Raise awareness of NEA's Priority Schools Campaign with elected and appointed officials to build support for the Priority Schools Campaign | - | 1,965 | 1,965 |
| 3.4 Provide targeted affiliates technical support to win contract language necessary to support the Priority Schools Campaign | 11,331 | - | 11,331 |
| Total communicate with members, partners, and the public to call attention to the urgency of, common issues and best practices for, transforming priority schools | 14,481 | 1,335,944 | 1,350,425 |

(continued)

See notes to supplemental summary schedule of agency fee chargeable and nonchargeable expenditures.

- 32 -

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

## SUPPLEMENTAL SUMMARY SCHEDULE OF AGENCY FEE CHARGEABLE AND NONCHARGEABLE EXPENDITURES
### YEAR ENDED AUGUST 31, 2011

|  | Chargeable Expenditure | Nonchargeable Expenditure | Total Expenditures |
|---|---|---|---|
| **Student learning and workforce quality** |  |  |  |
| 1. Support Association effort to advocate for enhanced student learning and workforce quality and the advancement of NEA supported pro-public education and social justice policies |  |  |  |
| 1.1 Provide research-based information that supports Association efforts to advocate for a quality education workforce that serves the whole student | 213,475 | - | 213,475 |
| 1.2 Advance federal legislation and regulations that promote policies and practices to enhance student learning and workforce quality | - | 373,783 | 373,783 |
| 1.3 Advance non-federal, NEA supported, pro-public education and social justice policies to enhance student learning and workforce quality | - | 389,606 | 389,606 |
| Total support Association effort to advocate for enhanced student learning and workforce quality and the advancement of NEA supported pro-public education and social justice policies | 213,475 | 763,389 | 976,864 |
|  |  |  |  |
| 2. Provide resources to assist affiliates build capacity to support their initiatives designed to advance pro-public education policies for student learning and workforce quality |  |  |  |
| 2.1 Grants and technical resources to develop ethnic minority leaders and improve staff skills regarding ethnic minority issues | 133,563 | - | 133,563 |
| 2.2 Mobilize Great Public Schools resources to build capacity in affiliates through training and professional development | 1,249,085 | 22,890 | 1,271,975 |
| 2.3 Protect and promote the profession of teaching by developing and implementing strategies to strengthen and enhance standards and/or policies for teacher preparation, licensure, or other standards for entry into teaching | - | 177,592 | 177,592 |
| 2.4 Increase the capacity of state affiliates to mobilize members and the public to create teaching/learning conditions that lead to the closing of achievement gaps, increased graduation rates, and quality education for all | 936,096 | 12,438 | 948,534 |
| Total provide resources to assist affiliates build capacity to support their initiatives designed to advance pro-public education policies for student learning and workforce quality | 2,318,744 | 212,920 | 2,531,664 |
|  |  |  |  |
| 3. Partner with affiliates and others to support workforce quality designed to improved student achievement and increased graduation rates |  |  |  |
| 3.1 Help state affiliates deliver high quality services to members and prospective members through existing NEA programs for teacher certification, licensure, recruitment, and other teacher quality resources | 248,981 | 24,553 | 273,534 |
| 3.2 Inform and engage ethnic minority organizations to promote and/or advocate for initiatives in support of culturally competent educators, improved student achievement, and increased graduation rates | 19,584 | 85,633 | 105,217 |
| Total partner with affiliates and others to support workforce quality designed to improved student achievement and increased graduation rates | 268,565 | 110,186 | 378,751 |

(continued)

See notes to supplemental summary schedule of agency fee chargeable and nonchargeable expenditures.

- 33 -

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

## SUPPLEMENTAL SUMMARY SCHEDULE OF AGENCY FEE CHARGEABLE AND NONCHARGEABLE EXPENDITURES
### YEAR ENDED AUGUST 31, 2011

|  |  | Chargeable Expenditure | Nonchargeable Expenditure | Total Expenditures |
|---|---|---:|---:|---:|
| 4. | Provide support, research, and information to staff, members, and affiliates that improve workforce quality through improved working conditions and benefits, advocacy rights, and professional development products |  |  |  |
| 4.1 | Provide grants and technical assistance to all state affiliates related to policy and practice | 988,896 | 776,303 | 1,765,199 |
| 4.2 | Provide policy support and analysis to NEA departments for the passage of pro-public education federal legislation, including ESEA | - | 1,478,908 | 1,478,908 |
| 4.3 | Provide state affiliates with policy frameworks and concepts to support school transformation | 179,385 | 445 | 179,830 |
| 4.4 | Identify quality workforce standards to support professional development and compensation improvement | 38,253 | 12,413 | 50,666 |
| 4.5 | Provide state affiliates with information, models, and strategies resulting from NEA's work in the Priority Schools Campaign | 241,734 | - | 241,734 |
| 4.6 | Provide high quality professional development products that meet the demands of the profession by improving and enhancing the knowledge, skills, and effectiveness of the educational workforce | - | 721,018 | 721,018 |
| 4.7 | Sustain, grow, and institutionalize comprehensive online tools devoted to education policy, research, and practice focused on the criteria and indicators for Great Public Schools | 113,895 | 116,968 | 230,863 |
| 4.8 | Advance the professional practice of teachers by working with state and/or local affiliates to develop, implement, and sustain comprehensive teacher assessment and evaluation systems | 105,780 | 105,779 | 211,559 |
| 4.9 | Educate, mobilize, and engage members, affiliate staff, and governance in teacher quality policy and practice issues by providing technical assistance | 809,872 | 849,316 | 1,659,188 |
| 4.10 | Provide research and information to transform our public education system to meet the needs of all students | 1,443,321 | 944,652 | 2,387,973 |
| 4.11 | Provide school assessment and improvement tools, processes, and related technical assistance to state and local affiliates and their partners to build capacity and their efforts to advocate for and secure improved school learning and working conditions and provide quality education for all students | 589,357 | 16,351 | 605,708 |
| 4.12 | Build relationships with external education service and program providers to review, recommend, and/or jointly create English-language learner programs/products and make those programs/products available to affiliates and school districts | 77,808 | 3,544 | 81,352 |
| 4.13 | Administer the Educators Employment Liability, Association Professional Liability, and Fidelity Bond Insurance Programs | 11,810,567 | 68,935 | 11,879,502 |
| 4.14 | Administer the Unified Legal Services Program by providing financial assistance to state affiliates for employment-related legal matters | 17,796,610 | 7,284,749 | 25,081,359 |
| 4.15 | Research, plan, implement, fund, and evaluate earned media, paid media, and other public relations initiatives that support student learning and workforce quality | - | 218,229 | 218,229 |
| 4.16 | Provide technical assistance to NEA governance, staff, and state affiliates in their efforts to address public pensions, retirement security, health care benefits, bargaining and advocacy rights, and/or policies issues for members | 957,465 | 747,767 | 1,705,232 |
| 4.17 | Develop and deliver training and assistance, including legislative analyses, regulatory information, and bargaining and advocacy strategies to state affiliates on federal health reform legislation | - | 405,065 | 405,065 |
| Total provide support, research, and information to staff, members, and affiliates that improve workforce quality through improved working conditions and benefits, advocacy rights, and professional development products | | 35,152,943 | 13,750,442 | 48,903,385 |
|  |  |  |  | (continued) |

See notes to supplemental summary schedule of agency fee chargeable and nonchargeable expenditures.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

## SUPPLEMENTAL SUMMARY SCHEDULE OF AGENCY FEE CHARGEABLE AND NONCHARGEABLE EXPENDITURES
### YEAR ENDED AUGUST 31, 2011

|  | Chargeable Expenditure | Nonchargeable Expenditure | Total Expenditures |
|---|---|---|---|
| **Affiliate programs and services that increase membership** | | | |
| 1. Build affiliate capacity for membership growth through project funding and constituency group assistance | | | |
| 1.1   Increase capacity and commitment of constituency groups to grow membership | 883,414 | 2,633,703 | 3,517,117 |
| 1.2   Strengthen affiliates' commitment, structures, and systems to facilitate a culture of organizing and membership growth | 64,699,439 | 12,625,641 | 77,325,080 |
| Total build affiliate capacity for membership growth through project funding and constituency group assistance | 65,582,853 | 15,259,344 | 80,842,197 |
| | | | |
| 2. Develop and administer state affiliates' cooperative agreements and provide funding for the implementation of state and regional financial assistance | | | |
| 2.1   Administer the affiliate cooperative agreement process | 1,296,052 | 432,017 | 1,728,069 |
| Total develop and administer state affiliates' cooperative agreements and provide funding for the implementation of state and regional financial assistance | 1,296,052 | 432,017 | 1,728,069 |
| | | | |
| 3. Create and align all NEA infrastructures to support membership growth, with special attention to UniServ, research, and technology | | | |
| 3.1   Create and align all NEA infrastructures to support membership growth with special attention to UniServ, research, and technology | 399,220 | 368,585 | 767,805 |
| Total create and align all NEA infrastructures to support membership growth, with special attention to UniServ, research, and technology | 399,220 | 368,585 | 767,805 |
| | | | |
| 4. Collaborate with affiliates to increase membership in existing and new markets | | | |
| 4.1   Grow membership in all categories by collaborating with state affiliates | - | 2,552,813 | 2,552,813 |
| 4.2   Grow membership in all categories by collaborating with targeted state affiliates with potential for growth to conduct organizationally integrated campaigns | 20,467 | 5,688,228 | 5,708,695 |
| 4.3   Grow membership through strategic investments in mergers, affiliation of independents, and new markets that have the potential for a return on investment | - | 108,204 | 108,204 |
| Total collaborate with affiliates to increase membership in existing and new markets | 20,467 | 8,349,245 | 8,369,712 |

(continued)

See notes to supplemental summary schedule of agency fee chargeable and nonchargeable expenditures.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

## SUPPLEMENTAL SUMMARY SCHEDULE OF AGENCY FEE CHARGEABLE AND NONCHARGEABLE EXPENDITURES
## YEAR ENDED AUGUST 31, 2011

| | Chargeable Expenditure | Nonchargeable Expenditure | Total Expenditures |
|---|---|---|---|
| **Advocate and communicate for public education** | | | |
| 1. Increase member support of pro-education candidates and increase public communications and advocacy for association political and legislative programs | | | |
| 1.1 Increase the level of support within NEA membership for NEA recommended candidates and increase membership engagement within campaigns | - | 4,651,529 | 4,651,529 |
| 1.2 Increase public communications to and advocacy by the public to support NEA positions, including issue advocacy efforts, ballot measure campaigns, and independent expenditures | - | 21,458,504 | 21,458,504 |
| Total increase member support of pro-education candidates and increase public communications and advocacy for association political and legislative programs | - | 26,110,033 | 26,110,033 |
| 2. Increase pro-public education advocacy and develop relationships with the federal government to advance NEA's pro-public education agenda | | | |
| 2.1 Advocate and pass pro-public education and social justice legislation and policies, and increase the frequency of advocacy with targeted public and elected officials | - | 11,699,077 | 11,699,077 |
| 2.2 Develop, coordinate, and maintain a partnership with the White House and the executive branch to best advance NEA's pro-public education agenda | - | 648,546 | 648,546 |
| Total increase pro-public education advocacy and develop relationships with the federal government to advance NEA's pro-public education agenda | - | 12,347,623 | 12,347,623 |
| 3. Communicate the NEA beliefs, qualities, and services to engage members and improve target audiences' recognition of NEA through print and electronic media | | | |
| 3.1 Strengthen the understanding and affinity of NEA members, as well as other target audiences, for the beliefs, qualities, and services associated with NEA | - | 1,976,748 | 1,976,748 |
| 3.2 Design communications to maximize effectiveness in supporting Core Services and Strategic Goals through the use of opinion research, planning, strategic implementation, and evaluation | 830,155 | 4,933,329 | 5,763,484 |
| 3.3 Implement reliable and well-crafted communications for educators that highlight the Association's activities, important developments, and information useful to educators' professional and personal lives | 1,776,613 | 9,981,424 | 11,758,037 |
| Total communicate the NEA beliefs, qualities, and services to engage members and improve target audiences' recognition of NEA through print and electronic media | 2,606,768 | 16,891,501 | 19,498,269 |
| 4. Increase the capacity of NEA governance, members, and staff to advocate for all members through a greater use of campaign tools and resources and partner with affiliates to increase PAC participation | | | |
| 4.1 Increase the capacity of governance, members, and staff to better advocate for themselves and members | - | 122,716 | 122,716 |
| 4.2 Increase participation in the NEA Fund for Children and Public Education | - | 1,803,743 | 1,803,743 |
| 4.3 Increase efficient use of campaign tools, technology, and resources in all NEA targeted campaigns | 130,849 | 797,950 | 928,799 |
| Total increase the capacity of NEA governance, members, and staff to advocate for all members through a greater use of campaign tools and resources and partner with affiliates to increase PAC participation | 130,849 | 2,724,409 | 2,855,258 |

(continued)

See notes to supplemental summary schedule of agency fee chargeable and nonchargeable expenditures.

- 36 -

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

## SUPPLEMENTAL SUMMARY SCHEDULE OF AGENCY FEE CHARGEABLE AND NONCHARGEABLE EXPENDITURES
## YEAR ENDED AUGUST 31, 2011

| | Chargeable Expenditure | Nonchargeable Expenditure | Total Expenditures |
|---|---|---|---|
| **Develop and sustain strategic partnerships** | | | |
| 1. Advance NEA's mission, vision, goals, and core values with Education International and other international organizations and partners | | | |
|   1.1   Reflect NEA's voice in Education International policy development, implementation, and programmatic work, as well as in advocacy among international organizations and with pertinent global partners | - | 5,083,348 | 5,083,348 |
| Total advance NEA's mission, vision, goals, and core values with Education International and other international organizations and partners | - | 5,083,348 | 5,083,348 |
| 2. Engage national, state, and local partners to support effective transformation of priority schools and provide assistance to locals for partnership development | | | |
|   2.1   Assist in efforts to transform NEA's targeted priority schools through partnership engagement and development, and developing funding from a variety of sources | 17,382 | 134,427 | 151,809 |
| Total engage national, state, and local partners to support effective transformation of priority schools and provide assistance to locals for partnership development | 17,382 | 134,427 | 151,809 |
| 3. Assist state affiliates in identifying partners and provide resources to strengthen coalitions and mobilize public and policy support for TEF | | | |
|   3.1   Provide technical assistance to state affiliates in identifying partners and provide resources to strengthen state-based coalitions to mobilize TEF support | - | 176,802 | 176,802 |
| Total assist state affiliates in identifying partners and provide resources to strengthen coalitions and mobilize public and policy support for TEF | - | 176,802 | 176,802 |
| 4. Partner with business and nonprofit leaders to support the Salary Campaign | | | |
|   4.1   Identify and develop partnerships with business and nonprofit leaders to support a Salary Campaign message | - | 66,991 | 66,991 |
| Total partner with business and nonprofit leaders to support the Salary Campaign | - | 66,991 | 66,991 |
| 5. Partner with organizations to inform and advance NEA's workforce quality agenda and promote healthy teaching and learning environments | | | |
|   5.1   Develop and sustain active partnerships and collaborations with national partners to inform and advance NEA's educator and future workforce quality agenda | 90,873 | 171,283 | 262,156 |
|   5.2   Support partnerships promoting healthy environments for students, staff, and members | 797,995 | 82,308 | 880,303 |
| Total partner with organizations to inform and advance NEA's workforce quality agenda and promote healthy teaching and learning environments | 888,868 | 253,591 | 1,142,459 |
| 6. Develop partnerships that advance and achieve NEA's federal and regulatory policy priorities including funding to implement these priorities | | | |
|   6.1   Develop, sustain, and leverage partnerships to advance and achieve NEA's federal and regulatory policy priorities | - | 133,318 | 133,318 |
| Total develop partnerships that advance and achieve NEA's federal and regulatory policy priorities including funding to implement these priorities | - | 133,318 | 133,318 |
| 7. Partner with ethnic minority, civil rights, and other organizations to advance NEA's commitment to social justice | | | |
|   7.1   Develop, sustain, and leverage partnerships with ethnic minority, civil rights, and other organizations to advance NEA's commitment to social justice | 93,536 | 160,882 | 254,418 |
| Total partner with ethnic minority, civil rights, and other organizations to advance NEA's commitment to social justice | 93,536 | 160,882 | 254,418 |

(continued)

See notes to supplemental summary schedule of agency fee chargeable and nonchargeable expenditures.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

## SUPPLEMENTAL SUMMARY SCHEDULE OF AGENCY FEE CHARGEABLE AND NONCHARGEABLE EXPENDITURES
## YEAR ENDED AUGUST 31, 2011

|  | Chargeable Expenditure | Nonchargeable Expenditure | Total Expenditures |
|---|---|---|---|
| 8. Partner with the business community and other organizations to ensure that public schools receive the resources required to prepare students for success in the 21st century |  |  |  |
| 8.1    Develop, sustain, and leverage partnerships with the business community and other organizations that will ensure funding, resources, and training are provided to public schools to prepare students for success in the 21st century | - | 98,527 | 98,527 |
| Total partner with the business community and other organizations to ensure that public schools receive the resources required to prepare students for success in the 21st century | - | 98,527 | 98,527 |
| 9. Develop national partnerships that support state affiliates in building and maintaining their capacity to achieve NEA priority policy goals at the state level |  |  |  |
| 9.1    Develop, sustain, and leverage national partnerships, coalitions, and alliances to assist state affiliates achieve NEA priority policy goals, primarily at the state level | - | 184,450 | 184,450 |
| Total develop national partnerships that support state affiliates in building and maintaining their capacity to achieve NEA priority policy goals at the state level | - | 184,450 | 184,450 |
| 10. Develop national partnerships that result in increased support for union membership, the recruitment and retention of NEA members, and minimized inter-union competition |  |  |  |
| 10.1    Develop and sustain relationships and agreements that result in increased support for union membership, the recruitment and retention of NEA members, and minimized inter-union competition | - | 76,624 | 76,624 |
| Total develop national partnerships that result in increased support for union membership, the recruitment and retention of NEA members, and minimized inter-union competition | - | 76,624 | 76,624 |
| 11. Develop, sustain, and leverage strategic alliances to advance NEA's core values and strategic priorities around partnerships |  |  |  |
| 11.1    Develop, sustain, and leverage strategic alliances to advance NEA's core values and strategic priorities around partnerships | - | 3,869,146 | 3,869,146 |
| Total develop, sustain, and leverage strategic alliances to advance NEA's core values and strategic priorities around partnerships | - | 3,869,146 | 3,869,146 |
|  |  |  | (continued) |

See notes to supplemental summary schedule of agency fee chargeable and nonchargeable expenditures.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

## SUPPLEMENTAL SUMMARY SCHEDULE OF AGENCY FEE CHARGEABLE AND NONCHARGEABLE EXPENDITURES
### YEAR ENDED AUGUST 31, 2011

| | | Chargeable Expenditure | Nonchargeable Expenditure | Total Expenditures |
|---|---|---|---|---|
| **Business and governance operations** | | | | |
| 1. | Provide business systems, legal, and financial expertise to NEA and affiliates | | | |
| 1.1 | Unify NEA properties, programs, and product sales under a consolidated business development plan to leverage brand assets, increase revenue, and ensure the Association image | - | 336,359 | 336,359 |
| 1.2 | Maintain financial and membership management systems to meet the evolving business of NEA and its affiliates | 956,023 | 1,015,159 | 1,971,182 |
| 1.3 | Ensure and track NEA and affiliate fiscal health with relevant training and advisory services provided to fulfill their fiduciary duties to staff and governance, to enhance their ability to conduct association business, and to meet all regulatory requirements | 2,843,495 | 3,019,382 | 5,862,877 |
| 1.4 | Provide comprehensive transaction processing and reporting to ensure compliance with NEA policies, accounting standards, and federal, state, and local regulations | 4,704,981 | 3,571,776 | 8,276,757 |
| 1.5 | Manage and project the finances of the Association through the monitoring and analysis of revenues and expenditures and all relevant factors | 425,247 | 442,284 | 867,531 |
| 1.6 | Execute a comprehensive risk management program, including audits, compliance, and information security, to reduce loss and increase efficiency | 338,444 | 209,805 | 548,249 |
| 1.7 | Legal advice, counseling, agency fee support and support for the NEA Fund for Children and Public Education and Federal Election Commission matters | 1,237,658 | 1,260,731 | 2,498,389 |
| | Total provide business systems, legal, and financial expertise to NEA and affiliates | 10,505,848 | 9,855,496 | 20,361,344 |
| | | | | |
| 2. | Manage employee benefits and services, labor relations, and workforce costs | | | |
| 2.1 | Workforce planning including position control, recruitment, internships, and Human Resource partner consulting | 1,763,138 | - | 1,763,138 |
| 2.2 | Human Capital including labor relations, payroll, benefits, performance management, and collective bargaining agreements | 3,343,755 | - | 3,343,755 |
| | Total manage employee benefits and services, labor relations, and workforce costs | 5,106,893 | - | 5,106,893 |
| | | | | |
| 3. | Provide departmental infrastructure and business intelligence systems that align with NEA's strategic goals and core services | | | |
| 3.1 | Align and leverage Association strategies and resources for innovation, adaptability, and operational efficiencies and effectiveness | 22,084 | 225,596 | 247,680 |
| 3.2 | Lead, direct, and align programs and services and manage resources to effectively realize the Association's core services and strategic goals | 271,880 | - | 271,880 |
| 3.3 | Improve business intelligence systems through enterprise integration to enhance leadership's ability to make business decisions aligned with NEA strategy | 16,177,950 | 17,178,647 | 33,356,597 |
| | Total provide departmental infrastructure and business intelligence systems that align with NEA's strategic goals and core services | 16,471,914 | 17,404,243 | 33,876,157 |
| | | | | |
| 4. | Sustain NEA as a high-performance learning organization and archive its records for current and future generations | | | |
| 4.1 | Support the alignment, integration, and sustainment of state affiliates | 267,160 | 7,645,986 | 7,913,146 |
| 4.2 | Facilitate the development and alignment of NEA strategy and operations | 461,021 | - | 461,021 |
| 4.3 | Facilitate the establishment of a workplace culture that fosters the development of a workforce that is inspired to achieve NEA's vision and strategy | 503,208 | - | 503,208 |
| 4.4 | Archiving of NEA records, documents, and related materials to preserve the Association's history, to allow for current and future generations to learn and appreciate NEA's role in the development of public education in America | 281,981 | 299,424 | 581,405 |
| | Total sustain NEA as a high-performance learning organization and archive its records for current and future generations | 1,513,370 | 7,945,410 | 9,458,780 |

(continued)

See notes to supplemental summary schedule of agency fee chargeable and nonchargeable expenditures.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

## SUPPLEMENTAL SUMMARY SCHEDULE OF AGENCY FEE CHARGEABLE AND NONCHARGEABLE EXPENDITURES
### YEAR ENDED AUGUST 31, 2011

| | | Chargeable Expenditure | Nonchargeable Expenditure | Total Expenditures |
|---|---|---|---|---|
| 5. | Provide technologies for strategic, tactical, and daily operations | | | |
| 5.1 | Ensure that Associationwide technology applications, databases, and systems are aligned with the Association's goals and objectives | 6,260,873 | 6,648,143 | 12,909,016 |
| 5.2 | Enhance the alignment and overall management of information technology and customer service delivery to match the current and future needs of the Association | 1,668,370 | 1,771,568 | 3,439,938 |
| 5.3 | Build and provide ongoing operations of a reliable and robust technology infrastructure to support the growing communication and information technology needs of the Association | 1,987,574 | 2,110,517 | 4,098,091 |
| Total provide technologies for strategic, tactical, and daily operations | | 9,916,817 | 10,530,228 | 20,447,045 |
| | | | | |
| 6. | Provide facility management, operational support, and meeting logistics | | | |
| 6.1 | Initiate and complete building projects that will improve the infrastructure | 251,490 | - | 251,490 |
| 6.2 | Facilities management, operational support, meeting logistics, and print media production | 16,114,592 | - | 16,114,592 |
| Total provide facility management, operational support, and meeting logistics | | 16,366,082 | - | 16,366,082 |
| | | | | |
| 7. | Provide administrative and financial support to the national councils and constituency groups | | | |
| 7.1 | Provide administrative and financial assistance to the national councils and constituency groups (NCHE, NCUEA, NCESP, NEA Retired, and Student Program) | - | 597,901 | 597,901 |
| Total provide administrative and financial support to the national councils and constituency groups | | - | 597,901 | 597,901 |
| | | | | |
| 8. | Provide support to governance and the NEA policy making process | | | |
| 8.1 | Executive officers and executive committee | 2,081,538 | 717,533 | 2,799,071 |
| 8.2 | Board of Directors and its committees | 3,702,619 | 64,043 | 3,766,662 |
| 8.3 | Standing committees | 189,932 | 329,273 | 519,205 |
| 8.4 | NEA Representative Assembly and its standing committees | 988,790 | - | 988,790 |
| 8.5 | Provide coordinated support and services to NEA governance in a manner that advances NEA's mission, vision, and strategic priorities | 1,100,484 | 546,084 | 1,646,568 |
| Total provide support to governance and the NEA policy making process | | 8,063,363 | 1,656,933 | 9,720,296 |
| | | | | |
| 9. | Provide members professional development and leadership training | | | |
| 9.1 | Provide useful, relevant, and effective minority and women's leadership training and continuing development through the Minority Leadership Training Program (MLTP) and the Women's Leadership Training Program (WLTP) | 1,761,849 | 482,639 | 2,244,488 |
| 9.2 | Provide constituency group leadership development through the National Student Leadership Conference, NEA-Retired Conference, Higher Education Emerging Leaders Academy, and the ESP Leaders for Tomorrow training | 728,719 | 1,221,355 | 1,950,074 |
| 9.3 | Provide member professional development opportunities | 897,921 | 214,316 | 1,112,237 |
| 9.4 | Provide support to state affiliates through the coordination of National Council of State Education Associations (NCSEA), implementation of executive leadership training, advocacy of state affiliate priorities within NEA and creation of opportunities for state affiliate leaders to share issues, concerns, and experiences | 363,185 | 139,754 | 502,939 |
| 9.5 | Provide state and local staff professional development opportunities that enhance their ability to work with all constituent groups | 250,970 | 1,695 | 252,665 |
| 9.6 | Develop and implement a governance leadership learning system through the establishment of leader-to-leader programs | - | 493,209 | 493,209 |
| 9.7 | Provide learning opportunities through the Leadership Institute that enhance professional skills and contribute to high performance | 550,881 | - | 550,881 |
| 9.8 | Conduct the Human and Civil Rights pre-RA events to address current trends and recognize accomplishments of women, GLBT, and ethnic minorities | 601,184 | 637,938 | 1,239,122 |
| Total provide members professional development and leadership training | | 5,154,709 | 3,190,906 | 8,345,615 |
| | | | | |
| **Total Expenditures** | | 187,241,015 | 165,079,254 | 352,320,269 |
| | | | | (concluded) |

See notes to supplemental summary schedule of agency fee chargeable and nonchargeable expenditures.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

## NOTES TO SUPPLEMENTAL SUMMARY SCHEDULES OF AGENCY FEE CHARGEABLE AND NONCHARGEABLE EXPENDITURES
## YEAR ENDED AUGUST 31, 2011

### 1. AGENCY FEE CHARGEABLE AND NONCHARGEABLE EXPENDITURES

The National Education Association (NEA) collects agency or service fees from non-members of NEA. These non-members are referred to as "agency feepayers." NEA is required by law to have procedures in effect to determine the amount of its expenditures that can be charged to objecting agency feepayers. The procedures that NEA applies have received the approval of arbitrators, public sector labor boards, and courts. The legal interpretations and standards that NEA currently utilizes to make its determinations of chargeability have been developed by the NEA's Office of General Counsel based on relevant case law.

NEA has analyzed its expenditures and determined which of those expenditures were "chargeable" to objecting agency feepayers and which of them were "nonchargeable" to those agency feepayers. Based on relevant federal and state judicial and administrative decisions, it was determined that chargeable activities and expenditures were related to the following matters:

1. collective bargaining;

2. preparations for strikes, and activities undertaken in connection with lawful strikes;

3. contract administration;

4. grievance processing, including arbitration;

5. specific terms and conditions of employment that may be negotiable, such as wages, hours, benefits, working conditions, employment discrimination, promotions, discipline, discharge, retirement benefits, performance evaluation, overtime compensation, environmental issues in the workplace, etc.;

6. communications with bargaining unit members regarding services they receive;

7. professional development (including teacher education, continuing education, and certification), curriculum development and implementation, teaching methods and other instructional skills, information and materials intended for instructional purposes, site-based decision making, and education generally, except to the extent that such activities and expenditures involve lobbying and other political activities, membership organizing or recruitment activities, and/or external public relations;

8. uses of technology in education;

9. publications, portions of publications, or any other communications which involve chargeable issues, such as those related to activities or expenditures listed herein as chargeable, if the publications are provided to agency feepayers;

10. unemployment and job opportunities in education;

11. insurance programs and other benefits for which both members and agency feepayers are eligible;

## NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

### NOTES TO SUPPLEMENTAL SUMMARY SCHEDULES OF AGENCY FEE CHARGEABLE AND NONCHARGEABLE EXPENDITURES
### YEAR ENDED AUGUST 31, 2011

12. NEA award programs;

13. Association leadership and management skills training and techniques, strategic planning;

14. NEA Representative Assembly, Executive Committee and Board of Directors; and

15. employee relations and NEA staff grievances.

It was further determined that nonchargeable activities and expenditures were related to the following matters:

1. lobbying and political efforts before state legislatures, state administrative agencies, Congress, federal agencies or other executive branch officials, and ballot initiatives, as well as any grassroots lobbying activities related to the Great Public Schools Program, unless any of the preceding are specifically related to ratification or implementation of a collective bargaining agreement;

2. external public relations (unless specifically related to collective bargaining or contract administration), American Education Week, National Teacher Day, and any public relations related to the Great Public Schools Program;

3. litigation, unless specifically related to collective bargaining, contract administration or organizational maintenance;

4. voter registration and get-out-the-vote activities for members, and campaign techniques (i.e., training programs designed to prepare leaders, staff and/or members to work with members in support of candidates for any public office);

5. supporting or contributing to charitable, religious or ideological causes (e.g., direct or in-kind contributions to such causes, expenditures designed primarily to assist such causes, and payments to fundraisers for groups which promote such causes);

6. supporting political organizations or candidates for public office (e.g., activities in connection with the endorsement of political candidates, activities in connection with the NEA Fund for Children and Public Education, including its administration, consulting with/or providing training for state/local political action committees);

7. publications, portions of publications or any other communications which involve nonchargeable issues, such as those related to activities or expenditures listed herein as nonchargeable;

8. organizing or recruiting new members, establishing new or expanded bargaining units, organizing and recruitment activities related to the Great Public Schools Program, defending against challenges to exclusive bargaining representative status;

9. various ideological issues unrelated to collective bargaining or organizational maintenance, such as reproductive freedom (including abortion and birth control), anti-flag burning laws,

## NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

### NOTES TO SUPPLEMENTAL SUMMARY SCHEDULES OF AGENCY FEE CHARGEABLE AND NONCHARGEABLE EXPENDITURES
### YEAR ENDED AUGUST 31, 2011

balanced budget amendment, prayer in school, school vouchers, race relations in Africa and Asia, energy conservation, human rights, nuclear arms freeze, child support enforcement, judicial or executive appointments, student scholarships, etc.;

10. illegal job actions and administration of the National Education Employees Assistance Fund;

11. monitoring and opposing activities of groups and individuals whose purpose is to undermine public education;

12. members-only benefits, (e.g., DUES-TAB Insurance);

13. NEA-Retired and NEA Student Program activities; and

14. international relations, the Education International.

Expenditures in the following categories were analyzed by examining staff's daily activity reports, vouchers and financial reports, written or audiovisual publications, service or funding agreements, meeting or conference agendas/materials, research surveys, etc., in the context of the criteria listed above: Tax and economic policies and school funding; Improved education members' salaries; Making priority schools great public schools for all students; Student learning and workforce quality; Affiliate programs and services that increase membership; categories 1, 2, 4 and portions of category 3 of Advocate and communicate for public education; Develop and sustain strategic partnerships; and portions of categories 1 - 4, 6, and 8 - 9, of Business and governance operations. Based upon these analyses, NEA determined which of its expenditures were chargeable and which were nonchargeable.

Case 8:13-cv-00676-JLS-CW Document 1 Filed 04/30/13 Page 189 of 211 Page ID #:208

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

## 2. STATE AFFILIATE DETERMINATION OF CHARGEABLE EXPENDITURES

The total chargeable and nonchargeable expenditures included in the Affiliate Financial Assistance Program (category 2 of Affiliate programs and services that increase membership), Small States Foundation Program, Unified State Executive Director Program, Local Presidents Release Time Program, and UniServ Grants Program (all in category 1 of Affiliate programs and services that increase membership), and in the Unified Legal Services Program (category 4 of Student learning and workforce quality), have been allocated based on a conservative estimate of the average chargeable percentages reported by the state affiliates for the year ended August 31, 2010. That is because, at the time of this audit, state affiliates have not yet completed their own audits for the year ended August 31, 2011. State affiliates will subsequently report their respective chargeable and nonchargeable percentages for the year ended August 31, 2011, when complete, audited information is available for them to make such determinations. Therefore, the chargeable and nonchargeable expenditures of those programs listed in this document are estimates for purposes of these schedules and will subsequently be adjusted to actual upon receipt of the chargeable and nonchargeable percentages from state affiliates.

The expenditures in category 4 of Student learning and workforce quality include amounts for Educators Employment Liability (EEL) insurance and the Attorney Referral Program (ARP), which are not provided to agency feepayers in some states. For purposes of this presentation, the EEL-related expenditures have been treated as chargeable and the ARP-related expenditures have been treated as nonchargeable; however, in the states where either the EEL insurance or ARP is not provided to agency feepayers, the expenditures will be considered nonchargeable.

## 3. OVERHEAD FUNCTIONS

The expenditures in the following Core Service Areas and Strategic Goals are considered programmatic in nature: Tax and economic policies and school funding; Improved education members' salaries; Making priority schools great public schools for all students; Student learning and workforce quality; Affiliate programs and services that increase membership; categories 1, 2, 4 and portions of category 3 of Advocate and communicate for public education; Develop and sustain strategic partnerships; and portions of categories 1, 4, 7, and 9, of Business and governance operations.

The expenditures in the following Core Service Areas are considered support or overhead: portions of category 3 of Advocate and communicate for public education; category 2, 3, 5, 6, and 8 and portions of categories 1, 4, 7, and 9 of Business and governance operations. In view of this relationship, management believes it is fair and reasonable to allocate the expenditures in the support or overhead areas by the percentage determined as chargeable for the programmatic activities, but only after specific clearly chargeable or clearly nonchargeable expenditures have been separated and treated as fully chargeable or nonchargeable, respectively.

# NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

## NOTES TO SUPPLEMENTAL SUMMARY SCHEDULES OF AGENCY FEE CHARGEABLE AND NONCHARGEABLE EXPENDITURES
## YEAR ENDED AUGUST 31, 2011

The support or overhead expenditures, which are considered clearly chargeable, are as follows:

Core Service Area 3 - Advocate and communicate for public education
3. Communicate the NEA beliefs, qualities, and services to engage members and improve target audiences' recognition of NEA through print and electronic media

| | | |
|---|---|---|
| Tactic 3.3 | RA Today | $ 413,778 |

Core Service Area 5 – Business and governance operations

1. Provide business systems, legal, and financial expertise to NEA and affiliates

| | | |
|---|---|---|
| Tactic 2.3 | Headquarters property tax payments | 1,601,661 |
| Tactic 2.5 | Internal auditing | 140,860 |
| Tactic 2.6 | Agency fee support | 109,332 |

2. Manage employee benefits and services, labor relations, and workforce costs

| | | |
|---|---|---|
| Tactic 3.1 | Workforce planning, position control | 1,763,138 |
| Tactic 3.2 | Human capital, labor relations, payroll | 3,343,755 |

3. Provide departmental infrastructure and business intelligence systems that align with NEA's strategic goals and core services

| | | |
|---|---|---|
| Tactic 4.1 | Annual meeting innovations | 19,624 |
| Tactic 4.1 | Align association strategies | 2,460 |
| Tactic 4.3 | Strategic management system | 271,880 |

4. Sustain NEA as a high-performance learning organization and archive its records for current and future generations

| | | |
|---|---|---|
| Tactic 5.1 | Strategic intent | 251,350 |
| Tactic 5.1 | G-27 | 15,810 |
| Tactic 5.2 | Strategic planning/operational review | 461,021 |
| Tactic 5.3 | Cultural tactics | 503,208 |

6. Provide facility management, operational support, and meeting logistics

| | | |
|---|---|---|
| Tactic 7.1 | Building projects | 251,490 |
| Tactic 7.2 | Facilities management, operational support | 16,114,592 |

8. Provide support to governance and the NEA policy making process

| | | |
|---|---|---|
| Tactic 9.2 | Executive committee | 1,405,805 |
| Tactic 9.3 | Board of directors | 3,702,619 |
| Tactic 9.5 | Standing committees of the RA | 988,790 |
| Tactic 9.6 | Handbook, proceedings, and minutes | 41,566 |
| Tactic 9.6 | Support organizational priorities | 544,645 |

## NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES

**NOTES TO SUPPLEMENTAL SUMMARY SCHEDULES OF AGENCY FEE
CHARGEABLE AND NONCHARGEABLE EXPENDITURES
YEAR ENDED AUGUST 31, 2011**

| | | |
|---|---|---:|
| 9. Provide members professional development and leadership training | | |
| Tactic 10.7 | Learning management system | 550,881 |
| | | 32,084,487 |

The support or overhead expenditures that are considered clearly nonchargeable are as follows:

Core Service Area 5 – Business and governance operations

| | | |
|---|---|---:|
| 1. Provide business systems, legal, and financial expertise to NEA and affiliates | | |
| Tactic 2.3 | PAC compliance systems | 276,498 |
| Tactic 2.6 | FCPE policy support services | 62,611 |
| 3. Governance capacity building, engagement and leadership development | | |
| Tactic 4.1 | Online training | 141,265 |
| Tactic 4.1 | Fulfillment services | 84,331 |
| 8. Support and sustain NEA as a high-performance learning organization | | |
| Tactic 9.2 | International travel | 45,164 |
| Tactic 9.3 | Committee on membership eligibility | 18,879 |
| Tactic 9.4 | Standing committee - legislation | 33,491 |
| Tactic 9.4 | Standing committee – student | 24,250 |
| Tactic 9.4 | Standing committee - membership | 69,852 |
| | | 756,341 |

For purposes of this schedule, the chargeable and nonchargeable expenditures of the remaining support or overhead areas are based upon a chargeable percentage figure that has been derived from the chargeable programmatic activity expenditures as they appear elsewhere in the schedule. Because, as explained in Note 2, the chargeable percentages for some programmatic activities will vary from state to state in accordance with certain specific expenditures of those state affiliates, the chargeable and nonchargeable expenditures of those remaining support or overhead areas are not final. Once NEA receives the appropriate information from the state affiliates, it will calculate a final chargeable programmatic activity percentage for each state affiliate and then use that percentage to allocate the expenditures in the remaining support or overhead areas. Consequently, new NEA total chargeable and nonchargeable expenditures will result for each state affiliate.

\* \* \* \* \*

Exhibit E



**NATIONAL EDUCATION ASSOCIATION**
**nea.org**
*Great Public Schools for Every Student*

1201 16th St., N.W.  |  Washington, DC 20036  |  Phone: (202) 833-4000

Dennis Van Roekel
*President*

Lily Eskelsen
*Vice President*

Rebecca S. Pringle
*Secretary-Treasurer*

John Stocks
*Executive Director*

August 9, 2012

California

# NATIONAL EDUCATION ASSOCIATION
# CHARGEABLE AND NONCHARGEABLE AUDITED
# EXPENDITURES FOR THE 2010-2011 FISCAL YEAR

*CHARGEABLE & NONCHARGEABLE AUDITED EXPENDITURES*
*BY CORE SERVICE AREA AND STRATEGIC GOAL CATEGORY*

## I. PROGRAMMATIC ACTIVITIES

NEA's programmatic activities are organized into 37 Strategic Goal and Core Service Categories.

### TAX AND ECONOMIC POLICIES AND SCHOOL FUNDING (TEF)

*Category 1 - Provide research and technical assistance to all state affiliates on TEF issues:* Provided research and technical assistance to state affiliate staff regarding how quality schools are related to educational funding, economic development, and taxation. Provided technical support and training on tax, economic policies and school funding.

| | |
|---|---|
| Chargeable audited expenditures.................$ | - 0 - |
| Nonchargeable audited expenditures..........$ | 2,226,918 |
| Total audited expenditures...............................$ | 2,226,918 |

*Category 2 - Provide research and technical assistance to state affiliates to build tax and economic infrastructures for adequate and equitable funding.* Provided TEF research and technical assistance to state affiliates for achieving adequate, equitable and stable funding for public education.

| | |
|---|---|
| Chargeable audited expenditures.................$ | - 0 - |
| Nonchargeable audited expenditures..........$ | 310,650 |
| Total audited expenditures...............................$ | 310,650 |

*Category 3 - Provide assistance to affiliates for implementing TEF-conscious advocacy, message development, and dissemination of TEF information*: Provided research and

technical assistance to states for implementing TEF-conscious strategies. Provided research and technical assistance to state affiliates to promote TEF policies. Created cross-platform media to mobilize around funding campaigns.

| | |
|---|---|
| Chargeable audited expenditures..................$ | - 0 - |
| Nonchargeable audited expenditures..........$ | 403,226 |
| Total audited expenditures..............................$ | 403,226 |

## IMPROVED EDUCATION MEMBERS' SALARIES

*Category 1 - Provide technical and financial support to affiliates engaged in or preparing to engage in comprehensive salary campaigns*: Created and presented training focusing on bargaining for higher compensation through living wage and salary campaigns. Conducted an Annual Salary Roundtable meeting. Provided assistance to affiliates with regard to building and mobilizing community support for better compensation. Provided financial assistance, materials, and training to affiliates in connection with bargaining strategies for increasing compensation. Provided information and technical assistance to state affiliates on such matters as career ladders, block scheduling, the impact of teacher experience on student achievement, teacher quality, and professional development resources.

| | |
|---|---|
| Chargeable audited expenditures..................$ | 1,272,396 |
| Nonchargeable audited expenditures..........$ | 401,355 |
| Total audited expenditures..............................$ | 1,673,751 |

*Category 2 – Position NEA to be the national voice for the improvement of education employees' salaries:* Marketed salary campaign-branded goods to affiliates for use in creating momentum for salary campaigns. Developed media to drive interest of members and the public around NEA salary campaign. Created a cross-platform media program that develops a sense of community among members for salary campaigns. Increased online coverage of salary campaign.

| | |
|---|---|
| Chargeable audited expenditures..................$ | 1,500 |
| Nonchargeable audited expenditures..........$ | 48,007 |
| Total audited expenditures..............................$ | 49,507 |

*Category 3 - Collect, store, analyze, and report information that supports NEA national state affiliate salary campaigns*: Populated a salary database with data on Education Support Professionals (ESPs) and higher education faculty. Produced a report on annual average starting salary and progress toward campaign goals. Provided Association Compensation Analysis Program and National Compensation Analysis Program database user support and training used in collective bargaining efforts. Held the NEA Summit on Alternative Compensation. Produced an internal report on alternative compensation models.

|  |  |
|---|---|
| Chargeable audited expenditures..................$ | 743,599 |
| Nonchargeable audited expenditure...........$ | 30,350 |
| Total audited expenditures...............................$ | 773,949 |

*Category 4 - Provide training to support the work of NEA and its affiliates to effectively advocate for professional pay for all members*: Provided training to UniServ, Regional field staff, and national office staff on salary campaigns. Updated training modules on salary campaigns. Provided message research, development, training, and delivery for salary campaigns.

|  |  |
|---|---|
| Chargeable audited expenditures..................$ | 48,661 |
| Nonchargeable audited expenditures..........$ | 358,822 |
| Total audited expenditures...............................$ | 407,483 |

### MAKING PRIORITY SCHOOLS GREAT PUBLIC SCHOOLS FOR ALL STUDENTS

*Category 1 – Provide technical assistance, training, and resources to state and local affiliates to help them identify and support targeted priority schools.* Mobilized Priority Schools Campaign (PSC) resources to support state comprehensive plans in the areas of policy, practice, capacity building, and demonstration projects. Built capacity in targeted affiliates through professional development for state leaders and staff and provided resources and technical assistance. Provided resources and technical assistance to affiliates and schools on the Keys to Excellence for Your School (KEYS) continuous school improvement program to improve student achievement in PSC targeted schools. Reviewed and produced education research studies about school improvement and information to support the KEYS indicators. Awarded grants to state affiliates to provide teachers with English Language Learner (ELL) training. Gathered and analyzed data to identify and meet the most critical information needs of targeted priority schools, including but not limited to information about closing achievement gaps, preventing dropouts, and teaching ELL students. Launched mentoring program that connects teachers in targeted high-needs schools with National Board Certified Teachers.

|  |  |
|---|---|
| Chargeable audited expenditures..................$ | 2,646,377 |
| Nonchargeable audited expenditures..........$ | 645,118 |
| Total audited expenditures...............................$ | 3,291,495 |

*Category 2 – Engage affiliates and members to support local efforts to transform priority schools while raising the awareness of the Priority Schools Campaign.* Established public engagement and family-school partnerships in support of targeted priority schools. Conducted presentations, trainings and briefings on ELLs. Identified, informed, and engaged leaders and partners within the ethnic minority communities in support of efforts to transform targeted priority schools.

|  |  |
|---|---|
| Chargeable audited expenditures..................$ | 425,283 |
| Nonchargeable audited expenditures..........$ | 579,947 |

-3-

Total audited expenditures..............................$     1,005,230

*Category 3 – Communicate with members, partners, and the public to call attention to the urgency of, common issues and best practices for, transforming priority schools.* Provided earned media, paid media, outreach, and other public relations initiatives in support of targeted priority schools. Created a media program that established and advanced the central messaging components to targeted audiences. Raised awareness of NEA's Priority Schools Campaign with elected and appointed officials to build support for the Priority Schools Campaign. Provided targeted affiliates technical support to win contract language necessary to support the Priority Schools Campaign.

Chargeable audited expenditures..................$     14,481
Nonchargeable audited expenditures..........$     1,335,944
Total audited expenditures..............................$     1,350,425

## STUDENT LEARNING AND WORKFORCE QUALITY

*Category 1 –Support Association effort to advocate for enhanced student learning and workforce quality and the advancement of NEA supported pro-public education and social justice policies*: Provided research-based information to advocate for a quality education workforce. Conducted research-based projects that identify ESP job standards and certification requirements and demonstrate positive ESP influence on quality learning. Monitored, reviewed and analyzed federal legislation and regulations on a wide variety of education-related issues. Advanced federal legislation and regulations that promote policies and practices to enhance student learning workforce quality. Advanced non-federal, NEA supported, pro-public education and social justice policies to enhance student learning and workforce quality.

Chargeable audited expenditures..................$     213,475
Nonchargeable audited expenditures..........$     763,389
Total audited expenditures..............................$     976,864

*Category 2 - Provide resources to assist affiliates build capacity to support their initiatives designed to advance pro-public education policies for student learning and workforce quality*:  Distributed grants and technical resources to develop ethnic minority leaders and improve staff skills regarding ethnic minority issues. Provided grants, information, resources, materials, and consultation regarding diversity, social justice, gay, lesbian, bisexual, transgender (GLBT), gender equity, and safe schools issues. Developed and provided specialized training for issues of concern to ESP members. Delivered training and resources on diversity, social justice, GLBT issues, safe schools, bullying and sexual harassment. Developed and implemented strategies to strengthen and enhance standards and policies for teacher preparation, licensure, and other standards for entry into teaching. Provided support for the work of the Individuals with Disabilities Education Act (IDEA) Cadre related to professional development on special education topics. Administered the Public Engagement Project (PEP) Program to assist in creating teaching and learning

conditions that lead to closing student achievement gaps and increase graduation rates. Created a professional development model to align curriculum with out-of-school experiences.

| | |
|---|---|
| Chargeable audited expenditures...................$ | 2,318,744 |
| Nonchargeable audited expenditures...........$ | 212,920 |
| Total audited expenditures ...............................$ | 2,531,664 |

*Category 3 - Partner with affiliates and others to support workforce quality designed to improve student achievement and increased graduation rates:* Helped state affiliates to deliver services to members and prospective members through existing NEA programs for teacher certification, licensure, recruitment, and other teacher quality resources. Developed and implemented national dissemination and outreach strategies for the NEA's National Board Candidate-Centered Support Guide. Engaged with ethnic minority organizations to promote and advocate for initiatives in support of culturally competent educations, improved student achievement, and increased graduation rates.

| | |
|---|---|
| Chargeable audited expenditures...................$ | 268,565 |
| Nonchargeable audited expenditures...........$ | 110,186 |
| Total audited expenditures ...............................$ | 378,751 |

*Category 4 - Provide support, research, and information to staff, members, and affiliates that improve workforce quality through improved working conditions and benefits, advocacy rights, and professional development policies:* Provided grants and technical assistance to all state affiliates related to policy and practice. Developed indicators for the Great Public Schools (GPS) criteria and established data repositories and reporting systems for state education policies and practices used for gauging the indicators. Provided technical assistance, analysis, and information to NEA governance and departments in support of their advocacy efforts for pro-public education federal policy. Awarded grants and provided technical assistance to staff in state affiliates to improve accountability frameworks. Convened a meeting of NEA state affiliate executive directors to develop an action plan for the Race to the Top (RTTT). Tracked and analyzed state and federal policy affecting the ESP workforce. Awarded grants to state affiliates to provide teachers with ELL training. Provided grants to state affiliates to help teachers improve their skills, support National Board Certification (NBC), and address various teacher quality issues. Assisted state affiliates in implementing the Teacher Working Conditions (TWC) survey initiative. Provided funding to organizations aligned with NEA's policies on testing, class size, and teaching students with learning disabilities. Promoted policy recommendations and provided policy support for the reauthorization of federal legislation, including the Elementary and Secondary Education Act (ESEA), the Individuals with Disabilities Education Act (IDEA), Head Start, Perkins Career and Technical Education Act, and the Child Nutrition Act. Supported NEA's involvement in the Partnership for 21st Century Skills (P21). Collaborated with NEA Academy and institutions of higher education to provide leadership and professional development programs that offer academic credits. Provided policy support and analysis to NEA departments for the passage of pro-public education federal legislation, including ESEA. Provided state affiliates with policy

frameworks and concepts to support school transformation. Identified quality workforce standards to support professional development and compensation improvement. Provided state affiliates information, models, and strategies resulting from NEA's work in the Priority Schools Campaign. Conducted an annual consortium on National Board Certification for state affiliates. Conducted the NEA/National Staff Association for the Improvement of Instruction (NSAII) Teaching and Learning Conference. Participated in, and provided technical support for, the National Council for the Accreditation of Teacher Education (NCATE). Sponsored the Commission of Effective Teachers and Teaching. Provided research on the relationship between teacher working conditions and student achievement, value-added evaluation methodologies, education policy debates, and chronically underperforming schools. Completed surveys on school culture, school safety and student discipline, staff satisfaction, conference evaluations, and school restructuring. Implemented enhancements to the KEYS program, including research on school improvement, technical assistance to NEA state affiliates, and conducting meeting of the KEYS Advisory Group. Paid the premium for the Educators Employment Liability Program, which provides insurance to members, and feepayers in some states, protecting them from personal financial liability when they are sued as a result of employment-related activities. Paid the premiums for and administered the Association Professional Liability Program and the Fidelity Bond Program, which provide legal and financial protection to the Association, its leaders, and its staff. Through the Unified Legal Services Program (ULSP), provided reimbursements to state affiliates for the costs of legal representation of educators in connection with challenges to their employment rights. Conducted the ULSP Coordinators' Meeting. Provided technical assistance and training on retirement benefits, bargaining, legislative, and policy issues. Developed approaches to protecting and defending public pensions and public educator retirement security. Conducted the Collective Bargaining/Research Conference. Provided technical assistance and training on health care reform implementation issues and policy.

| | |
|---|---|
| Chargeable audited expenditures...............$ | 11,860,961[1] |
| Nonchargeable audited expenditures..........$ | 37,042,424 |
| Total audited expenditures ...........................$ | 48,903,385 |

## AFFILIATE PROGRAMS AND SERVICES THAT INCREASE MEMBERSHIP

*Category 1 - Build affiliate capacity for membership growth through project funding and constituency group assistance:* Increased capacity and commitment of constituency groups to grow membership. Conducted NEA-Retired and NEA-Student National Programs. Provided assistance, financial and technological support to the Higher Education National Program. Published the 2011 Higher Education Almanac. Managed the Higher Education Contract Analysis System (HECAS) project. Delivered national skills training sessions to experienced UniServ staff. Conducted UniServ Academy Skill Development training for newly hired UniServ staff. Provided training to state and local affiliates on such matters as arbitration skills, crisis intervention, interest-based bargaining, bargaining behavior, team-building, and dispute resolution systems. Provided affiliates with financial assistance for local president release time, and provided training to local presidents on

such matters as working as a team, conflict resolution, mobilizing members for collective action, developing an emerging leaders program, and creative ways to engage members in Association activities. Administered National Education Employees Assistance Fund (NEEAF) to provide interest-free loans to education employees and other financial assistance to affiliates in crises that emerge from disputes between education employees and boards of education. Provided grants to state affiliates to help pay salaries of UniServ directors, whose primary functions consist of contract negotiation and implementation, grievance processing and representation in arbitration, administration of local affiliates, and training local leaders and other educators in bargaining and school improvement activities. Provided financial assistance to state affiliates, including through the Unified State Executive Director and Small States Foundation Programs, for the maintenance of effective business operations and organizational and program development. Provided coordination of, and assistance for, state affiliate leadership and management services. Conducted regional leadership conferences. Implemented the Affirmative Action UniServ Intern Training Program. Conducted state-based training sessions on bargaining and advocacy skills.

| | | |
|---|---|---|
| Chargeable audited expenditures | $ | 69,697,074[ii] |
| Nonchargeable audited expenditures | $ | 11,145,123 |
| Total audited expenditures | $ | 80,842,197 |

*Category 2 - Develop and administer state affiliates' cooperative agreements and provide funding for the implementation of state and regional financial assistance*: Administered the affiliate cooperative agreement process. Provided affiliate financial assistance grants for maintenance of effective business operations and programs.

| | | |
|---|---|---|
| Chargeable audited expenditures | $ | 1,181,999[iii] |
| Nonchargeable audited expenditures | $ | 546,070 |
| Total audited expenditures | $ | 1,728,069 |

*Category 3 - Create and align all NEA infrastructures to support membership growth, with special attention to UniServ, research, and technology*: Updated the NEA bullying and prevention program and help education employees create safer working conditions by reducing the instances of bullying in classrooms and schools. Conducted research on ESP earnings and demographics and the findings of the ESP survey. Developed the Data Book of K-12 and Higher Education ESP workforce with data on the composition, demographics, benefits, and earnings of the ESP workforce. Collected data to assess the impact of the current recession on employment conditions in education. Published book examining teacher working conditions, professional development, and compensation over the past 50 years and project for the future. Conduct the pilot phase of 5-year ESP member survey. Data used for organizing and collective bargaining efforts. Explore and design the methodology and survey questionnaire in preparation for the National Membership Survey of 2012. Upgraded and maintained the research database used to identify potential organizing targets and to provide salary information for collective bargaining.

| | | |
|---|---|---|
| Chargeable audited expenditures | $ | 399,220 |

| Nonchargeable audited expenditures..........$ | 368,585 |
| Total audited expenditures ..............................$ | 767,805 |

*Category 4 – Collaborate with affiliates to increase membership in existing and new markets:* Worked to grow membership in all categories by collaborating with state affiliates. Provided campaign management and technical assistance to affiliates for membership growth. Provided research, training, materials, and assistance to affiliates facing privatization of ESP members' jobs. Provide campaign management and technical assistance to affiliates that require crisis assistance, and explored organizing possibilities. Provided training and materials to assist with organizing political action committee (PAC) contributions as part of membership growth campaigns. Developed resources and materials to support integrated issue campaigns and monitor activities and messaging of anti-union competitor organizations. Increase membership of ethnic minorities and women, including members in public schools on Indian reservations, and Higher Education members in minority-serving institutions by utilizing Minority Leadership Training (MLT) and Women's Leadership Training (WLT) trainees as recruiters in targeted state affiliate campaigns.

| Chargeable audited expenditures..................$ | 20,467 |
| Nonchargeable audited expenditures..........$ | 8,349,245 |
| Total audited expenditures ..............................$ | 8,369,712 |

## ADVOCATE AND COMMUNICATE FOR PUBLIC EDUCATION

*Category 1 - Increase member support of pro-education candidates and increase public communications and advocacy for association political and legislative programs:* Developed a political program to build support among NEA members for pro-public education candidates from both major parties. Assisted state affiliates in efforts to assess the positions of their members on candidates and education issues. Collaborated with state associations on plans to educate, organize, mobilize, and turn out members and their households in state and federal elections. Built and strengthened coalitions, donor collaborations, and independent communication tables to increase capacity for public communications through independent expenditures and issue advocacy. Provided state affiliates with financial assistance to advance public support for pro-education ballot measures, defeat anti-public education ballot measures, and urge passage or defeat of state education legislation. Coordinated the operation of the NEA Fund for Children and Public Education, NEA's PAC, which is funded exclusively from voluntary member contributions, and engaged members to increase PAC contributions.

| Chargeable audited expenditures..................$ | - 0 - |
| Nonchargeable audited expenditures..........$ | 26,110,033 |
| Total audited expenditures ..............................$ | 26,110,033 |

*Category 2 - Increase pro-public education advocacy and develop relationships with the federal government to advance NEA's pro-public education agenda:* Advocated and

passed pro-public education and social justice legislation and policies, and increased the frequency of advocacy with targeted public and elected officials. Developed, coordinated and maintained a partnership with the White House and the executive branch to best advance NEA's pro-public education agenda. Promoted NEA's federal legislative agenda through a bipartisan lobbying program and grassroots mobilization. Partnered with other national organizations to lobby Congress and the executive branch in support of public education and NEA's priorities. Maintained and expanded communications with NEA members and affiliate staff and leaders with regard to legislative and political issues.

Chargeable audited expenditures.................$ - 0 -
Nonchargeable audited expenditures..........$ 12,347,623
Total audited expenditures..............................$ 12,347,623

*Category 3 - Communicate the NEA beliefs, qualities, and services to engage members and improve target audiences' recognition of NEA through print and electronic media:* Informed NEA's affiliates, leaders, members, and agency feepayers about Association policies, programs, and accomplishments through an internal network of printed publications, including *NEA TODAY* and specialized constituency periodicals. Created multi-platform to publicize and advance NEA's high-profile work. Created multimedia programs that advance the membership goals in targeted campaigns. Implement public relations activities that support NEA efforts to advocate for public education. Administered the NEA State Affiliate Advertising Assistance Grant program.

Chargeable audited expenditures.................$    478,391
Nonchargeable audited expenditures..........$ 15,070,844
Total audited expenditures..............................$ 15,549,235

*Category 4 - Increase the capacity of NEA governance, members, and staff to advocate for all members through a greater use of campaign tools and resources and partner with affiliates to increase PAC participation:* Conducted staff, governance, and member political organizing trainings. Increased support for NEA's legislative agenda among our members running for, or elected to, local, state, or national political offices. Provide training to leaders and members in venues for constituency groups, UniServ Managers Association, Higher Education faculty, and staff. Tracked state legislation. Increased affiliates' ability to meet PAC fundraising goals through training, capacity-building programs, and online fundraising. Supported the PAC Council and administered contributions to recommended candidates. Created and maintained a system for all state affiliates that would support regular reporting and tracking of activities. Engaged members and the public in social media to promote advocacy of NEA supported issues and/or candidates.

Chargeable audited expenditures.................$    130,849
Nonchargeable audited expenditures..........$  2,724,409
Total audited expenditures..............................$  2,855,258

## DEVELOP AND SUSTAIN STRATEGIC PARTNERSHIPS

*Category 1 - Advance NEA's mission, vision, goals, and core values with Education International and other international organizations and partners* Managed international outreach to NEA leaders and members, international advocacy, and policy input with international bodies.

| | |
|---|---|
| Chargeable audited expenditures.................$ | - 0 - |
| Nonchargeable audited expenditures..........$ | 5,083,348 |
| Total audited expenditures.............................$ | 5,083,348 |

*Category 2 - Engage national, state and local partners to support effective transformation of priority schools and provide assistance to locals for partnership development:* Assisted efforts to transform NEA's targeted priority schools through partnership engagement and development. Collaborated with parental involvement organizations to promote NEA's Priority Schools parental involvement efforts. Assisted affiliates requesting assistance in building state and local partnerships with the ethnic minority community that support NEA's PSC.

| | |
|---|---|
| Chargeable audited expenditures.................$ | 17,382 |
| Nonchargeable audited expenditures..........$ | 134,427 |
| Total audited expenditures.............................$ | 151,809 |

*Category 3 - Assist state affiliates in identifying partners and provide resources to strengthen coalitions and mobilize public policy and support for TEF:* Provided technical assistance to state affiliates in identifying partners and provided resources to strengthen state-based coalitions to mobilize TEF support

| | |
|---|---|
| Chargeable audited expenditures.................$ | - 0 - |
| Nonchargeable audited expenditures..........$ | 176,802 |
| Total audited expenditures.............................$ | 176,802 |

*Category 4 - Partner with business and nonprofit leaders to support the Salary Campaign:* Research, identify, and develop partnerships with leaders from corporations/business and nonprofit organizations who will support the state affiliates salary/living wage campaigns and monitor and report on their supportive involvement.

| | |
|---|---|
| Chargeable audited expenditures.................$ | - 0 - |
| Nonchargeable audited expenditures..........$ | 66,991 |
| Total audited expenditures.............................$ | 66,991 |

*Category 5 - Partner with organizations to inform and advance NEA's workforce quality agenda and promote healthy teaching and learning environments:* Partnered with other national organizations to enhance professional development opportunities and influence federal policy related to ESP quality. Supported and advance NEA's initiatives for green school working environments. Sustained partnerships with minority-serving

institutions to increase the pool of ethnic minority educators. Developed and sustained active partnerships to advance NEA's workforce quality agenda related to teacher accreditation, preparation, licensure, professional development, and other teacher quality interests. Provided financial support to NEA Health Information Network to promote the health of students, staff, members, and a healthy environment.

Chargeable audited expenditures...................$ 888,868
Nonchargeable audited expenditures..........$ 253,591
Total audited expenditures..............................$ 1,142,459

*Category 6 - Develop partnerships that advance and achieve NEA's federal and regulatory policy priorities including funding to implement these priorities:* Developed and sustained partnerships with ethnic minority and civil rights organizations to engage with them on key federal education policy.

Chargeable audited expenditures...................$ - 0 -
Nonchargeable audited expenditures..........$ 133,318
Total audited expenditures..............................$ 133,318

*Category 7 – Partner with ethnic minority, civil rights, and other organizations to advance NEA's commitment to social justice:* Partnered with organizations to advance NEA's agenda related to English-language learner (ELL) students. Partnered with women, ethnic minority and GLBT organizations to advance NEA's policies on workplace equity.

Chargeable audited expenditures...................$ 93,536
Nonchargeable audited expenditures..........$ 160,882
Total audited expenditures..............................$ 254,418

*Category 8 – Partner with business community and other organizations to ensure that public schools receive the resources required to prepare students for success in the 21st century:* Identified potential opportunities to coordinate with businesses, ethnic minority leaders, and philanthropic partners to support of NEA goals.

Chargeable audited expenditures...................$ - 0 -
Nonchargeable audited expenditures..........$ 98,527
Total audited expenditures..............................$ 98,527

*Category 9 – Develop national partnerships that support state affiliates in building and maintaining their capacity to achieve NEA priority policy goals at the state level:* Assisted state affiliates in developing partnerships with state-based education, civil rights, ethnic minority, business, and other advocacy groups to promote NEA's political program, public education priorities, and civic engagement goals.

Chargeable audited expenditures...................$ - 0 -
Nonchargeable audited expenditures..........$ 184,450
Total audited expenditures..............................$ 184,450

-11-

*Category 10 – Develop national partnerships that result in increased support for union membership, the recruitment and retention of NEA members, and minimized inter-union competition*: Participated in the National Classified Education Support Employee Unions (NCESEU) to position NEA as the ESP industry leader servicing ESP members. Sustained partnerships, jurisdictional agreements, and joint organizing efforts with other labor organizations.

| | | |
|---|---|---|
| Chargeable audited expenditures..................$ | - 0 - |
| Nonchargeable audited expenditures..........$ | 76,624 |
| Total audited expenditures ..............................$ | 76,624 |

*Category 11 – Develop, sustain, and leverage strategic alliances to advance NEA's core values and strategic priorities around partnerships:* Monitor organizations whose priorities contradict those of NEA. Built and sustained strategic alliances with businesses, education organizations, and child advocacy, progressive advocacy, and faith-based communities to advance NEA's strategic goals. Developed strategic engagement with selected education research think tanks and academic forums focused on public school reform and closing the achievement gaps.

| | | |
|---|---|---|
| Chargeable audited expenditures..................$ | - 0 - |
| Nonchargeable audited expenditures..........$ | 3,869,146 |
| Total audited expenditures ..............................$ | 3,869,146 |

## BUSINESS AND GOVERNANCE OPERATIONS

*Category 1 – Provide business systems, legal and financial expertise to NEA and affiliates*: Positioned NEA's school improvement program (KEYS) and its related products and services as a potential non-dues revenue generating resource. Collected and analyzed teacher salary data for use in NEA dues calculation. Developed earnings estimates, profiles, and membership distribution. Updated and maintained the school-rankings databases.

| | | |
|---|---|---|
| Chargeable audited expenditures..................$ | 116,561 |
| Nonchargeable audited expenditures..........$ | 450,864 |
| Total audited expenditures ..............................$ | 567,425 |

*Category 4 – Sustain NEA as a high performing learning organization*: Supported the alignment, integration, and sustainment of state affiliates.

| | | |
|---|---|---|
| Chargeable audited expenditures..................$ | - 0 - |
| Nonchargeable audited expenditures..........$ | 7,645,986 |
| Total audited expenditures ..............................$ | 7,645,986 |

*Category 7 – Provide administrative and financial assistance to the national councils and constituency groups*: Provided assistance to National Council of Urban Education,

National Council for Higher Education, National Council for Education Support Professionals, NEA-Retired, and Student Programs.

| | |
|---|---|
| Chargeable audited expenditures.................$ | - 0 - |
| Nonchargeable audited expenditures.........$ | 597,901 |
| Total audited expenditures ..............................$ | 597,901 |

*Category 9 – Provide members professional development and leadership training*: Provided training to ESP participants that develops minority leaders, increases awareness of diversity issues, and increases capacity to lead in adverse environments. Conducted Minority Leadership Training and Women's Leadership Training conferences and seminars. Conducted Student Leadership Conference, NEA-Retired Conference, Higher Education Emerging Leaders Academy, and the ESP Leaders for Tomorrow training. Provides information and training for Students, Retired, UniServ Managers Association, and Higher Education faculty and staff on legislative efforts. Provided support to state affiliates through the coordination of National Council of State Education Associations (NCSEA) and implementation of executive leadership training. Held annual Human and Civil Rights Awards dinner that recognizes the accomplishments and issues of women, minorities, and GLBT. Conducted annual NEA Joint Conference on Concerns of Minorities and Women and the Ethnic Leaders Meeting to address current trends and applications relating to women and minority issues.

| | |
|---|---|
| Chargeable audited expenditures..................$ | 4,603,828 |
| Nonchargeable audited expenditures.........$ | 3,190,906 |
| Total audited expenditures ..............................$ | 7,794,734 |

## PROGRAMMATIC ACTIVITY SUMMARY

Total Programmatic Activity Chargeable Audited Expenditures .......$ 97,442,217

Total Programmatic Activity Nonchargeable Audited Expenditures $ 143,254,951

Total Programmatic Activity Expenditures ...................................................$ 240,697,168

Programmatic Activity Chargeable Percentage ..........................................40.48%

Programmatic Activity Nonchargeable Percentage..................................59.52%

# II. SUPPORT/OVERHEAD

NEA's Support and Overhead Activities are organized into 9 Core Service Areas.[iv]

## ADVOCATE AND COMMUNICATE FOR PUBLIC EDUCATION

*Core Service Area # 3-3 (Tactics 3.1-3.3)*: Provided video and audio products for NEA departments, affiliates, and the general public. Maintained NEA Interactive, the Association's Web product for members, affiliates, and the general public. Produced media packages designed to increase public and member interaction with NEA via print and the Web. Through various converged media packages, generated greater visibility among the public and membership for NEA's work. Published *RA Today* for NEA Annual Meeting and Representative Assembly (RA).

| | |
|---|---|
| Chargeable audited expenditures.................$ | 1,844,850 |
| Nonchargeable audited expenditures..........$ | 2,104,184 |
| Total audited expenditures.............................$ | 3,949,034 |

## BUSINESS AND GOVERNANCE OPERATIONS

*Core Service Area #5-1 (Tactics 1.2-1.7)*: Provided payment of the headquarters building mortgage (incurred in connection with building renovation to address health and safety concerns) and property taxes. Coordinated NEA's agency fee procedures. Conducted internal auditing functions. Provided accounting functions for NEA, including compliance with federal and local regulations involving NEA's status as a not-for-profit labor organization and as an employer. Administered NEA's banking and investment activities and a computer-based accounting system for its affiliates. Coordinated business management, membership information, and financial systems support for state affiliates. Provided legal and accounting services to NEA's political action committee (PAC), as well as to the PACs of some of its affiliates. Provided membership information that enables the collection of dues, and the verification of membership and analysis of membership trends. Conducted a management user group meeting that addressed topics such as accounting and income tax issues, business consolidations, and financial analysis tools. Provided legal assistance and representation to NEA's officers, staff, affiliates, and political action committee through the Office of General Counsel. Planned and conducted the annual meeting of attorneys representing NEA and its affiliates.

| | |
|---|---|
| Chargeable audited expenditures.................$ | 8,977,529 |
| Nonchargeable audited expenditures..........$ | 10,816,390 |
| Total audited expenditures.............................$ | 19,793,919 |

*Core Service Area #5-2 (Tactics 2.1-2.2)*: Administered contracts with representatives of NEA staff unions. Developed and administered personnel policies, employee health, wellness and benefits programs, and problem identification and resolution procedures regarding relations with staff. Maintained a system for recruiting, selecting, and orienting new employees. Maintained a systematic staff professional development program. Coordinated implementation of a program assessment process to measure and evaluate the effectiveness of NEA's program, staff, and financial allocations.

| | |
|---|---|
| Chargeable audited expenditures..................$ | 5,106,893 |
| Nonchargeable audited expenditures..........$ | - 0 - |
| Total audited expenditures..............................$ | 5,106,893 |

*Core Service Area #5-3 (Tactics 3.1-3.3)*: Administered the program assessment process to measure and evaluate the effectiveness of NEA's program, staff, and financial allocations. Aligned department plans with NEA's mission and maintained the strategic management system. Provided employee wellness program. Provided for NEA's management and integration. Created and implemented staff professional development strategy. Established and implemented long-term organizational and business strategy. Implemented strategic learning system strategy.

| | |
|---|---|
| Chargeable audited expenditures..................$ | 13,796,714 |
| Nonchargeable audited expenditures..........$ | 20,079,443 |
| Total audited expenditures ..............................$ | 33,876,157 |

*Core Service Area #5-4 (Tactics 4.1-4.4)*: Advanced NEA's strategic intent. Facilitated the development of NEA strategy and operations. Implemented workplace culture initiative. Maintained NEA records archives.

| | |
|---|---|
| Chargeable audited expenditures..................$ | 1,466,742 |
| Nonchargeable audited expenditures..........$ | 346,052 |
| Total audited expenditures..............................$ | 1,812,794 |

*Core Service Area #5-5 (Tactics 5.1-5.3)*: Supported and maintained current Web-enabled Association foundation computer applications, NEA's local area network and the wide-area networks that it shares with affiliates, NEA's Web site, computer technical support, disaster recovery and business continuity plans, and other internal data and technology operations. Provided policy development and support for strategic, tactical, and operational planning of Association technology.

| | |
|---|---|
| Chargeable audited expenditures..................$ | 8,276,964 |
| Nonchargeable audited expenditures..........$ | 12,170,081 |
| Total audited expenditures..............................$ | 20,447,045 |

*Core Service Area #5-6 (Tactics 6.1-6.2)*: Provided for administration, management, and maintenance of the property of NEA's headquarters and regional offices, including casualty and liability insurance. Administered building projects to improve infrastructure. Administered NEA's printing, graphic design, and multimedia services, as well as its procurement services, telephone services, and the receipt and distribution of mail. Provided logistical support for NEA-sponsored meetings throughout the country, and for governance and staff travel.

| | |
|---|---|
| Chargeable audited expenditures..................$ | 16,366,082 |
| Nonchargeable audited expenditures..........$ | - 0 - |
| Total audited expenditures..............................$ | 16,366,082 |

*Core Service Area #5-8 (Tactics 8.1 – 8.5)*: Provided for operation of NEA Annual Meeting, including Representative Assembly (RA). Provided support for RA Standing Committee meetings and their activities in connection with NEA policy documents. Provided for operation of NEA Board of Directors, Executive Committee (and Executive Officers), and other governance bodies. Published organizational handbook, as well as minutes and proceedings of governance meetings. Provided governance and policy coordination in support of policymaking, reports on governance actions, communications of Association policies, and staff support for policy planning, development, and implementation by NEA officers, Executive Director, Board of Directors, Executive Committee, RA, and governance committees.

| | |
|---|---|
| Chargeable audited expenditures..................$ | 7,835,176 |
| Nonchargeable audited expenditures..........$ | 1,885,120 |
| Total audited expenditures..............................$ | 9,720,296 |

*Core Service Area #5-9 (Tactic 9.7)*: Provided learning opportunities through the Leadership Institute that enhance NEA staff's professional skills and contribute to high performance.

| | |
|---|---|
| Chargeable audited expenditures..................$ | 550,881 |
| Nonchargeable audited expenditures..........$ | -0- |
| Total audited expenditures..............................$ | 550,881 |

**SUPPORT/OVERHEAD SUMMARY**

Total Support/Overhead Chargeable Audited Expenditures...............$ 64,221,831

Total Support/Overhead Nonchargeable Audited Expenditures........$ 47,401,270

Total Support/Overhead Audited Expenditures .......................................$ 111,623,101

# III. OVERALL ANALYSIS OF NEA AUDITED EXPENDITURES

Total Chargeable Audited Expenditures........................................................$ 161,664,048

Total Nonchargeable Audited Expenditures.............................................$ 190,656,221

Total Audited Expenditures............................................................................$ 352,320,269

Final Chargeable Percentage .................................................................................. 45.89%

Final Nonchargeable Percentage ........................................................................ 54.11%

---

[i] In light of the U.S. Supreme Court's decisions in *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507 (1991), and *Locke v. Karass*, 555 U.S. 207 (2009), which recognized that "part of a local's affiliation fee which contributes to the pool of resources potentially available to the local is assessed for the bargaining unit's protection, even if it is not actually expended on that unit in any particular membership year," NEA has allocated its Unified Legal Services Program ("ULSP") reimbursements, Tactic 4.14, on the basis of the California Teachers Association's ("CTACTA's") determination of the chargeable percentage of the reimbursements it received in the 2010-2011 fiscal year (20.60%). Thus, the resulting ULSP chargeable amount is $5,153,282. This figure differs from the ULSP chargeable amount used for purposes of the chargeable/ nonchargeable schedule included in the NEA audit, $17,761,312, because the amount in the audit was based upon a conservative adjustment of the average chargeable percentage of ULSP reimbursements to agency fee state affiliates for the year ended August 31, 2010. That percentage was 71%. NEA used this method because, at the time its audit was conducted, most of those state affiliates had not yet determined their fiscal year 2010-2011 chargeable percentages. In addition, for purposes of the NEA audit, Educators Employment Liability (EEL) insurance expenditures Tactic 4.13, were treated as chargeable. However, CTA does not make EEL coverage available to agency feepayers, and therefore all such expenditures ($10,683,952) have been treated as nonchargeable with regard to CTA. Thus, the resulting chargeable total for Category 4 of Student Learning and Workforce Quality is $11,860,961, as compared with $35,152,943 in the NEA audit.

[ii] In light of the decisions in *Lehnert* and *Locke*, *see* note i, NEA has allocated its UniServ grants program expenditures, part of Tactic 1.2, on the basis of the CTA's determination of the chargeable percentage of the grants it received in the 2010-2011 fiscal year (94.50%). Thus, the resulting UniServ chargeable amount is $63,168,639, rather than $58,823,706 that was used for purposes of the NEA audit. The reason for the difference between the new figure for this program and its counterpart in the NEA audit is that, at the time the audit was conducted, most of the agency fee state affiliates had not yet determined their fiscal year 2010-2011 chargeable percentages. Accordingly, for purposes of the audit, the expenditures in the UniServ grants program were allocated using a conservative adjustment of the average chargeable percentage of UniServ grants to agency fee state affiliates for the year ended August 31, 2010 (88%).

In addition, NEA has allocated its expenditures in the Small States Foundation Program, part of Tactic 1.2, in accordance with CTA's determination of the overall chargeable percentage of its total expenditures for the 2010-2011 fiscal year (68.40%), resulting in a chargeable amount of $1,991,192, rather than $2,183,325 that was used for purposes of the NEA audit. The reason for the difference between the new figure for this

-17-

program and its counterpart in the NEA audit is that, at the time the audit was conducted, most of the agency fee state affiliates had not yet determined their fiscal year 2010-2011 chargeable percentages. Accordingly, for purposes of the audit, the expenditures in the Small States Foundation program were allocated using a conservative adjustment of the average chargeable percentage of agency fee state affiliates' total expenditures for the year ended August 31, 2010 (75%).

Similarly, NEA allocated its expenditures in the Unified State Executive Director Program ("USEDP"), part of Tactic 1.2, in accordance with CTA's determination of the chargeable percentage of its executive director's salary and benefits for the 2010-2011 fiscal year (68.40%), resulting in a chargeable amount of $646,122, as compared with $689,575 that was used for purposes of the NEA audit. Again, the reason for the difference between the new figure and its counterpart in the NEA audit is that, at the time the audit was conducted, most of the agency fee state affiliates had not yet determined their fiscal year 2010-2011 percentages. Accordingly, for purposes of the audit, the expenditures in the USEDP were allocated using a conservative adjustment of the average chargeable percentage of expenditures for the salary and benefits of agency fee state affiliate executive directors for the year ended August 31, 2010 (73%).

Finally, since the agency fee locals affiliated with CTA have allocated their 2010-11 expenditures into chargeable and nonchargeable categories, NEA is allocating its expenditures in the Local Presidents Release Program, part of Tactic 1.2, by the average chargeable percentage (80.00%) reported by those locals, resulting in a chargeable amount of $389,892, as compared with $385,018 that was used for purposes of the NEA audit. The reason for the difference between the new figure for this program and its counterpart in the NEA audit is that, at the time the audit was conducted, most of the agency fee affiliates had not yet determined their fiscal year 2010-2011 chargeable percentages. Accordingly, for purposes of the audit, the expenditures in the Local Presidents Release Program were allocated using a conservative adjustment of the average chargeable percentage of agency fee local affiliates' total expenditures for the fiscal year ended August 31, 2010 (79%).

As a result of these modifications to the allocation of expenditures in the UniServ grants, Small States Foundation, USEDP, and Local Presidents Release Programs, the total chargeable amount for Category 1 of Affiliate Programs and Services that Increase Membership is $69,697,074, as compared with $65,582,853 in the NEA audit.

[iii] In light of the decisions in *Lehnert* and *Locke*, *see* note i, NEA has allocated its expenditures in the Affiliate Financial Assistance Program, Tactic 2.1, in accordance with CTA's determination of the overall chargeable percentage of its total expenditures for the 2010-11 fiscal year (68.40%), resulting in a chargeable amount of $1,181,999, rather than the amount of $1,296,052 that was used for purposes of the NEA audit. The reason for the difference between the new figure for this program and its counterpart in the NEA audit is that, at the time the audit was conducted, most of the agency fee state affiliates had not yet determined their fiscal year 2010-2011 chargeable percentages. Accordingly, for purposes

-18-

of the audit, the expenditures in the Affiliate Financial Assistance Program were allocated using a conservative adjustment of the average chargeable percentage of agency fee state affiliates' total expenditures for the year ended August 31, 2010 (75%).  As a result of these modifications to the allocation of expenditures in the Affiliate Financial Assistance Program, the total chargeable amount for Category 2 of Affiliate Programs and Services that Increase Membership is $1,181,999, as compared with $1,296,052 in the NEA audit.

[iv] As a result of the adjustments in the programmatic activities, *see* notes i through iii, the Programmatic Activity Chargeable Percentage is 40.48% as compared with 48.5% that was in the NEA audit.  Therefore, for purposes of these calculations, the figure 40.48% was used to allocate certain expenditures in the Support/Overhead activities in accordance with the procedure discussed in footnote 3 on pages 44-46 of the NEA audit.